## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦

JEFFREY D. HILL,

   Plaintiff,

  vs.

~~NEW CASTLE COUNTY POLICE DEPARTMENT, a division of New Castle County; and~~ NEW CASTLE COUNTY, a municipal corporation, <ins>SGT. ANDREA HYDEN, in her individual capacity; CAPT. MARK HITCH in his individual capacity; and CAPT. QUINTON WATSON, in his individual capacity,</ins>

   Defendants.

♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦♦

C.A. No. 07-228 (GMS)

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

### INTRODUCTION

1. Plaintiff Corporal Jeffrey D. Hill ("Plaintiff" or "Cpl. Hill"), resides at 670 Port Penn Road, Middletown, Delaware 19709. He is a male employee of the New Castle County Police Department and has been so employed since September 28, 1992. At all times material hereto, he has been a diligent, honest and loyal employee who always performs his job in a satisfactory to exemplary manner.

~~2. Defendant New Castle County Police Department ("NCCPD") is a division of New Castle County, a municipal corporation under the laws of the State of Delaware, and Plaintiff's~~

~~employer. NCCPD is subject to service through the New Castle County Government Center, 87~~
~~Reads Way, New Castle, DE 19720.~~

2.      Defendant New Castle County ("NCC") is a municipal corporation under the laws of
the State of Delaware, and Plaintiff's employer. NCC is subject to service through the New Castle
County Government Center, 87 Reads Way, New Castle, DE 19720.

3.      Defendant Sergeant Andrea Nicole Hyden ("Sgt. Hyden") was at all times relevant to
this case the Sergeant of the New Castle County Police Department's Mounted Unit. She is sued in
her individual and official capacities for discriminatory and retaliatory actions taken against Plaintiff.
Sgt. Hyden is subject to service through the New Castle County Government Center, 87 Reads Way,
New Castle, DE 19720.

4.      Defendant Captain Mark Hitch ("Capt. Hitch") was a Captain for the New Castle
County Police Department. He is sued in his individual and official capacities for retaliatory actions
taken against Plaintiff. Capt. Hitch is subject to service through the New Castle County Government
Center, 87 Reads Way, New Castle, DE 19720.

5.      Defendant Captain Quinton Watson ("Capt. Watson") was a Captain for the New
Castle County Police Department. He is sued in his individual and official capacities for retaliatory
actions taken against Plaintiff. Capt. Watson is subject to service through the New Castle County
Government Center, 87 Reads Way, New Castle, DE 19720.

## JURISDICTION

6.      This action for injunctive relief and damages is brought pursuant to Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. This Court has jurisdiction of this

14.    The Mounted Unit's primary functions are to participate in demonstrations such as parades, perform tactical work such as patrolling high crime neighborhoods, maintain crowd control and conduct terrain searches; all on horseback.

15.    The Mounted Unit is a very prestigious unit within the NCCPD.

16.    It is prestigious because the officers are permitted to work on horseback, get to work with animals, make various public relations appearances, appear in parades, participate in photo shoots, compete in horseback competitions, work primarily day shift, and in general are held in high esteem by other police officers not employed in the Mounted Unit.

17.    Throughout Cpl. Hill's tenure with the Mounted Unit, Corporal Darla Hoff ("Cpl. Hoff") received more favorable treatment from the commanding officer of the Mounted Unit, Sergeant ~~Andrea Nicole~~ Hyden ~~("Sgt. Hyden")~~, than did Cpl. Hill and the other male officers in the Mounted Unit.

18.    Cpl. Hoff is a female member of the Mounted Unit and close personal friend of Sgt. Hyden.

19.    The following are examples of Cpl. Hoff receiving more favorable treatment than Cpl. Hill and the other male officers:

        a.    At one point the Mounted Unit received a donation of a very attractive show horse named Misty. Sgt. Hyden assigned the horse to Cpl. Hoff without asking any of the male officers if they wanted the horse assigned to them;

        b.    There was an incident where Cpl. Hill could not use the horse assigned to him for a competition because the horse's coat was discolored. As a result, he spent a lot of time training another horse, Tonka, who up to that point had very little

4

training. After the competition and after Tonka had been properly trained, Cpl. Hill requested that he continue to be permitted to work with Tonka. Sgt. Hyden denied this request and assigned Tonka, now newly trained, to Cpl. Hoff;

c. Sgt. Hyden would often offer last minute over time (paid ~~and~~ at 1.5 times her normal rate) to Cpl. Hoff that was not offered to the other male officers in the Mounted Unit thereby increasing Cpl. Hoff's income;

d. Sgt. Hyden also decided to have a contest at one point and award two compensation days to the officer who produced the most statistics (traffic tickets etc). However, the contest did not run from the announcement of the contest forward; it ran back in time for a month when Cpl. Hoff was injured and permitted to patrol in a car instead of on horseback. Logistically it is much easier for an officer to achieve higher statistics when patrolling in a car than on horseback. In essence, Sgt. Hyden announced the "contest" and then in the next breath announced that the winner of this "contest" was Cpl. Hoff. Several of the male officers believed that Cpl. Hoff merely needed two days off and this was Sgt. Hyden's way of giving them to her. However, none of the male officers were the recipients of such predetermined "contest" prizes;

e. It is a Mounted Unit policy for officers injured either on the job or at home to be required go to report to Omega Health Care for any injury sustained. The reason for this is because any serious injury may impede that officer's ability to ride a horse and may require that the injured officer be transferred out of the Mounted Unit if such an injury is sustained. Cpl. Hoff was injured after she fell down her

5

steps. However, Sgt. Hyden permitted Cpl. Hoff to continue working in the Mounted Unit without being examined at Omega;

f.   Cpl. Hoff sustained an injury another time and like the incident described above, was not required to go to Omega. While working with the other officers in the Mounted Unit, she stated that her doctor said that she should not be riding. It was not until Capt. Settings caught wind of her injury and actually called Sgt. Hyden and asked what was going on with Cpl. Hoff's injury that Sgt. Hyden finally sent Cpl. Hoff to Omega;

g.   Finally, due to their close personal relationship, the communication lines between Sgt. Hyden and Cpl. Hoff were much more open than with the male officers and Cpl. Hoff had much more access to Sgt. Hyden during non-business hours.

### b.  **Calibration of Radar Units**

20.    Cpl. Hill encountered no problems in his capacity as an officer in the Mounted Unit and received high marks on his performance evaluations until December 2004.

21.    At that time, Sgt. Hyden went on vacation and Cpl. Hill filled in as acting Sergeant, as he possessed the most seniority of the members of the Mounted Unit.

22.    Prior to Sgt. Hyden's vacation, two radar units were scheduled for calibration for the time period when Sgt. Hyden would be on vacation. As acting Sergeant, Cpl. Hill carried through with the calibrations as scheduled. His decision was based on the fact that the units must be calibrated once per year and the company who performs the calibrations only conducts such calibrations at the NCCPD once per month. In other words, if the calibrations are not conducted in a

6

timely manner, the information generated by the units may be tainted resulting in an inability to utilize this information at trial.

23.    Upon information and belief, prior to going on vacation, Sgt Hyden instructed Cpl. Hoff to contact her regarding actions taken by Cpl. Hill as acting Sergeant, despite the fact that Cpl. Hill was acting as Cpl. Hoff's senior officer.

24.    The same day that the calibrations were performed, upon information and belief, Cpl. Hoff contacted Sgt. Hyden and notified her that Cpl. Hill approved the calibrations of these radar units. Following her call to Sgt. Hyden, Cpl. Hoff approached Cpl. Hill and told him that Sgt. Hyden wanted him to telephone her at home immediately. During this conversation, Sgt. Hyden expressed ~~expressing~~ her anger and displeasure with Cpl. Hill's decision to have the radar units calibrated, at times raising her voice. She instructed Cpl. Hill to hold the entire unit over after hours for a meeting with her.

25.    During this meeting with the entire Mounted Unit, Sgt. Hyden verbally reprimanded Cpl. Hill in front of all members of the Unit.

26.    Sgt. Hyden did not verbally reprimand Cpl. Hoff in front of the other members of the Unit.

27.    This reprimand was an attempt to discredit Cpl. Hill as acting Sergeant and to humiliate him in front of his colleagues.

28.    Sgt. Hyden then held a private meeting with Cpl. Hill again reprimanding him for going forward with the calibrations. Cpl. Hill explained that the calibrations were previously scheduled and that he believed that it was the correct decision to go forward with the calibrations given the need to keep the units calibrated on a timely basis. Furthermore, the calibrations took only

7

a short period of time and only required his and one other officer's presence thereby freeing up the other members of the Mounted Unit for patrol duties.

29.    Upon information and belief, Sgt. Hyden's anger over this very minor issue is attributable to her feeling threatened by a male performing her job.

### c.  Sgt. Hyden's Comment to Cpl. Hill: "You should know, you spend enough time under [Capt. Settings'] desk"

30.    Sometime during the spring of 2005, Sgt Hyden asked Cpl. Hill to relay mail to Capt. Settings' office at the main headquarters for the NCCPD.

31.    Cpl. Hill, unaware of where Capt. Settings' office was located, asked Sgt. Hyden for the location. Sgt. Hyden responded "you [meaning Cpl. Hill] should know; you spend enough time under his [meaning Capt. Settings'] desk."

32.    Sgt Hyden's statement implied that Cpl. Hill performed oral sex on Capt. Settings in order to receive favorable treatment from Capt. Settings.

33.    Sgt. Hyden made no similar statements to Cpl. Hoff, the only other female officer in the Mounted Unit.

### d.  Cpl. Hoff Takes Over as Acting Sergeant

34.    As the senior member of the Mounted Unit, anytime that Sgt. Hyden was absent from the unit, Cpl. Hill should have been named acting Sergeant.

35.    However, in July of 2005, Sgt. Hyden again left for vacation, but this time, Sgt. Hyden named Cpl. Hoff, a female officer with less seniority than Cpl. Hill, as acting Sergeant.

8

36.    No explanation was ever given to Cpl. Hill as to why he was passed over to serve as acting sergeant.

### e.  Cpl. Hill Wins Awards at Competition

37.    In October 2005, the Mounted Unit, including Cpl. Hill, Cpl. Hoff and Sgt Hyden, traveled to Virginia Beach to participate in the 22nd National Police Equestrian Competition.

38.    This competition consisted of three phases: 1) the uniform and mount; 2) equitation1/riding ability; and 3) obstacle course.

39.    Cpl. Hill earned first place in the uniform and mount phases and second place in the equitation/riding ability phase. Given the fact that mounted units from across the United States and Canada participated in this competition, Cpl. Hill's performance was exceptional and reflected very well on the New Castle County Police Department.

40.    Following his receipt of these awards, the entire unit, except the two female members, Sgt. Hyden and Cpl. Hoff, congratulated Cpl. Hill for his accomplishments.

41.    Instead, Sgt. Hyden and Cpl. Hoff, turned their backs to their colleague and teammate, Cpl. Hill, and walked away.

42.    Sgt. Hyden was angry that a male officer with much less experience riding and showing horses had scored higher than she at the competition.

### f.  Sgt. Hyden Jealous Over Cpl. Hill's Performance

---

1 The art of riding on horseback; horsemanship.

9

43.    The day after the Mounted Unit returned to Delaware from the competition, Sgt. Hyden summonsed Cpl. Hill to her office. During this meeting, Sgt. Hyden verbally reprimanded Cpl. Hill for his performance at the competition, despite his high awards, because she claimed that a portion of Cpl. Hill's horse (the sheath) was dirty.

44.    Sgt. Hyden gave no similar reprimand to Cpl. Hoff for her performance at the competition even though Cpl. Hoff did not perform as well as did Cpl. Hill.

45.    Cpl. Hill responded that the dirty sheath must have been an oversight due to the numerous preparations for the competitions that were taking place. Cpl. Hill, confused by this reprimand in the face of his exemplary finish, also reminded Sgt. Hyden that he had won this particular potion of the competition (the uniform and mounted phases).

46.    Sgt. Hyden advised Cpl. Hill that her first inclination was to punish him by requiring him to "clean the sheath of every horse in the barn." However, she stated that she had changed her mind.

47.    Sgt. Hyden also brought up performance statistics at this meeting. Specifically, the amount of traffic citations that Cpl. Hill had written. This was done despite the fact that the NCCPD imposes no statistical average that the officers must achieve. Notwithstanding this reprimand, Cpl. Hill's statistics were not low in comparison to the rest of the Mounted Unit.

48.    Cpl. Hill asked Sgt. Hyden why she would bring up these negative issues just hours after returning from a very successful competition for the Mounted Unit as a whole and especially considering how well Cpl. Hill had performed.

49.    In response, Sgt. Hyden stated, "That's strike two." Cpl. Hill asked what she meant by that statement and Sgt Hyden replied, "You saw what happened to Doc."

50.     By Doc, Sgt Hyden was referring to Corporal David Devine ("Cpl. Devine") who was nicknamed "Doc" and who had been transferred out of the Mounted Unit by Sgt. Hyden after he had gone forward with a vacation to go elk hunting that was paid for long in advance when Sgt. Hyden wanted him to cancel it at the last minute to stay and work.

51.     Sgt. Hyden's statement was a very thinly veiled threat to have Cpl. Hill removed from the Mounted Unit.

52.     Cpl. Hill, knowing what had happened to Cpl. Devine, told Sgt. Hyden that he believed that she was treating him unfairly and creating a hostile work environment because she was upset that he, as a male with less riding experience, outperformed her at the competition.

53.     With this comment, Sgt. Hyden became visibly upset and terminated the meeting without explanation.

54.     During this meeting, Cpl. Hill began to reflect on all that had transpired since December 2004 and realized that Sgt. Hyden was discriminating against him due to his gender. As such, he decided to make a formal complaint with Capt. Settings, the unit commander.

g.  **Cpl. Hill Makes Complaint of Unfair Treatment**

55.     Cpl. Hill made a verbal complaint to Capt. Settings, but before Capt. Settings could respond to the complaint, Capt. Settings was transferred and replaced by Captain Mark Hitch ("Capt. Hitch").

56.     Cpl. Hill then brought the matter to the attention of Capt. Hitch, who requested a written complaint. Cpl. Hill complied with this request on December 15, 2005.

11

57.     In late January 2006, Capt. Hitch, Sgt. Hyden and Cpl. Hill had a conflict resolution meeting.    At the conclusion of the meeting, Capt. Hitch told all parties that they were now on a "clean slate," meaning that these issues should be behind them.  Cpl. Hill was satisfied with this resolution as he merely wanted to do his job under fair circumstances in a hostile-free environment.

58.     For the remainder of January, February and into March, Cpl. Hill had no negative contact with Sgt. Hyden.

### h.  NCCPD Retaliates by Transferring Cpl. Hill Out of the Mounted Unit and is Replaced by Female Officer

59.     On March 13, 2006, Cpl. Hill was called into Captain Quinton Watson's ("Capt. Watson") office.  Capt. Watson had just replaced Capt. Hitch as unit commander.  Capt. Hitch was also present.

60.     At this meeting, both Captains advised Cpl. Hill that he was being transferred out of the Mounted Unit back to the Patrol Unit.

61.     Neither Captain Hitch nor Captain Watson offered a reason for the transfer.

62.     Cpl. Hill asked if the transfer had anything to do with his complaint against Sgt. Hyden.  Neither Captain responded directly to the question.

63.     Cpl. Hill, suspecting that Sgt. Hyden had followed through with her threat to have Cpl. Hill transferred out of the Mounted Unit, stated that to the Captains that "this is wrong on so many levels [meaning it was discriminatory and retaliatory] and you know it."  Neither Captain responded.

64.    The very same day that Cpl. Hill was transferred out of the Mounted Unit, he was replaced in the unit by a female, Cpl. Rosemarie Williams, who also just happened to be good friends with Sgt. Hyden and Cpl. Hoff.

65.    The decision to transfer Cpl. Hill was discriminatory and based on Cpl. Hill's gender and done in an effort to have another female officer join the unit. It was also in direct retaliation for Cpl. Hill engaging in the statutorily protected act of expressing a valid workplace complaint against Sgt. Hyden. Furthermore, Defendants' actions to have Cpl. Hill transferred out of the unit were conducted with malice.

### i.    NCCPD Fails to Carry Out a Proper Investigation and Sgt. Hyden Lies During Investigation

66.    On April 5, 2006, Cpl. Hill filed a grievance through the Fraternal Order of Police.

67.    All three steps in the grievance process were denied.

68.    During the second and third step hearings, Cpl. Hill discovered that a portion of his complaint had not been investigated and Sgt. Hyden had made several false statements during the investigation.

69.    The portion of his complaint that had not been investigated was the comment by Sgt. Hyden regarding Cpl. Hill spending time under Capt. Settings' desk. Cpl Hill was told that this would be investigated in April 2006. However, it was not investigated until January 2007 after the matter had been referred to Internal Affairs.

70.    The first false statement made by Sgt. Hyden during the investigation was her denial of any involvement in Cpl. Hill's transfer. However, during the 2nd Step Grievance Hearing Capt. Hitch testified that Sgt. Hyden had, in fact, personally requested the Cpl. Hill's transfer out of the unit.

71.     The second false statement made by Sgt. Hyden was her denial that she ever made the "under the desk" comment. In her denial, she admitted that, "it would be hostile, threatening and harassing to say that." However, at the 3rd Step Grievance Hearing, Officers William Brown and Andy Guyton both testified that they personally heard Sgt. Hyden make the statement.

**j.   Cpl. Hill's Evaluations Plummet From "The Model of What a Mounted Officer Should Be" Following the Filing of His Complaint**

72.     Prior to the above events, Cpl. Hill received nothing but positive evaluations, indicative of an officer who was an asset to the Mounted Unit; as late as August 2004, only four months prior to the radar unit incident, Cpl. Hill was rated as "outstanding" to "very good" and a "model of what a mounted officer should be."

73.     Cpl. Hill received no evaluations for the entire 2005 year until April 2006 and then his 2006 review shortly thereafter. Both of these evaluations were negative. Both were also given after Cpl. Hill's complaint regarding Sgt. Hyden.

74.     In her "2005" evaluation of Cpl. Hill, Sgt. Hyden cited an incident where Cpl. Hill did not clean snow from some vehicles to her satisfaction. However, in that same evaluation, there was no positive mention of Cpl. Hill's awards at the mounted unit competition. Sgt. Hyden's failure to cite Cpl. Hill's positive achievements was a direct attempt to justify Cpl. Hill's transfer out of the Mounted Unit.

**k.   Cpl. Hill Files Charge of Discrimination and Receives Right to Sue**

75.     Cpl. Hill filed a Charge of Discrimination with the Delaware Department of Labor on September 12, 2006.

14

76.    On January 31, 2007 the Department of Labor issued Cpl. Hill a Right to Sue, (attached hereto as Ex. A), and a subsequent Right to Sue was issued by the U.S. Equal Employment Opportunity Commission.

77.    Cpl. Hill remains in the Patrol Unit to this day.

78.    Due to Defendants' wrongful conduct, Cpl. Hill suffers from a loss of his esteemed position, loss of income, loss of job satisfaction, and loss of job status.

79.    As a result of the acts of discrimination and retaliation, Cpl. Hill has suffered emotional harm, humiliation, embarrassment and damage to his professional reputation.

80.    Defendants' acts of discrimination and retaliation were performed with malice and reckless indifference to Cpl. Hill's protected civil rights.

**COUNT I**
**GENDER DISCRIMINATION**

81.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 787 as if specifically set forth herein.

82.    The practices of Sgt. Hyden, Capt. Hitch and Capt. Watson as set forth above violate 42 U.S.C. §2000e-2(a) and 3(a) and are imputable to New Castle County the Defendants in violation of 42 U.S.C. §2000e-2(a) and 3(a).

83.    Defendants intentionally and maliciously discriminated against Plaintiff on the basis of his gender (male) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e(2)(a).

84.    As a result of Defendants' unlawful gender discrimination, Plaintiff suffered and continues to suffer loss of employment opportunities, loss of income, loss of other employment

15

benefits, distress, humiliation, conscious pain, suffering, embarrassment, other emotional harm and damage to his reputation, both personal and professional.

## COUNT II
## RETALIATION

85.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 82<s>4</s> as if specifically set forth herein.

86.    Defendants intentionally and maliciously discriminated against Plaintiff in retaliation for his complaints in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(2)(a) when it:

        (a)    failed to conduct a full and complete investigation into his complaint against Sgt. Hyden;

        (b)    transferred him out of the Mounted Unit and back to the Patrol Unit; and

        (c)    unfairly evaluated his performance for 2005 and 2006.

87.    Defendants' actions were materially adverse to Cpl. Hill and would be viewed as materially adverse to a reasonable employee in Cpl. Hill's position.

88.    As a direct and proximate result of said acts, Cpl. Hill suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, distress, humiliation, conscious pain, suffering, embarrassment, other emotional harm and damage to his reputation, both personal and professional.

## COUNT III
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

89.    Paragraphs 1 – 86 are incorporated and restated as if fully set forth herein.

16

90.     Beginning in December 2004, Plaintiff was treated unfairly by ~~Plaintiffs~~ Defendant New Castle County in the terms and conditions of his employment. He was given unjustifiably negative performance evaluations, was unjustifiably transferred from his position in the Mounted Unit and unjustifiably criticized.

91.     These actions of New Castle County constitute violations of the covenant of good faith and fair dealing implicit in every employment contract.

92.     As a direct and proximate result of New Castle County's breach of the Covenant of Good Faith and Fair Dealing, Plaintiff suffered and continues to suffer from loss of employment, loss of income, loss of other employment benefits, distress, humiliation, conscious pain, suffering, embarrassment, other emotional harm and damage to his reputation, both personal and professional.

### COUNT IV
### (42 U.S.C. § 1983, FOURTEENTH AMENDMENT)

91.     Paragraphs 1 – 90 are incorporated and restated as if fully set forth herein.

92.     By discriminating against Plaintiff in the terms and conditions of his employment, Defendants Hyden, Hitch and Watson subjected Plaintiff to gender discrimination in violation of the Fourteenth Amendment to the United States Constitution, as made actionable pursuant to 42 U.S.C. § 1983..

94.     There is no legitimate explanation for the actions taken against Plaintiff by Defendants Hyden and Watson.

95.     As a direct and proximate result of said acts, Cpl. Hill suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, distress, humiliation, conscious pain, suffering, embarrassment, other emotional harm and damage to his reputation, both personal and professional.

17

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

(a)     Enter a declaratory judgment declaring the acts of Defendants to be a violation of Plaintiff's constitutional rights;

(b)     Enter a judgment against Defendants, for compensatory damages, including lost wages, back pay, pension and other benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation, embarrassment and injury to his reputation;

(c)     Enter judgment against Defendants for punitive damages;

(d)     Issue a mandatory injunction directing Defendants to reinstate Plaintiff to the position that he held prior to his discriminatory transfer;

(e)     Issue a an injunction directing Defendants to remove Plaintiff's evaluations from 2005 and 2006 from his employee file;

(f)     Issue a reparative injunction directing that Defendants place a signed document in Plaintiff's personnel file indicating he was qualified to maintain his employment in the Mounted Unit and that but for illegal conduct by Defendants, he would have remained in that until and not been transferred to the patrol unit;

(g)     Enjoining Defendants from retaliating against Plaintiff;

(h)     Award Plaintiff attorney's fees, costs, pre- and post-judgment interest for this action pursuant to 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1983; and

(i)     To award such other and further relief as the Court deems just and proper under the circumstances.

**MARTIN & WILSON, P.A.**

18

Timothy J. Wilson, Esquire (#4323)
Jeffrey K. Martin, Esquire (#2407)
15089 Gilpin Pennsylvania Avenue
Wilmington, DE  19806
Telephone (302) 777-4681
Facsimile (302) 777-5803
twilson@martinandwilson.com
*Attorney for the Plaintiff*

Dated:  April 27, 2007

19

## CERTIFICATE OF SERVICE

I, Timothy J. Wilson, Esquire do hereby certify that a true and correct copy of the

Plaintiff's Motion for Leave of Court to Amend the Complaint was filed and served via

electronic EM/CMF filing on October 26, 2007 to the following:

Megan Sanfrancesco, Esquire
New Castle County Law Department
87 Reads Way
New Castle, DE 19707

**MARTIN & WILSON, P.A.**

**TIMOTHY J. WILSON, ESQUIRE (#4323)**
**JEFFREY K. MARTIN, ESQUIRE (#2407)**
1508 Pennsylvania Avenue
Wilmington, Delaware 19806
(302) 777-4681 Telephone
(302) 777-5803 Facsimile
twilson@martinandwilson.com
jmartin@martinandwilson.com
*Attorneys for Plaintiff*