## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JEFFREY D. HILL,                              :

            Plaintiff,              :     C. A. No. 07-228 (GMS)

                    :     JURY TRIAL DEMANDED

      v.                                  :

                    :

NEW CASTLE COUNTY, a municipal     :
corporation, SGT. ANDREA HYDEN,    :
in her individual capacity, CAPT. MARK   :
HITCH in his individual capacity, and    :
CAPT. QUINTON WATSON, in his       :
individual capacity,                         :

                    :

           Defendants.             :

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**MARTIN & WILSON, P.A.**

**/s/ TIMOTHY J. WILSON**
**TIMOTHY J. WILSON**    **(Bar ID 4323)**
**JEFFREY K. MARTIN**    **(Bar ID 2407)**
1508 Pennsylvania Avenue
Wilmington, DE 19806
302-777-4681
twilson@martinandwilson.com
jmartin@martinandwilson.com
*Attorney for Plaintiff*

DATED:  July 29, 2008

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES .......................................................................................... iii

I.   NATURE AND STAGE OF THE PROCEEDINGS ................................................ 1

II.  SUMMARY OF ARGUMENT ............................................................................... 1

III. STATEMENT OF FACTS ...................................................................................... 2

IV. STANDARD OF REVIEW ..................................................................................... 15

V.  ARGUMENT ........................................................................................................... 16

      A.      GENUINE ISSUES OF MATERIAL FACT EXIST IN THE RECORD,
               PERTAINING TO DEFENDANTS' DISCRIMINATION
               AGAINST PLAINTIFF, THAT PRECLUDE SUMMARY JUDGMENT
               IN FAVOR OF DEFENDANTS ON PLAINTIFF'S DISCRIMINATION
               CLAIM.................................................................................................... 16

             1.   ALL OF PLAINTIFF'S ALLEGATIONS OF DISCRIMINATINON
                   ARE TIMELY PURSUANT TO THE CONTINUING
                   VIOLATION THEORY ............................................................... 16

             2.   GENIUNE ISSUES OF MATERIAL FACT REGADING SGT. HYDEN'S
                   DISCRIMINATION OF PLAINTIFF EXIST IN THE RECORD THEREBY
                   PRECLUDING SUMMARY JUDGMENT ..................................... 19

             3.   CAPTAINS HITCH AND WATSON PARTICIPATED IN THE CONDUCT
                   THAT VIOLATED PLAITIFF'S RIGHTS UNDER TITLE VII ................... 30

             4.   DEFENDANTS' REPLACEMENT OF PLAITIFF WITH A FEMALE,
                   CPL. WILLIAMS, RAISES AN INFERENCE OF DISCRIMINATION ...... 33

      B.      GENIUNE ISSUES OF MATERIAL FACT GENUINE ISSUES
               OF MATERIAL FACT EXIST IN THE RECORD, PERTAINING
               TO DEFENDANTS' RETALIATION AGAINST PLAINTIFF,
               PRECLUDE SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS
               ON PLAINTIFF'S RETALIATION CLAIM........................................ 34

             1.   PLAINTIFF MUST NOT BE ACTUALLY DISSUADED
                   FROM PURSUING HIS RIGHTS TO ASSERT A PRIMA
                   FACIE RETALIATION CLAIM ................................................... 34

2.  INVESTIGATION OF COMPLAINT .............................................................35

3.  TRANSFER....................................................................................................37

C.  GENUINE ISSUES OF MATERIAL FACT EXIST IN THE RECORD,
PERTAINING TO MISREPRESENTATIONS CONTAINED IN
DEFENDANTS' INVESTIGATION OF PLAINTIFF'S COMPLAINT OF
DISCRIMINATION, DEFENDANTS' SUBSEQUENT INVESTIGATION
FOLLOWING THE FILING OF PLAINTIFF'S GRIEVANCE, AND IN
DEFENDANTS' PERFORMANCE EVALUATIONS OF PLAINTIFF, THAT
PRECLUDE SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS ON
PLAINTIFF'S BREACH OF THE COVENANT OF GOOD FAITH
AND FAIR DEALING CLAIM ..........................................................................41

D.  GENUINE ISSUES OF MATERIAL FACT EXIST IN THE
RECORD PERTAINING TO PLAINTIFF'S CLAIM UNDER
THE FOURTEENTH AMENDMENT WHICH PRECLUDE
SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM
UNDER THE FOURTEENTH AMENDMENT...................................................42

## TABLE OF AUTHORITIES

### CASES

*Angelino v. New York Times Co.*, 200 F.3d 73, at 398-399 (3rd Cir. 1999),
*quoting, Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394 (3d Cir.1976)....................................30

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).....................................................15, 16

*Couden v. Duffey*, 305 F. Supp. 2d 379, 387 (D. Del. 2004).........................................................42
*Dister v. Continental Group, Inc.*, 859 F.2d 1108, 112 (2d Cir. 1988) .........................................20

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)...........................................39

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) ....................................................................19

*Gadson v. City of Wilmington*, 478 F.Supp.2d 635, 640 (D. Del. 2007),
*quoting, West v. Phila Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995) ...............................................16

*Gamble v. Birmingham Southern R.R. Co.*, 514 F.2d 678 (5th Cir.1975).....................................31

*Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) ...................15

*Iadimarco v. Runyon*, 190 F.3d 151, 163 (3d Cir. 1999),
*quoting, Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978).............................................19

*Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) ................................................................38

*Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 Fed Appx. 239, 242 (3d Cir. 2007)..................33

*Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 551 (1999)..............................................................19

*Lafate v. Chase Manhattan Bank*, 123 F.Supp.2d 773, 779 (3rd Cir. 2000) .................................38

*Laughlin v. Metropolitan Washington Airports* Authority, 149 F.3d 253, 259 (4th Cir. 1998).....37

*Oubichon v. North Am. Rockwell Corp.*, 482 F.2d 569 (9th Cir.1973) .........................................31

*Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).........................................................15

*Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003) ..................................39

*Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2nd Cir. 1990) ....................................38

*Sykes v. Pennsylvania State Police*, 2008 WL 901969 (3d Cir. 2008)...........................................34

*United States Postal Service Bd. Of Governors v.* Aikens, 460 U.S. 711, 716 (1983)..................19

*Zimmermann v. Assocs. First Captial Corp.*, 251 F.3d 376,381 (2d Cir. 2001)...........................34

## **FEDERAL**

42 U.S.C. §§2000e.....................................................................................................................1

42 U.S.C. §1983........................................................................................................................1

Fed. R. Civ. P. 56(c) ...............................................................................................................15

## I.     NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff filed his Complaint on April 27, 2007 and subsequently filed an Amended Complaint on September 21, 2007 alleging discrimination based upon his gender and retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e *et seq.*, violations of his Fourteenth Amendment rights, via 42 U.S.C. §1983, and a state law claim for Breach of the Covenant of Good Faith and Fair Dealing.

Discovery of the matter was completed on June 30, 2008. Thereafter, Defendants filed a Motion for Summary Judgment with an accompanying Opening Brief on July 15, 2008. This is Plaintiff's Answering Brief in support of his opposition thereto.

## II.    SUMMARY OF ARGUMENT

   A.    **Genuine Issues of Material Fact Exist in the Record, Pertaining to Defendants' Discrimination Against Plaintiff, that Preclude Summary Judgment in Favor of Defendants on Plaintiff's Discrimination Claim.**

   B.    **Genuine Issues of Material Fact Exist in the Record, Pertaining to Defendants' Retaliation Against Plaintiff, Preclude Summary Judgment in Favor of Defendants on Plaintiff's Retaliation Claim.**

   C.    **Genuine Issues of Material Fact Exist in the Record, Pertaining to Misrepresentations Contained in Defendants' Investigation of Plaintiff's Complaint of Discrimination, Defendants' Subsequent Investigation Following the Filing of Plaintiff's Grievance, and in Defendants' Performance Evaluations of Plaintiff, that Preclude Summary Judgment in Favor of Defendants on Plaintiff's Breach of the Covenant of Good Faith and Fair Dealing Claim.**

   D.    **Genuine Issues of Material Fact Exist in the Record Pertaining to Plaintiff's Claim Under the Fourteenth Amendment Which Preclude Summary Judgment on Plaintiff's Claim Under the Fourteenth Amendment**

## III.    STATEMENT OF FACTS

Plaintiff Corporal Jeffrey D. Hill ("Plaintiff" or "Cpl. Hill"), is a male employee of the New

Castle County Police Department ("NCCPD"), beginning his employment on September 28, 1992.

(Hill Dep. at 140).[1]  Immediately following his graduation from the Police Academy, Cpl. Hill was

assigned to the Patrol Unit as a Patrol Officer.  The Patrol Unit is a unit within the NCCPD where

officers fresh out of the Police Academy typically begin their employment and a unit from which

many of the NCCPD strive to be transferred because officers assigned thereto must work various

shifts, suffer other disruptions to their schedules and endure higher stress levels. (Hill Aff.).[2]

Much like most other officers placed in the Patrol Unit, Cpl. (then Officer) Hill also desired

to be transferred from the Patrol Unit.  In April 2002, after approximately nine years in the Patrol

Unit, and after applying for a transfer to the Mounted Unit virtually every one of those nine years,

Cpl. Hill was awarded a transfer to the Mounted Unit upon the recommendation of Captain (then

Lieutenant) Elmer Settings ("Capt. Settings").  (Hill Aff.).  The Mounted Unit's primary functions

are to participate in demonstrations such as parades, perform tactical work such as patrolling high

crime neighborhoods, maintain crowd control and conduct terrain searches; all on horseback.  (Hill

Dep. at 136; Appendix C)[3].  The officers in the Mounted Unit work on horseback, get to interact and

work with animals on a regular basis, make various public relations appearances, appear in parades,

participate in photo shoots, compete in horseback competitions, work primarily day shift, and in

---

[1] Deposition of Plaintiff, Jeffrey D. Hill, *Hill v. New Castle County, et al.,* C.A. No. 07-228 (GMS), December 18, 2007. ("Hill Dep."). Excerpts of Plaintiff's deposition are found at Appendix A.
[2] Affidavit of Plaintiff, Jeffrey D. Hill ("Hill Aff.") is found at Appendix B.
[3] New Castle County Police Department Standard Operating Procedure for Mounted Patrol Unit is found at Appendix C.

2

general are held in high esteem by other police officers not employed in the Mounted Unit. (Hill Aff.). As such, the Mounted Unit is a very prestigious unit within the NCCPD. (Hyden Dep. at 37)[4].

Throughout Cpl. Hill's tenure with the Mounted Unit, Corporal Darla Hoff ("Cpl. Hoff") received more favorable treatment from the commanding officer of the Mounted Unit, Defendant Andrea Hyden, ("Sgt. Hyden"), than did Cpl. Hill and the other male officers in the Mounted Unit. (Hill Aff.). At all relevant times, Cpl. Hoff was the only female member of the Mounted Unit other than Sgt. Hyden. (Hill Dep. at 112-113). The following are examples of Cpl. Hoff receiving more favorable treatment than Cpl. Hill and the other male officers:

a. At one point the Mounted Unit received a donation of a very attractive show horse named Misty. (Hill Dep. at 147; Hyden Dep. at 48-49). Misty was immediately assigned to Cpl. Hoff without asking any of the male officers if they wanted the horse assigned to them; (Hill Dep. at 148-149);

b. There was an incident where Cpl. Hill could not use the horse assigned to him for a competition because the horse's coat was discolored. (Hill Dep. at 150-151; Hyden Dep. at 52-53). As a result, he spent a lot of time training another horse, Tonka, who up to that point had very little training. (Hill Dep. at 150-152; Hyden Dep. at 55). After the competition and after Tonka had been properly trained, Cpl. Hill requested that he continue to be permitted to work with Tonka. (Hill Dep. at 153-154). Sgt. Hyden denied this request and unofficially assigned Tonka, now newly trained, to Cpl. Hoff. (Hill Dep. at 153-154);

---

[4] Deposition of Defendant, Andrea Hyden, *Hill v. New Castle County, et al.,* C.A. No. 07-228 (GMS), June 30, 2008. ("Hyden Dep."). Excerpts of Defendant Hyden's Deposition are found at Appendix D.

3

c. Sgt. Hyden would offered last minute over time (paid at 1.5 times her normal rate) to Cpl. Hoff that was not offered to the other male officers in the Mounted Unit thereby increasing Cpl. Hoff's income. (Hill Dep. at 113, 154-157; Appendix E)[5].

d. Sgt. Hyden also decided to have a contest at one point and award two compensation days to the officer who produced the most statistics (traffic tickets etc). (Hill Dep. at 114; Hyden Dep. at 63-64). However, the contest did not run from the announcement of the contest forward; it ran back in time for a month when Cpl. Hoff was injured and permitted to patrol in a car instead of on horseback. (Hill Dep. at 115 - 118). Logistically it is much easier for an officer to achieve higher statistics when patrolling in a car than on horseback. (Hill Dep. at 115; Hyden Dep. 66-67). In essence, Sgt. Hyden announced the "contest" and then in the next breath announced that the winner of this "contest" was Cpl. Hoff. (Hyden Dep. at 64-65). Several of the male officers believed that Cpl. Hoff merely needed two days off and this was Sgt. Hyden's way of giving them to her. (Hill Dep. at 117). However, none of the male officers were the recipients of such predetermined "contest" prizes; (Hyden Dep. at 64-65).

e. It is a Mounted Unit policy for officers injured either on the job or at home to be required go to report to Omega Health Care for any injury sustained. (Hyden Dep. at 69-70). The reason for this is because a serious injury to one of the Mounted Unit officers may impede that officer's ability to work on horseback and may

---

[5] Corporal Darla Hoff's time sheets and overtime records for the period 4/12/2002 through 4/9/2006 are found at

require that the injured officer be transferred out of the Mounted Unit if such an injury is sustained. (Hill Aff.). Cpl. Hoff was injured after she fell down her steps. (Hill Dep. at 159; Hyden Dep. at 70). However, Sgt. Hyden permitted Cpl. Hoff to continue working in the Mounted Unit without being examined at Omega. (Hill Dep. at 159-164; Hyden at 70-71). Cpl. Hoff sustained an injury another time and like the incident described above, was not required to go to Omega. While working with the other officers in the Mounted Unit, she stated that her doctor said that she should not be riding. (Hill Dep. at 159-164). It was not until Capt. Settings caught wind of her injury and actually called Sgt. Hyden and asked what was going on with Cpl. Hoff's injury that Sgt. Hyden finally sent Cpl. Hoff to Omega. (Hill Dep. at 162). One of these two injuries sustained by Cpl. Hoff so serious that Cpl. Hoff's own personal physician recommended that she not ride horses at all (Hill Dep. at 160-161; Appendix F)[6].

f.  Finally, the communication lines between Sgt. Hyden and Cpl. Hoff were much more open than with the male officers and Cpl. Hoff had much more access to Sgt. Hyden during non-business hours. (Hill Dep. at 164; Hyden Dep. at 26-34).

Cpl. Hill encountered no problems in his capacity as an officer in the Mounted Unit and received high marks on his performance evaluations from the time he joined the Mounted Unit until December 2004. (Hill Dep. at 88, 107-108; Appendix G)[7]. At that time, Sgt. Hyden went on vacation and Cpl. Hill filled in as acting Sergeant, as he possessed the most seniority of the members

---

Appendix E.
[6] Memorandum of Defendant, Mark Hitch dated February 1, 2006 is found at Appendix F.
[7] Plaintiff, Jeffrey Hill Employee Performance Reports for 2003 through 2006 are found at Appendix G.

5

of the Mounted Unit. (Hill Dep. at 89; Hyden Dep. at 73). Prior to Sgt. Hyden's vacation, two radar

units were scheduled for calibration for the time period when Sgt. Hyden would be on vacation. (Hill

Dep. at 89- 91; Hyden Dep. at 76). It is each officer's duty to ensure that his radar units are

calibrated on a timely basis and that it does not fall out of compliance. (Hyden Dep. at 78-79).

As acting Sergeant, Cpl. Hill carried through with the calibrations as scheduled. (Hill Dep. at

92; Hyden Dep. at 74). His decision was based on the fact that the units must be calibrated once per

year and if the calibrations were not performed on a timely basis, then their certificate of calibration

may expire and then radar readings would be inadmissible in court. (Hill Dep. 94-95). In other

words, if the calibrations are not conducted in a timely manner, the information generated by the

units may be tainted resulting in an inability to utilize this information at trial. (Hill Dep. at 94-95;

Hyden Dep. at 78; Appendix H; Appendix I)[8][9]. Typically, when the County employee in charge of

the calibrations calls to inform the Mounted Unit that calibrations are scheduled, the radar units are

simply taken over as instructed. (Hyden Dep. at 79).

The same day the calibrations were performed, Cpl. Hoff and Sgt. Hyden communicated, and

it was relayed to Sgt. Hyden that Cpl. Hill approved the calibrations of these radar units. (Hyden

Dep. at 76). Following her call to Sgt. Hyden, Cpl. Hoff approached Cpl. Hill and told him that Sgt.

Hyden wanted him to telephone her at home immediately.[10] (Hill Dep. at 96; Hyden Dep. at 76).

During this conversation, Sgt. Hyden expressed her anger and displeasure with Cpl. Hill's decision

to have the radar units calibrated. (Hill Dep. at 97-99; Hyden Dep. at 76, 81-82). She instructed the

entire unit to remain after work for a meeting with her. (Hill Dep. at 100-101; Hyden Dep. at 81-82).

---

[8] New Castle County Division of Police, Traffic Directive 61, Section L.2.-3. is fond at Appendix H.

[9] New Castle County Internal Operating Procedures, Traffic Services Unit, Section 5 is found at Appendix I.

[10] During the Investigation of Cpl. Hill's Complaint against Sgt. Hyden, Sgt. Hyden falsely reported that she contacted

During this meeting with the entire Mounted Unit, Sgt. Hyden verbally reprimanded Cpl. Hill in front of all members of the Unit. (Hill Dep. at 102-103). Sgt. Hyden did not verbally reprimand Cpl. Hoff in front of the other members of the Unit. (Hill Aff.). Cpl. Hill felt as though this reprimand was an attempt to discredit him as acting Sergeant and to humiliate him in front of his colleagues. (Hill Dep. at 102-103). Several other members of the Mounted Unit felt that Sgt. Hyden completely overreacted at the meeting and that the radar issue simply was not that big of a deal. The decision as to whether or not to take the radar units to have them calibrated is one up to the discretion of the commanding officer and whether or not to conduct such calibrations in the face of other duties is one of discretion and subject to numerous factors. (Hyden Dep. at 80-81).

Sgt. Hyden then held a private meeting with Cpl. Hill again reprimanding him for going forward with the calibrations. (Hill Dep. at 103-105). Cpl. Hill explained that the calibrations were previously scheduled and that he believed that it was the correct decision to go forward with the calibrations given the need to keep the units calibrated on a timely basis. (Hill Dep. at 97-98). Furthermore, the calibrations took only a short period of time and only required his and one other officer's presence thereby freeing up the other members of the Mounted Unit for patrol duties. (Hill Dep. at 92-94).

Sometime during the spring of 2005, Sgt Hyden asked Cpl. Hill to relay mail to Capt. Settings' office at the main headquarters for the NCCPD. (Hill Aff.). Cpl. Hill, unaware of where Capt. Settings' office was located, asked Sgt. Hyden for the location. (Hill Aff.). Sgt. Hyden responded "you [meaning Cpl. Hill] should know; you spend enough time under his [meaning Capt. Settings'] desk." (Hyden Dep. at 83-87; Watson Dep. at 12). Sgt Hyden's statement implied that

---

Cpl. Hill when she discovered that Plaintiff and Officer Brown went to have the radar calibrations performed.

7

Cpl. Hill performed oral sex on Capt. Settings in order to receive favorable treatment from Capt. Settings. (Hill Aff.). Sgt. Hyden made no similar statements to Cpl. Hoff, the only other female officer in the Mounted Unit. (Hyden Dep. at 87).

As the senior member of the Mounted Unit, anytime that Sgt. Hyden was absent from the unit, Cpl. Hill should have been named acting Sergeant. (Hill Dep. at 89; Hyden Dep. at 73). However, in July of 2005, Sgt. Hyden again left for vacation, but this time, Sgt. Hyden named Cpl. Hoff, a female officer with less seniority than Cpl. Hill, as acting Sergeant. (Hyden Dep. at 73; Hill Aff.; Appendix F). No explanation was ever given to Cpl. Hill as to why he was passed over to serve as acting sergeant. (Hill Aff.).

In October 2005, the Mounted Unit, including Cpl. Hill, Cpl. Hoff and Sgt Hyden, traveled to Virginia Beach to participate in the 22nd National Police Equestrian Championship. (Hill Dep. at 42; Hyden Dep. at 89). This competition consisted of three phases: 1) the uniform and mount; 2) equitation[11]/riding ability; and 3) obstacle course. (Hill Dep. at 151; Hyden Dep. at 56). Cpl. Hill earned first place in the uniform and mount phases and second place in the equitation/riding ability phase. (Hill Dep. at 42; Hyden Dep. at 56). Given the fact that mounted units from across the United States and Canada participated in this competition, Cpl. Hill's performance was exceptional and reflected very well on the New Castle County Police Department. (Hyden Dep. at 88).

Following his receipt of these awards, the entire unit, except the two female members, Sgt. Hyden and Cpl. Hoff, congratulated Cpl. Hill for his accomplishments. (Hill Dep. at 43; Hyden Dep.

---

[11] The art of riding on horseback; horsemanship.

at 88-89). Instead, Sgt. Hyden and Cpl. Hoff, turned their backs to their colleague and teammate, Cpl. Hill, and walked away.[12] (Hill Dep. at 43).

Sgt. Hyden had been riding horses and participating in competitions since she was twelve. (Hyden Dep. at 8). Such competitions, when held for teens, are comprised primarily of females. (Hyden Dep. at 12-13). Sgt. Hyden has won over one-hundred awards in her life in horse-related competitions. (Hyden Dep. at 12). However, Cpl. Hill, with much less experience riding and showing horses than Sgt Hyden placed higher than did Sgt. Hyden. (Hyden Dep. at 13). Sgt. Hyden was upset that a male officer with significantly much less experience riding and showing horses had scored higher than she at the competition. (Hill Aff.).

The day the Mounted Unit returned to Delaware from the competition, Sgt. Hyden and Cpl. Hill met at Sgt. Hyden's office located at Carousel Park. (Hyden Dep. at 92-94). During this meeting, Sgt. Hyden verbally reprimanded Cpl. Hill for his performance at the competition, despite his high awards, because she claimed that a portion of Cpl. Hill's horse (the sheath) was dirty. (Hyden Dep. at 94). Sgt. Hyden gave no similar reprimand to Cpl. Hoff for her performance at the competition even though Cpl. Hoff did not perform as well as did Cpl. Hill.

Cpl. Hill responded that the dirty sheath must have been an oversight due to the numerous preparations for the competitions that were taking place. (Hill Aff.). Cpl. Hill, confused by this reprimand in the face of his exemplary finish, also reminded Sgt. Hyden that he had won this particular potion of the competition (the uniform and mounted phases). (Hill Aff.). The issue with the sheath had absolutely no negative consequences on the outcome of the competition. (Hyden Dep.

---

[12] Hyden denied that she did not congratulate Plaintiff in her Answer to the Amended Complaint, yet confirms that she did not congratulate him in her deposition testimony.

at 90). Sgt. Hyden threatened to have Cpl. Hill "clean the sheath of every horse in the barn." This punishment would have been unwarranted. (Appendix F).

Sgt. Hyden also reprimanded Cpl. Hill's statistics at this meeting. (Hyden Dep. at 94-95). This was done despite the fact that the NCCPD imposes no statistical average that the officers must achieve. (Hyden Dep. at 101-102; Watson Dep. at 7)[13]. Notwithstanding this reprimand, Cpl. Hill's statistics were not low in comparison to the rest of the Mounted Unit. (Appendix K)[14].

Cpl. Hill asked Sgt. Hyden why she would bring up these negative issues just hours after returning from a very successful competition for the Mounted Unit as a whole and especially to him, considering how well he had performed. In response, Sgt. Hyden stated, "That's strike two." Cpl. Hill asked what she meant by that statement and Sgt Hyden replied, "You saw what happened to Doc." By Doc, Sgt Hyden was referring to Corporal David Devine ("Cpl. Devine") who was nicknamed "Doc" and who had been transferred out of the Mounted Unit by Sgt. Hyden after he had gone forward with a very expensive vacation to go elk hunting that was paid for long in advance when Sgt. Hyden wanted him to cancel it at the last minute to stay and work. (Hill Dep. at 60). However, the stated reason by Sgt. Hyden as to why Cpl. Devine was transferred out of the Mounted Unit was "productivity, lack of motivation, lack of teamwork, unwillingness to modify his work ethic and work assignments." (Hyden Dep. at 95-96). Sgt. Hyden's statement was a very thinly veiled threat to have Cpl. Hill removed from the Mounted Unit. (Hill Aff.).

Cpl. Hill, knowing what had happened to Cpl. Devine, told Sgt. Hyden that he believed that she was treating him unfairly and creating a hostile work environment. (Hill Aff.). With this

---

[13] Deposition of Defendant, Quinton L. Watson, *Hill v. New Castle County, et al.,* C. A. No. 07-228 (GMS), June 30, 2008. ("Watson Dep."). Excerpts of Watson Deposition are found at Appendix J.
[14] Mounted Unit Statistics for the period October 2004 through August 2005 are found at Appendix K.

comment, Sgt. Hyden became visibly upset and terminated the meeting without explanation. During this meeting, Cpl. Hill began to reflect on all that had transpired since December 2004 and realized that Sgt. Hyden was discriminating against him due to his gender. (Hill Dep. at 12-14.). As such, and in light of her threat to transfer him from the Mounted Unit, Cpl. Hill sought the protection of his employer and decided to make a complaint to Capt. Settings, the unit commander at the time. (Hill Dep. at 56).

Cpl. Hill made a verbal complaint to Capt. Settings, but before Capt. Settings could respond to the complaint, Capt. Settings was transferred and replaced by Captain Hitch. (Hill Dep. at 134; Hitch Dep. at 7-10)[15]. Cpl. Hill then brought the matter to the attention of Capt. Hitch, who requested a written complaint. Cpl. Hill complied with this request on December 15, 2005. (Appendix S)[16]. During his investigation of Cpl. Hill's complaint, he spoke to Officer Andrew Guyton ("Officer Guyton"). When asked, Officer Guyton told Capt. Hitch that Sgt. Hyden did in fact treat Cpl. Hoff differently from the other officers in the Mounted Unit. (Hitch Dep. at 10).

Despite Cpl. Hill's complaint of gender discrimination by Sgt. Hyden and Officer Guyton's confirming statement that a female received preferential treatment by Sgt. Hyden, Capt. Hitch took no disciplinary actions against Sgt. Hyden. Instead, in late January 2006, Capt. Hitch held a conflict resolution meeting with Sgt. Hyden and Cpl. Hill. (Hyden Dep. 98-100; Hitch Dep. at 16-17; Hill Dep. at 9). At the conclusion of the meeting, Capt. Hitch told all parties that they were now on a "clean slate," meaning that these issues should be behind them ("clean slate meeting"). (Hill Dep. at 9-10; Hyden Dep. at 98; Hitch Dep. at 16-17). Cpl. Hill was satisfied with this resolution as he

---

[15] Deposition of Defendant, Mark Hitch, *Hill v. New Castle County, et al.*, C. A. No. 07-228 (GMS), June 30, 2008. ("Hitch Dep.") is found at Appendix L.

[16] Plaintiff, Jeffrey D. Hill's December 15, 2005 Memorandum to Captain Mark Hitch is found at Appendix S.

merely wanted to do his job under fair circumstances in a hostile-free environment. For the remainder of January, February and into March, Cpl. Hill had no negative contact with Sgt. Hyden and thought that the "clean slate meeting" had worked. (Hill Dep. at 9).

On March 13, 2006, Cpl. Hill was called into Captain Quinton Watson's ("Capt. Watson") office. (Hill Dep. at 11; Hitch Dep. 18-22; Watson Dep. 21). Capt. Watson had just replaced Capt. Hitch as unit commander. (Hill Dep. at 11; Watson Dep. at 20). Capt. Hitch was also present (Hill Dep. at 11; Hitch Dep. 18-22; Watson Dep. 21). At this meeting, both Captains advised Cpl. Hill that he was being transferred out of the Mounted Unit back to the Patrol Unit. (Hill Dep. at 9-11; Hitch Dep. 18-22; Watson Dep. 21; Appendix M)[17]. Cpl. Hill requested a reason for the transfer but neither Captain Hitch nor Captain Watson responded. (Hitch Dep. 18-22; Watson Dep. 21; Appendix M). Cpl. Hill then asked if the transfer had anything to do with his complaint against Sgt. Hyden. Again, neither Captain responded to the question.   Cpl. Hill, knowing that their silence was confirmation that he was being transferred in retaliation for his complaint about Sgt. Hyden, stated, "This is so wrong on so many levels and you know it." Captains Hitch and Watson, as well as Sgt. Hyden, all directly participated in the transfer of Cpl. Hill which was retaliatory against Plaintiff due to his complaints about Sgt. Hyden. (Hill Dep. at 10- 12).

The very same day that Cpl. Hill was transferred out of the Mounted Unit, he was replaced in the unit by a female, Cpl. Rosemarie Williams. (Hill Dep. at 68; Hitch Dep. at 20-21; Watson Dep. 13-14). Sgt. Hyden and Cpl. Hoff associated with Cpl. Williams while off duty. (Hyden Dep. 26- 27, 32-33). Later Cpl. Hill discovered that the alleged reasons for his transfer were lack of productivity, lack of motivation and lack of teamwork – reasons strikingly similar to those used to justify the

[17] Memorandum from Major Stuart A. Snyder, Acting Chief of Police to All Police Personnel regarding Personnel

transfer of Cpl. Devine, the individual Sgt. Hyden referred to when she threatened to transfer Cpl.
Hill out of the Mounted Unit following the Virginia Beach Competition.

On April 5, 2006, Cpl. Hill filed a grievance through the Fraternal Order of Police.
(Appendix N)[18]. All three steps in the grievance process were denied. (Appendix O)19. During the
second and third step hearings, Cpl. Hill discovered that a portion of his complaint had not been
investigated and Sgt. Hyden had made several false statements during the investigation. (Hill Aff.).
The portion of his complaint that had not been thoroughly investigated was the comment by Sgt.
Hyden regarding Cpl. Hill spending time under Capt. Settings' desk. (Watson Dep. at 10-13). Cpl
Hill was told that this would be investigated in April 2006. (Hill Aff.). However, it was not
investigated until January 2007 after the matter had been referred to Internal Affairs.

The first false statement made by Sgt. Hyden during the investigation was her denial of any
involvement in Cpl. Hill's transfer. (Hyden Dep. at 96-97; Hitch Dep. at 22). However, during the
2nd Step Grievance Hearing Capt. Hitch testified that Sgt. Hyden had, in fact, personally requested
the Cpl. Hill's transfer out of the unit. (Appendix O).

The second false statement made by Sgt. Hyden was her denial that she ever made the "under
the desk" comment. (Hyden Dep. at 83- 84; Appendix O). In her denial, she admitted that, "it would
be hostile, threatening and harassing to say that." (Appendix O). However, at the 3rd Step Grievance
Hearing, Officers William Brown and Andy Guyton both testified that they personally heard Sgt.
Hyden make the statement. (Hyden Dep. at 84). Following these meetings, Sgt. Hyden contacted
Capt. Watson and indicated to him that she had in fact made the statement. (Watson Dep. at 11-12).

Transfers dated March 13, 2006 is found at Appendix M.
[18] Grievances FOP 06-06, 06-07 and 06-08 are found at Appendix N.
[19] Step 1 Grievance Decision dated April 24, 2006; Step 2 Grievance Decision dated July 14, 2006 and Step 3 Grievance

Despite this knowledge, and despite Captain Watson's own admission that an individual who would make such a comment should be disciplined took no action against Sgt. Hyden. (Watson Dep. at 11-12). He did not even speak to Cpl. Hill and did not address Sgt. Hyden regarding her false statement. (Watson at 12-13).

Prior to the above events, Cpl. Hill received nothing but positive evaluations, indicative of an officer who was an asset to the Mounted Unit; as late as August 2004, only four months prior to the radar unit incident, Cpl. Hill was rated as "outstanding" to "very good" and a "model of what a mounted officer should be." (Appendix G). Cpl. Hill received no evaluations for the entire 2005 year until April 2006 and then his 2006 review shortly thereafter. (Appendix G). Both of these evaluations were negative. (Appendix G). Both were also given after Cpl. Hill's complaint regarding Sgt. Hyden. (Appendix G). In her "2005" evaluation of Cpl. Hill, Sgt. Hyden cited an incident where Cpl. Hill did not clean snow from some vehicles to her satisfaction. (Appendix G). However, in that same evaluation, there was no positive mention of Cpl. Hill's awards at the mounted unit competition. (Appendix G).

Cpl. Hill filed a Charge of Discrimination with the Delaware Department of Labor on September 12, 2006. (Appendix P)[20]. On May 31, 2007, the U.S. Equal Employment Opportunity Commission issue Cpl. Hill a Right to Sue. (Appendix Q)[21]. Hill remains in the Patrol Unit to this day. (Hill Dep. at 36-37).

---

Decision dated November 9, 2006 are found at Appendix O.
[20] Plaintiff, Jeffrey D. Hill's Charge of Discrimination filed with the Delaware Department of Labor on September 12, 2006 is found at Appendix P.

## IV.    **STANDARD OF REVIEW**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall be rendered" where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A dispute over a material fact must be "genuine", i.e., the evidence is such "that a reasonable jury could return a verdict in favor of the non-moving party." *Id.* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995). The Court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). "[E]vidence of nonmovant is to be believed and all reasonable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The matter before the Court is a case of drawing inference from fact, i.e., the inference that Sgt. Hyden's treatment of Plaintiff in conjunction with her favorable treatment of another female employee, was based upon their genders; whether Sgt. Hyden's treatment of him subsequent to his complaints about her was retaliatory; whether Defendants investigations of Plaintiff's Complaints were conducted in a discriminatory manner and/or were conducted unfairly in retaliation for his complaints; whether Defendants' evaluations of Plaintiff were retaliatory for his complaints about

---

[21] The U.S. Equal Employment Opportunity Commission Right to Sue is found at Appendix Q.

Sgt. Hyden; and whether Defendants' transfer of Plaintiff from the Mounted Unit to Patrol was

retaliatory for his complaints about Sgt. Hyden. Drawing inferences is typically reserved for a jury at

trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (holding that drawing inferences

is a jury's function so long as competing inferences are reasonable under the law).

## V.   **ARGUMENT**

### A.   **Genuine Issues of Material Fact Exist in the Record, Pertaining to Defendants' Discrimination Against Plaintiff, that Preclude Summary Judgment in Favor of Defendants on Plaintiff's Discrimination Claim.**

#### 1.   All of Plaintiff's Allegations of Discrimination are Timely Pursuant to the Continuing Violation Theory

Defendants first suggest that the incidents complained of in the Complaint are time-barred

because Plaintiff has not pin-pointed the date upon which they occurred. However, individual acts

of discrimination, even if such acts fall outside of the filing period, are not time-barred if such acts

are the product of a "continuing violation." "Under the theory of continuing violations, a plaintiff

may pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can

demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant."

*Gadson v. City of Wilmington*, 478 F.Supp.2d 635, 640 (D. Del. 2007), *quoting, West v. Phila Elec.*

*Co.*, 45 F.3d 744, 754 (3d Cir. 1995)(internal quotations omitted). To establish a continuing

violation, plaintiff must first, "demonstrate that at least one act occurred within the filing period ....

[then he] must establish that the harassment is more than the occurrence of isolated or sporadic acts

of intentional discrimination. The relevant distinction is between the occurrence of isolated,

intermittent acts of discrimination and a persistent, on-going pattern." *Id.*

16

Here, Plaintiff meets his burden of demonstrating that at least one act of protected activity occurred within the filing period. Plaintiff filed his Charge of Discrimination on September 12, 2006, (Bates #00000228), and his wrongful transfer from the Mounted Unit occurred on March 20, 2006. (Bates # NCC0936). In addition, Plaintiff participated in the "clean slate meeting" on January 25, 2006 in which Captain Hitch discounted the evidence pointing to discriminatory conduct and summarily found no evidence of discrimination. (Bates ##NCC2242 - 2252). Plaintiff also engaged in protected activity contemporaneous with the notification of his transfer and only three days before the actual transfer when he suggested to Captains Hitch and Watson that the proposed transfer was due to his complaint about Sgt. Hyden, as well as his statement to them that the transfer was "so wrong on so many levels." (Hitch Dep. 18-22; Watson Dep. 21). Finally, Plaintiff engaged in protected activity by participating in the grievance process following his transfer. All of these instances occurred within the statutory period.

Plaintiff also establishes that the discrimination was persistent and an on-going pattern. The remaining discriminatory treatment began during the radar calibration incident and continued throughout the remainder of Plaintiff's tenure with the Mounted Unit and even for a period of time after the transfer. Such incidents are numerous and include: the incident with the radar units; the sexually-charged comment about Plaintiff being under Capt. Settings desk; instances where Sgt. Hyden's named Cpl. Hoff as acting Sergeant in her absence instead of Plaintiff; Sgt Hyden's snubbing of Plaintiff after his competition victories in Virginia Beach; Sgt. Hyden's reprimanding Plaintiff for his performance at the competition in Virginia Beach; Sgt. Hyden reprimanding Plaintiff for his statistics in the face of the fact that the New Castle County Police Department imposes no statistical requirements on its police officers and the fact that any alleged deficiencies in Plaintiff's

17

statistics had never been brought to his attention before; Sgt. Hyden's threat to transfer Cpl. Hill referencing "what happened to Doc," another police officer with whom Sgt. Hyden had issues; Sgt Hyden's "assigning" a Misty to Cpl. Hoff without asking any of the male officers if they wanted the horse assigned to them; Sgt. Hyden denying Cpl. Hill's request to continue working with Tonka after Cpl. Hill trained him, but permitting Cpl. Hoff to work with Tonka; Sgt. Hyden offering last minute overtime to Cpl. Hoff but not making such offers to Plaintiff or other male members of the Mounted Unit; Sgt. Hyden's "contest" whereby the winner, Cpl. Hoff, had already been predetermined; Sgt. Hyden relaxing the requirements requiring injured officers to report to Omega Health Care for injuries sustained by Cpl. Hoff; Sgt. Hyden communicating more openly and on a much more informal basis with Cpl Hoff than Plaintiff, sometimes during non-business hours; for instructing the Mounted Unit to just try to work with Cpl. Hoff despite their complaints about her, while not making this same request for Plaintiff, but instead writing a length memo to Capt. Hitch outlining his alleged deficiencies; Capt. Hitch's flawed investigation in Cpl. Hill's complaints about Sgt. Hyden; the alleged "clean slate meeting" wherein Plaintiff was really not on a clean slate; Capt Watson's flawed investigation; and the transfer of Plaintiff out of the Mounted Unit while Cpl. Hoff was permitted to remain despite her inability to get along with the other members of the Unit as well as Sgt. Hyden, the individual who discriminated against him being permitted to remain in the Mounted Unit despite evidence corroborating Plaintiff's complaint. Clearly the numerous events described above and occurring over a period of approximately one and a half years establishes a persistent, on-going pattern of discrimination against Plaintiff.

18

2.    Genuine Issues of Material Fact Regarding Sgt. Hyden's Discrimination of Plaintiff
      Exist in the Record Thereby Precluding Summary Judgment[22]

Contrary to Defendants' assertions, Plaintiff has established a *prima facie* case of reverse

discrimination.    A Plaintiff meets his *prima facie* obligation in a reverse discrimination, "in the

absence of direct evidence of discrimination case by presenting sufficient evidence to allow a

reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated

plaintiff less favorably that others because of his race, color, religion, sex, or national origin."

*Iadimarco v. Runyon*, 190 F.3d 151, 163 (3d Cir. 1999), *quoting*, *Furnco Const. Corp. v. Waters*,

438 U.S. 567, 577 (1978).    In rebutting a defendant's justifications for its actions in a "reverse

discrimination" case:

> the plaintiff must point to *some evidence*, direct or circumstantial,
> from which a fact finder could reasonably either (1) disbelieve the
> employer's articulated legitimate reasons; or (2) believe that an
> invidious discriminatory reason was more likely than not a motivating
> or determinative cause of the employer's action.

*Id*. at 166, *quoting*, *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).    The United States Supreme

Court recognized that direct evidence of discrimination is rarely available due to sophisticated

employers concealing their true motivations.    "All courts have recognized that the question facing

triers of fact in discrimination cases is both sensitive and difficult ... [and that] [t]here will seldom

be eyewitness testimony as to the employer's mental processes." *United States Postal Service Bd. Of*

*Governors v.* Aikens, 460 U.S. 711, 716 (1983); *see also, Kolstad v. Am. Dental Assoc.*, 527 U.S.

526, 551 (1999).    "[D]irect evidence of discrimination is difficult to find precisely because its

practitioners deliberately try to hide it.    Employers of a mind to act contrary to law seldom note such

---

[22] During her deposition testimony, Sgt. Hyden provided testimony inconsistent with her Answers to the Amended
Complaint. Specifically, during her deposition testimony, Sgt. Hyden admits to many of the allegations contained in the

19

a motive in their employee's personnel dossier." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 112 (2d Cir. 1988).

Defendants contend that there is no evidence that substantiates Plaintiff's claims of discrimination against him. However, it appears as if what they contend Plaintiff must set forth is *direct* evidence of discrimination against Plaintiff. Although Plaintiff believes direct evidence does exist in the form of Sgt. Hyden's comment to Plaintiff about him knowing the location of Capt. Setting's desk because he spends so much time under it, *direct* evidence is *not* required. This is not Plaintiff's motion for summary judgment and he is not asking the Court to find, at this point and as a matter of law that Defendant's discriminated against him. That inquiry must remain for the jury. Importantly, Plaintiff is not required to prove his case when responding to a motion for summary judgment.

What Plaintiff *is* required to provide, and what he *does* provide, is *some evidence* in the record, direct or circumstantial, upon which the jury could reasonably conclude that the Defendants' articulated reasons for their actions are pretext; or upon which the jury could reasonably conclude that there was an invidious discriminatory reason that was more likely the motivating or determinate cause of Defendants' actions. In this regard, summary judgment in favor of Defendants is not warranted.

Although the facts must be viewed under the totality of the circumstances standard, Defendants parcel out each instance to attempt to establish that there was not discriminatory motive behind Defendants' actions. Plaintiff will address each single instance raised by Defendants and will establish that each one is supported by evidence that the jury could conclude that each was

---

Amended Complaint that were denied in Defendants' Answer to the Amended Complaint.

20

discriminatory in nature. However, as is stated above, viewing all of these instances together, the evidence supporting them shows that there significant evidence upon which a jury could conclude that Defendants discriminated against Plaintiff due to his gender.

a.    The "Contest"

The first issue addressed by Defendants pertains to the "contest" whereby Cpl. Hoff "won" two days off. The undisputed evidence in record establishes that Cpl. Hoff was the only female officer in the Mounted Unit, (Appendix R)[23]; she was the only officer in the Mounted Unit to win such a contest, (Hyden Dep. at 64-65; Appendix R); and the male officers in the Mounted Unit were not given a fair opportunity to win the award because they had no knowledge of the "contest" until it was already over. (Hyden at 64–65). Helping Cpl. Hoff "win" this contest is the fact that she spent an inordinate amount of time during the relevant time period patrolling in a patrol car as opposed to being on horseback.

b.    "Overtime"

With regard to Sgt. Hyden providing Cpl. Hoff with overtime opportunities not offered to the male employees, the record establishes that this was the case. (Hill Dep. at 156-157). In fact, during the calendar years 2005 and 2006 Cpl. Hoff had more overtime hours than anybody in the Mounted Unit. (Appendix E). In 2005, Cpl. Hoff worked X hours overtime while Plaintiff worked only X hours of overtime. (Appendix E). In 2006, Cpl. Hoff was afforded X hours overtime compared to only X hours of overtime for Plaintiff. (Appendix E). While there is testimony in the record that *some* of the overtime was offered to all officers, there is also testimony in the record that Sgt. Hyden

---

[23] Defendants' Answer To Amended Complaint is found at Appendix R.

21

offered Cpl. Hoff overtime on the weekends that was not offered to Plaintiff and the other male officers – a fact that Cpl. Hoff gloated about openly to the male officers. (Hill Dep. at 156-157).

      c.     *Misty and Tonka*

Sgt. Hyden's discriminatory "assignment" of Misty and Tonka to Sgt. Hoff is supported by the evidence in the record. The facts contained in the record establish that, although Misty and Tonka may or may not have been *officially* "assigned" to Cpl. Hoff, there was no question within the Mounted Unit that Sgt. Hyden had *in fact* assigned them to Cpl. Hoff without asking the male officers, including Plaintiff who had more seniority that Cpl. Hoff if they would like to have the horse assigned to them – officially or otherwise. (Hill Dep. at 153-156).

With regard to Tonka, the record establishes that Tonka, while a handsome horse, was hard to handle. (Hyden Dep. at 51, 55; Hill Dep. at 150). Cpl. Hill trained Tonka for the Virginia Beach Competition because he could not use the horse assigned to him, Darby. (Hyden Dep. at 52-53; Hill Dep. at 152). After working extensively with Tonka and training him to the extent that Plaintiff and Tonka won awards at the competition, Plaintiff placed a request to Sgt. Hyden that she permit him to continue to work with Tonka. (Hyden Dep. at 57). Sgt. Hyden responded that he would not be able to continue working with Tonka because Cpl. Hoff would now be working with him primarily. (Hill Dep. at 153-154). Obviously this was a de facto assignment of Tonka to Cpl. Hoff. (*Id.*). Simply put, once Tonka was properly trained and was now an award winning horse, Sgt. Hyden decided that the only female officer in the Mounted Unit would now be the officer who worked with Tonka primarily. (Hill Dep at 153-154).

Additionally, Defendants' Opening Brief itself provides insight into the discriminatory assignment of these horses to Cpl. Hoff. Defendants' Opening Brief reads, "Misty was also an extra

22

horse that everyone had a chance to ride. Hoff apparently rode Misty more than the other officers because she asked Hyden to ride her." (Defs'. Opening Br. at 24). This statement implies that a request is all that was required in order for Cpl. Hoff to work with the horse of her choosing. However, when Plaintiff requested to continue to working with Tonka after the Virginia Beach Competition, a horse that he had properly trained and built a rapport with, Sgt. Hyden denied that request and informed Plaintiff that Cpl. Hoff would now be working with Tonka. (Hill Dep. at 153-154). Stated differently, all Cpl. Hoff had to do was make a request to ride a horse and that request was granted. Cpl. Hill on the other hand, made a similar request and that request was denied in favor of a female officer.

   d.    Omega

   Next is the issue of Cpl. Hoff being injured on the job and not being required by Sgt. Hyden to present at Omega for an examination. Defendants contend that Sgt. Hyden had no knowledge of any such injury. However, evidence exists in the record that establishes that Sgt. Hyden *had* to know of the injury because Cpl. Hoff was permitted by Sgt. Hyden to spend an inordinate amount of time working from her patrol car, as opposed to being on horseback, during the time frame when she was injured. The amount of time spent by Cpl. Hoff in the patrol car raised the suspicion of the other officers as to the extent of her injury. Then, Cpl. Hoff openly admitted in front of the other officers in the Mounted Unit that her own personal doctor told her that she should not to ride horses. (Bates ## NCC2246 – 2247). It was only after Cpl. Hill made his verbal complaint to Capt. Setting about the unfair treatment that he received and mentioned Cpl. Hoff's injury did Sgt. Hyden require Cpl. Hoff to present at Omega for an examination. (Bates # NCC2245).

23

Defendants attempt to explain away the discriminatory conduct of Sgt. Hyden in this regard by pointing to a very minor injury suffered by Plaintiff in which he was permitted to work out of a patrol car for a couple days. The significant difference between the two is the amount of time that each was permitted to work out of a patrol car and more importantly the extent of their injuries. Plaintiff simply had a pulled muscle and was never instructed by his doctor that he should not be riding horses while Cpl. Hoff was advised that she should not be riding horses at all. (Appendix J; Hill Dep. at 160-161).

  e. *Communication Lines*

Next is the issue of the open communication lines. Again, Defendants' argue that there is no evidence in the record to substantiate this claim. However, Sgt. Hyden found out about the radar calibration issue through Cpl. Hoff. (Hyden Dep. at 76). When she did find out, Sgt. Hyden did not call the acting sergeant, Cpl. Hill about this issue. (Hill Dep. at 96-97). She called or spoke to Cpl. Hoff about the incident and had Cpl. Hoff relay the message to Cpl. Hill that the entire unit was to have a meeting on that issue after work. (Hill Dep. at 100-101; Hyden Dep. at 76). Logic dictates that, all communication lines being equal, Sgt. Hyden would have called Cpl. Hill, as acting sergeant and the individual who she claims did not follow her orders, about this issue instead of an officer who was supposed to be working under his supervision.[24] But she did not. Instead, she spoke to the only other female in the Unit and had her instruct Cpl. Hill to telephone Sgt. Hyden. (Hill Dep. at 101); Hyden Dep. at 76).

---

[24] During the investigation of Cpl. Hill's complaint, Sgt. Hyden falsely stated that she called Plaintiff in response to her discovering that the Mounted Unit was not where she believed they would be, (Bates ## NCC2269, NCC2242-2243); when in fact, Plaintiff received a message from Cpl. Hoff to telephone Sgt. Hyden regarding the incident – which he did in prompt fashion. (Hyden Dep at 75 – 76).

24

There is also the issue of the overtime outlined above. If all communications lines were equal, then it stands to reason that all officers would have received the calls for overtime opportunities on the weekends such as Cpl. Hoff. However, they did not. Sgt. Hyden has also has associated with Cpl. Hoff on an off duty basis in a manner different from that of Plaintiff and the other male officers of the Mounted Unit. (Hyden Dep. at 26-34). For instance, Cpl. Hoff has spend the night at Sgt. Hyden's house; (Hyden Dep. at 29-30); spoke to her on the telephone about personal issues; (Hyden Dep. at 27); went on trips together – even staying in the same room, (Hyden Dep. at 30-31); and went to get a pedicure with her. (Hyden Dep. at 26–27). Sgt. Hyden did none of these things with Plaintiff. (Hyden Dep. at 34).

Defendants also argue that Cpl. Hoff and Sgt. Hyden's friendship does not give rise to a cause of action under Title VII. This argument runs contrary to the testimony provided by Sgt. Hyden in her deposition – that they are *not* personal friends. (Hyden Dep. at 36). If Sgt. Hyden's testimony regarding their not being friends is accepted as true, that fact goes to support discriminatory animus inasmuch as she was afforded opportunities to interact with Sgt. Hyden that were not afforded to Plaintiff and the other male members of the Mounted Unit.

   f.   *Acting Sergeant*

Defendants contend that up until December 2005, the date that the official policy changed requiring the most senior member to be named sergeant, Sgt. Hyden was not required to use Cpl. Hill as the acting sergeant.[25] Although this may have been the official written policy of the New Castle County Police Department during that time period, that is not what was done in practice. The

---

[25] The comments in Defendants' Opening Brief pertaining to the start dates of employment of Plaintiff and Cpl. Hoff are immaterial to this case inasmuch as a more senior officer is more senior whether he is more senior by one day or one year.

common practice during Cpl. Hill's entire tenure with the New Castle County Police Department (with the exception of the time period encompassing the discriminatory conduct) has been for the most senior officer to fill in as acting sergeant. (Hill Aff.). Important in this regard is the fact that Sgt. Hyden *never* utilized Cpl. Hoff as acting sergeant until she began openly discriminating against Plaintiff. (Hill Aff.).

      g.    *Radar Calibrations*

Clearly, Sgt Hyden's ire over the radar calibration incident focused on Cpl. Hill and not the entire unit. (Hill Dep. at 97-102; Hyden Dep. at 74). Furthermore, it is undisputed that Sgt. Hyden not only addressed the entire unit on this issue, but came in to work while on vacation that very same day. (Hyden Dep. at 81). Sgt. Hyden did this despite the fact that there was only one other officer who went with Cpl. Hill to have the radar units calibrated. (Hyden Dep. at 76; Hill Dep. at 92). The remainder of the Mounted Unit went on patrol as Sgt. Hyden expected them to do. (Hill Dep. at 92-93; Hyden Dep. at 76). Virtually all of the officers in the Mounted Unit felt that Sgt. Hyden made much more of this incident than was warranted. (Bates ## NCC2244 –2245; NCC2247;).

The above facts certainly raise more than an inference that Sgt. Hyden's motivation to address this issue with the whole unit was done as a means to discredit Cpl. Hill with the other officers in the Mounted Unit. Stated differently, Sgt. Hyden had no issue with the other officers in the Mounted Unit on this topic as it was Plaintiff's decision for he and Officer Brown to go have the calibrations done. (Hill Dep. 92-93). Therefore, it was patently unnecessary for the other members of the Mounted Unit to be present while she addressed the issue with Plaintiff – unless her motive was to create ill will amongst the other members of the Mounted Unit's against Plaintiff and discredit him as the acting sergeant.

Also casting doubt on the validity Sgt. Hyden's anger geared toward Plaintiff is her own response on how she would have handled similar circumstances:

> Q. – would you have taken the radar units to have the calibrated?
> A. You know, again, not being there that's hard to say.... I think for me to answer that blanketly I don't know that I can do that with one blanket answer. I think with any good, sound decision-making you have to consider all the circumstances.

(Hyden Dep. at 80). Given Sgt. Hyden's position on how she would have handled the situation, one wonders why she was so angry with Plaintiff on this issue in light of the fact that she could not even provide a straight answer as to yes she would have done the calibrations or no she would not have. In addition, Sgt. Hyden did not even speak to Plaintiff beforehand to determine the surrounding circumstances to ascertain if he had in fact made the correct decision. (Hill Dep. 97-98). Finally, as acting Sgt. it was Plaintiff's duty to make such a decision.

Defendants also point to Plaintiff's own evidence recorded prior to the institution of the lawsuit to support their claims. In other words, they contend that Plaintiff's own notes do not indicate that he felt he was being discriminated against. However, the radar incident was the first instance of discrimination and, as is the case often in a workplace discrimination case, Plaintiff did not even recognize this first discriminatory act as discriminatory at the time. It stands to reason that an employer's first instance of discrimination taken under the pretext of a legitimate business reason will not be viewed as discriminatory by the target. Indeed, it was not until after Sgt. Hyden took subsequent discriminatory actions against Plaintiff that he began to realize that he was being discriminated against. (Hill Aff.).

27

*h.*    *Captain Setting's Desk*

Defendants contend that Sgt. Hyden's statement about Plaintiff being under Capt. Setting's desk cannot be viewed in a vacuum. On this point, Plaintiff agrees with Defendant – this is only one piece of evidence that should not be viewed alone, but instead must be viewed under the totality of all of the circumstances along with all other evidence to determine if Sgt. Hyden was discriminating against Plaintiff. *See, Iadimarco, supra.*

Defendants further assert that "this comment cannot be used to denigrate because he was a male." (Opening Br. at 28).[26]   Defendants' argument in this regard is somewhat confusing and appears to denote gender discrimination in its own right. Nevertheless, by Sgt. Hyden's own admission, this comment was harassing. (Hyden Dep. at 87). Sgt. Hyden also testified that she has *never* made a similar statement like this to Cpl. Hoff. (Hyden Dep. at 83). Inasmuch as this statement has been recognized as harassing by Sgt. Hyden and inasmuch as she has never made such a statement to a female officer in the Mounted Unit, Sgt. Hyden's own admissions establish that this statement to Cpl. Hill was discriminatory.

*i.*    *Virginia Beach Snub*

Sgt. Hyden admits that she did not congratulate Plaintiff after his victories in Virginia Beach. (Hyden Dep. at 87-89).[27] She attributes her snub to Plaintiff's victory as a team victory being a team victory. (Hyden Dep. at 88). Yet when it came time to *criticize* Plaintiff for overlooking something at the competition, Sgt. Hyden apparently has a different outlook on the team concept because for his alleged poor performance, Sgt. Hyden singled him out for criticism and threatened to discipline him

---

[26] During the "investigation" of Plaintiff's Complaint regarding Sgt. Hyden, Sgt. Hyden denied making the comment. However, after Officers Guyton and Brown testified that they heard her make the statement, Sgt. Hyden recognized that she did in fact make the statement.

with measures not warranted under the circumstances. (Hyden Dep. at 92-96). However, when the Mounted Unit returned to Delaware after the competition, Sgt. Hyden did single out Plaintiff negatively for failing to clean his horse's sheath and threatened him not only with discipline, but threatened to have him removed from the Mounted Unit – a threat that she carried through only five months later. (Appendix M).

      j.      *Cpl. Hoff's Interaction with Mounted Unit*

      One of Defendants' stated reasons for Plaintiff's transfer was his being withdrawn from the remainder of the Mounted Unit. (Watson Dep. at 8). Even if this statement is accepted as true, Cpl. Hoff also encountered problems with the other members of the Mounted Unit. In fact, Cpl. Hoff's interaction with the Mounted Unit became so bad that a meeting was held with the other members of the Mounted Unit to address the issue. (Bates #NCC2245) During this meeting, all of the members of the Mounted Unit discussed how difficult Cpl. Hoff was to work with and everybody in the Mounted Unit felt "Cpl. Hoff's 'cut throat' personality was a problem within the unit." (Bates # NCC2245).

      Despite Cpl. Hoff's difficulties working with the other officers, Sgt. Hyden, told the other members of the Mounted Unit that this was just her personality and requested that they just try to work with Cpl. Hoff. (Bates #NCC2249). Cpl. Hoff remains on the Mounted Unit today. On the other hand, with regard to Plaintiff's alleged difficulties with the other members of the Mounted Unit, he was not the beneficiary of a request to the other members of the Mounted Unit to just try to work with him. Instead, Sgt. Hyden drafted a four page memorandum about Plaintiff to Captain

---

[27] Although Sgt. Hyden admitted during her deposition testimony that she did not congratulate Plaintiff following the competition in Virginia Beach, that allegation is denied in Defendants' Answer to the Amended Complaint.

Hitch on February 24, 2006, (Bates ##NCC2254 – 2257); and Plaintiff was transferred out of the Mounted Unit approximately two weeks later. (Appendix M).

      *k.*    *Summary*

Defendants contend that Plaintiff has not met his prima facie burden and that his claims are all based upon his own suspicions. However, the above instances are supported by solid facts in the record and these instances cannot be viewed in a vacuum – everything must be viewed together. Plaintiff has sufficiently pointed to a substantial amount of evidence whereby the finder of fact could reasonably find that discrimination was the motivating reason for the complaint or to disbelieve Defendant's reasons for taking the actions against Plaintiff, easily exceeding his burden of pointing only to *some evidence* of same. In this regard, Plaintiff has met this burden.

Furthermore, given the inconsistent testimony of Sgt. Hyden during her deposition as opposed to her Answers in the Amended Complaint and her statements during the investigations of Plaintiff's complaints against her, it is plausible, in fact likely, that the finder of fact *will* disbelieve her stated reasons for taking action against Plaintiff.

      3.    <u>Captains Hitch and Watson Participated in the Conduct that Violated Plaintiff's Rights Under Title VII</u>

          *a.*    *Plaintiff's EEOC Complaint States a Cause of Action Against Hitch and Watson*

The "parameters of a civil action in the District Court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination ...." *Angelino v. New York Times Co.*, 200 F.3d 73, at 398-399 (3rd Cir. 1999), *quoting, Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394 (3d Cir.1976), *see also, Gamble v. Birmingham Southern R.R.*

30

*Co.,* 514 F.2d 678 (5th Cir.1975) and *Oubichon v. North Am. Rockwell Corp.,* 482 F.2d 569 (9th

Cir.1973)).

The EEOC Complaint was filed by Plaintiff on September 12, 2006. Among other things it

states:

> In October 2005, Charging Party filed a formal complaint with the
> mounted Patrol Division Captain, Capt. Setting, that he was being
> harassed by Sgt. Hyden. Capt. Setting was immediately transferred
> and Capt. Hitch replaced him and performed the investigation into
> Charging Party's complaint. Respondent found the complaint
> unsubstantiated and Capt. Hitch was replaced by Capt. Watson at the
> beginning of March 2006. On 03/13/06, Charging Party was called in
> by both Capt. Hitch and Capt. Watson and informed the [sic] he was
> immediately being transferred to the Uniformed Patrol Division
> which encompassed working any of the three shifts in a 24 hour
> period with rotating days off.

(Appendix P).

Captains Hitch and Watson were identified in the Charge of Discrimination *by name* as actors

in the discriminatory conduct taken against Plaintiff. Clearly, Plaintiff's claims against Captains

Hitch and Watson were reasonably within the scope of the EEOC investigation, and/or could have

reasonably been expected to grow out of the Charge of Discrimination.

       *b.*     *Hitch and Watson Discriminated Against Plaintiff in Violation of Title VII.*

Defendants contend that Captains Hitch and Watson committed no violations of Title VII

because Col. McLaren was the individual who ordered the transfer of Plaintiff. However, Captains

Hitch and Watson recommended the transfer via information gained through tainted investigations

that violated Title VII, and based upon their statements, Col. McLaren ordered the transfer. Captains

Hitch and Watson blindly accepted Sgt. Hyden's statements that Plaintiff was a poor performer.

(Hitch Dep. 18-22; Watson Dep. 21). Incredibly, accepted these statements by Sgt. Hyden, the very

31

supervisor who was accused of discriminating against him and with knowledge that there was an ongoing conflict between Sgt. Hyden and Plaintiff. (Watson Dep. at 6).

Secondly, the stated reasons for the transfer were Plaintiff's "*continued* lack of performance to a certain level. There were some issues with him having respect for Sergeant Hyden's authority." (Watson Dep. at 8). However, they made this recommendation in the face of years worth of above-average performance evaluations of Plaintiff. (Appendix G). In fact, in the most recent evaluation of Plaintiff prior to his transfer, Plaintiff performed "very good" in three of the twelve categories, and "outstanding" in nine of the twelve. (Bates # NCC0099). Furthermore, in the descriptive portion of the evaluation, it was reported that "Your relationship with co-workers can only be described as excellent. You are constantly helping your partners and are in example of a team players, something which is mandatory in this unit." (Bates # NCC0100). This evaluation also commended Plaintiff for "not us[ing] any sick time … [being] a hard worker … written and oral communications are outstanding … [y]ou represent the New Castle County Police in a positive way … [y]ou accept additional responsibilities the Mounted Unit requires without complaint … never heard you complain and are always willing to tackle your daily assignments … [and] you should consider testing for Sergeant at the next posting …." (Bates ##NCC0100 – 0101).

Also, during the investigation and the grievance procedure, Sgt. Hyden denied making the statement about Plaintiff being under Capt. Setting's desk. (Hyden Dep. at 87). Later, when faced with Officers Guyton and Brown's statements that she had in fact made the comment, Sgt. Hyden has admitted to making the comment (although she claims that she still does not remember making it). Captain Watson testified that such a sergeant who makes such a comment to another should be disciplined of the comment is offending to the recipient. (Watson Dep. at 12). However, not only did

32

Capt. Watson fail to pursue any discipline against Sgt. Hyden, he did not even bother to talk to Plaintiff about it. (Watson Dep. at 12-13).

Here we have an employee, who made a discrimination complaint about his direct supervisor. The commanding officer of the unit, Capt. Watson then discovered that Sgt. Hyden made a false representation during the investigation regarding the comment; that she had in fact made the comment; yet he completely failed to pursue any type of disciplinary action against Sgt. Hyden and did not even attempt to talk to the individual to whom the comment was made. Instead of disciplining Sgt. Hyden for the comment, Captain Watson transferred Plaintiff and replaced him *the very same day Plaintiff is transferred out of the Mounted Unit with a female police officer*. Based upon these facts, Capt. Watson clearly gave preferential treatment to a female, Sgt. Hyden than he did to Plaintiff.

Captain Hitch also violated Title VII inasmuch as he participated in the transfer of Plaintiff out of the Mounted Unit with direct evidence, in the form of the statement by Officer Guyton, that Sgt. Hyden treated Cpl. Hoff more favorably than the male officers and by not taking similar disciplinary actions against Sgt. Hyden.

    4.    <u>Defendants' Replacement of Plaintiff with a Female, Cpl. Williams Raises an Inference of Discrimination</u>

Defendants contend that Plaintiff's replacement on the Mounted Unit does not support Plaintiff's claim for gender discrimination. To the contrary, while the Third Circuit no longer *requires* a plaintiff to show that he was replaced by someone outside of his protected class, the fact that he was replaced by someone outside of the protected class establishes an inference of discrimination. *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 Fed Appx. 239, 242 (3d Cir. 2007),

33

*see also, Zimmermann v. Assocs. First Captial Corp.*, 251 F.3d 376,381 (2d Cir. 2001)("[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination.").

**B.    Genuine Issues of Material Fact Exist in the Record, Pertaining to Defendants' Retaliation Against Plaintiff, Preclude Summary Judgment in Favor of Defendants on Plaintiff's Retaliation Claim**

1.    Plaintiff Must Not Be Actually Dissuaded From Pursuing His Rights to Assert a Prima Facie Retaliation Claim

Plaintiff is at a loss to respond to Defendants' first argument that, because Plaintiff followed through with his complaints about Sgt. Hyden, somehow he has no retaliation claim. Simply put, in order to sustain a retaliation claim, one must first engage in protected activity (i.e., make a complaint). In support of their argument, Defendants cite to *Sykes v. Pennsylvania State Police*, 2008 WL 901969 (3d Cir. 2008).[28] This case does not stand for the proposition alleged by Defendants – that the employee must, *in fact*, be dissuaded from following through. The holding in that case is that "the employer's actions must be harmful to the point that they *could* well dissuade a *reasonable worker* from making or supporting a charge of discrimination." *Id.* at *1 (emphasis supplied). The actual holding of that case is that the lower court found that none of the alleged retaliatory conduct was prompted by the protected activity. *Id.* at *2.

Here, Plaintiff *was* dissuaded for a period of time – for over one year – from making a claim of discrimination because he was concerned that Defendants would retaliate against him. Due to this fear, he endured months of discriminatory actions by Sgt. Hyden. It was not until Plaintiff was convinced that Sgt. Hyden was eventually going to transfer him out of the Mounted Unit no matter

---

[28] To construe the case as Defendants had done in their opening brief is absurd and is directly contrary to the public policy underlying the anti-retaliation provision of Title VII.

what he did that Plaintiff decided to seek the protection of his employer and make the complaint to Captain Setting. Simply put, Plaintiff felt he had nothing to lose by filing the complaint because he was convinced that his days on the Mounted Unit were numbered in any event.

2.    Investigation of Complaint

Defendants contend that there is "no evidence in the record that Hitch failed to fully investigate Plaintiff's complaint against Hyden." However, upon interviewing Officer Guyton, Capt. Hitch discovered that, another member of the Mounted Unit felt that Cpl. Hoff received more favorable treatment than did the male members of the Mounted Unit. (Bates # NCC2247). In addition, other members of the Mounted Unit indicated that there were tensions between Sgt. Hyden and Plaintiff (Bates ## NCC2242 – 2252). Despite hearing this corroborating evidence of Plaintiff's complaints about Sgt. Hyden, Capt. Hitch took no action whatsoever to follow up on or explore that evidence further. He merely concluded that Sgt. Hyden had done nothing wrong and promptly held the "clean slate meeting."

Plaintiff proffers that if an employee makes a claim of discrimination against a supervisor, and upon investigating the matter, the investigator collects corroborating evidence from another employee similarly-situated to the complainant, that investigator is under a duty to take reasonable steps to fully and completely investigate the claims and to remove the perpetrator of the alleged discrimination from contact with the target of the conduct. In this regard, a complete Internal Affairs investigation should have been recommended. However, instead of removing Sgt. Hyden from the situation and instead of recommending an Internal Affairs investigation, Capt. Hitch simply discounted Plaintiff and Officer Guyton's statements out of hand and found the complaints unsubstantiated.

35

Nevertheless, the failure to investigate goes beyond the time period in which Capt. Hitch was in charge of the Mounted Unit. The investigation also flowed into Capt. Watson's tenure. (Watson Dep. at 20). Capt. Watson requested memorandums from some members of the Mounted Unit regarding, *not* Cpl. Hill's complaints, but Cpl. Hill's performance. (Bates ## NCC2258 – 2259; NCC2263 – 2267; and NCC2260 – 2262). Significantly, Capt. Watson, while requesting memorandums from members of the Mounted Unit who he knew would provide him with the proper ammunition to accomplish the transfer, *did not* request or procure memorandum from Officer Guyton, the individual who previously indicated that Cpl. Hoff received favorable treatment from Sgt. Hyden. Again, much like Capt. Hitch, Capt. Watson also failed to conduct and adequate and fair investigation of the matter. Seemingly, both Capt. Watson and Capt. Hitch's investigations were tailored to find fault with Plaintiff all the while ignoring evidence that Sgt. Hyden was discriminating against Plaintiff.

Also during the grievance investigation, Capt. Watson discovered that Sgt. Hyden provided false information during the investigation and/or grievance process of Plaintiff's complaints on two areas of inquiry. First she denied making the "under Capt. Setting's desk" comment, (Hyden Dep. at 87); a comment that Capt. Watson later learned had in fact been made by Sgt. Hyden. (Watson Dep. at 11-12). Sgt. Hyden also denied participating or being involved in any way of the transfer of Plaintiff out of the Mounted Unit. (Hyden Dep. at 96-97). Again, Defendants learned that this statement, provided at Plaintiff's grievance hearings was also false.

Despite providing false testimony on two separate subjects during the grievance proceedings of this matter, and despite Capt. Watson's own testimony that such a comment warranted disciplinary action, Sgt. Hyden incurred no discipline whatsoever and there is no information in the

36

record that Defendants ever investigated these matters further. Instead, they simply upheld Plaintiff's transfer.

With regard to Plaintiff's claims about the failure to investigate being a retaliatory action, Plaintiff proffers to the Court that any reasonable worker *would* be dissuaded from making a complaint about discrimination by his supervisor if he believed, as was the case here, that the employer would not investigate or would not investigate the matter thoroughly.

        3.    Transfer

              i.    *Plaintiff Engaged in Protected Activity Even After He Made His Initial Written Complaint to Captain Hitch*

In their Opening Brief, Defendants incorrectly assume that Plaintiff's initial complaint to Capt. Hitch is the only protected activity in which Plaintiff engaged for purposes of addressing the temporal proximity of the protected activity to the retaliatory conduct of the transfer from the Mounted Unit. Not only was the initial complaint protected activity under Title VII, but any other actions opposing the employer's discriminatory conduct, including actions or statements by Plaintiff opposing the discriminatory conduct is considered protected activity under Title VII. For example, protected activity encompasses utilizing an informal grievance procedure or participating in an investigation such as that conducted by Captain Hitch. *Laughlin v. Metropolitan Washington Airports* Authority, 149 F.3d 253, 259 (4th Cir. 1998). Therefore, any interaction Plaintiff had with that investigation was protected activity.

In addition, any time Plaintiff spoke out about Sgt. Hyden discriminating against him to *anybody* working for New Castle County, including his speaking out about Sgt. Hyden's treatment of him and her preferable treatment of Cpl. Hoff during the "clean slate meeting" on January 25, 2006,

also constitutes protected activity under Title VII. In that meeting, Cpl. Hill aired his grievances to Capt. Hitch and Sgt. Hyden and indicated his disagreement with Capt. Hitch's findings. (Bates ## NCC2251; NCC2254); *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2nd Cir. 1990). Furthermore, Plaintiff engaged in protected activity by speaking out against being discriminated against on the very day that he was transferred.

> ii.    *The Timing of Defendant's Transfer of Plaintiff in Relation to His Protected Activity in Addition to Other Evidence of Retaliation Establishes a Question of Fact for the Jury as to Whether a Causal Link Exists Between the Two to Establish a Claim for Retaliation*

"The Third Circuit has stated that: temporal proximity between the protected activity and the adverse employment action is sufficient to establish a causal link." *Lafate v. Chase Manhattan Bank*, 123 F.Supp.2d 773, 779 (3rd Cir. 2000). "Courts are quick to draw an inference of causation when the alleged retaliation occurs only a short time after the employer received notice of the employee's protected activity." *Id.* Here, Plaintiff engaged in protected activity on the very day that he was transferred. Obviously such timing is indicative of a causal link. *See, Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)(two days between notice of the protected activity and the retaliation led to an inference of causation).

However, as this is not Plaintiff's Motion for Summary Judgment, Plaintiff need not conclusively prove that there exists a causal link between the protected activity and the retaliatory transfer. All Plaintiff must do is point to facts that raise a material issue of fact as to whether a jury could find that there is such a causal link. "The amount of time between the protected activity and the alleged retaliation is a circumstance to be considered by a fact-finder in determining if the plaintiff has established the required causation." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d

38

183, 189 (3d Cir. 2003). In other words, where the causal link is not affirmatively established by temporal proximity, Plaintiff may establish the causal link via other factors indicative of retaliation. The Third Circuit has "set forth no limits on what [courts can] consider" in determining causation. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).

The first issue is Plaintiff's evaluations prior to the transfer. As is stated above, all are at least satisfactory and the most recent evaluation prior to the transfer very good to outstanding. In order to legitimately transfer Plaintiff based upon performance reasons, Defendants would have had to have *completely* discounted Plaintiff's prior performance evaluations and decided to accept the word of the very supervisor that this individual accused of discriminating against him.

Next is the issue of Defendants New Castle County, Hitch and Watson with regard to their treatment of Sgt. Hyden for her misconduct. Sgt. Hyden was caught on two separate occasion giving false statements during in internal investigation. Yet no disciplinary actions were ever taken against her for these transgressions. However, the individual who brought the charges against her that necessarily precipitated the false statements was transferred out of the Mounted Unit. Significantly, it was not the *discriminator* who was transferred out of the Mounted Unit – it was the individual who was being discriminated against.

Third is the continuing hostility by Sgt. Hyden toward Plaintiff. After Plaintiff made his complaint about Sgt. Hyden, she rarely spoke to him throughout the course of the work day and only did so when she absolutely had to. This conduct toward Plaintiff continued even after the "clean slate meeting."

Next are the evaluations given to Plaintiff following his transfer from the Mounted Unit. These evaluations were not timely submitted and were retroactive two years prior. Not surprisingly,

39

these evaluations were the two worst evaluations that Plaintiff received the entire time that he was "in" the Mounted Unit. A very strong inference is raised via these evaluations that Defendants were simply attempting to cover their tracks, or substantiate their retaliatory transfer.

Based upon the above, there is clearly enough here to allow the decision of whether the transfer was retaliatory to be made by a jury.

### iii. *Performance Evaluation*

Defendants' argument that Plaintiff's 2005 and 2006 performance evaluations were not retaliatory because they did not occur subsequent to or contemporaneous with the protected activity completely misses the mark. The "2005" performance evaluation was completed by Sgt. Hyden on April 17, 2006, barely one month after Plaintiff's retaliatory transfer and only two weeks after he engaged in the protected activity of filing a grievance over his wrongful transfer; and contemporaneously with participating in the grievance procedure. (Bates # 0000009, 0000114-0000115). The 2006 performance evaluation occurred less than one month later during a time that Plaintiff was still participating in the grievance procedure. (Bates # 0000015, 0000116-0000118)

Interestingly, prior to the "2005" evaluation, Plaintiff had received no evaluations for almost twenty months and that previous evaluation contained no performance categories graded at less than "very good" and the vast majority of which were graded at "outstanding." (Bates # 0000006). Then, within two months following Plaintiff's retaliatory transfer, he received *two* evaluations that contained two grades of "improvement needed" and five grades of only "satisfactory." (Bates ## 0000015, 0000020).

Also noteworthy is the fact that the *entire time* Plaintiff was in the Mounted Unit, he *never* was graded at "improvement needed" until after he complained of discrimination and after he filed a

40

grievance on that issue. (Bates ## 0000001, 0000006, 0000009, 0000015).  Given the temporal proximity of Plaintiff's protected activity of filing and participating in the grievance procedure, immediately prior to and contemporaneously with the performance evaluations, an inference is raised that such performance evaluations were retaliatory.

Furthermore, not only is an inference raised that these performance evaluations were retaliatory in and of themselves, an inference is also raised that they are continuation of the retaliatory conduct of the transfer itself.  Based upon the factual circumstances as well as the timing of these performance evaluations, a material issue of fact is raised as to whether these performance evaluations are retaliatory that must be preserved for the jury at trial.

> **C.**   **Genuine Issues of Material Fact Exist in the Record, Pertaining to Misrepresentations Contained in Defendants' Investigation of Plaintiff's Complaint of Discrimination, Defendants' Subsequent Investigation Following the Filing of Plaintiff's Grievance, and in Defendants' Performance Evaluations of Plaintiff, that Preclude Summary Judgment in Favor of Defendants on Plaintiff's Breach of the Covenant of Good Faith and Fair Dealing Claim**

Plaintiff has established a viable claim for breach of the covenant of good faith and fair dealing that should be addressed by the jury.  Simply put Defendants misrepresented their reasons for his transfer and included grades on his performance evaluations that were lower than that which Plaintiff should have earned.  The evidence supporting these two aspects of the claim are outlined in §§2(a), 3(b), 5(c)(i),(iii), *supra*.

> **D.**   **Genuine Issues of Material Fact Exist in the Record Pertaining to Plaintiff's Claim Under the Fourteenth Amendment Which Preclude Summary Judgment on Plaintiff's Claim Under the Fourteenth Amendment**

> *1.*   *Official Capacity Claims*

41

As the caption of the Amended Complaint clearly establish, Sgt. Hyden, Capt. Hitch and Capt. Watson are sued only in their individual capacities. Therefore, Plaintiff need not address Defendants' arguments against official capacity claims against the individual Defendants.

2.    *Individual Capacity Claims*

The allegations in the Amended Complaint as well as the factual record clearly establish that Sgt. Hyden, Capt. Hitch and Capt. Watson all participated individually in discriminating and/or retaliating against Plaintiff in violation of Title VII and under color of state law. Therefore, these claims must not be dismissed.

3.    *Defendants are Not Entitled to Qualified Immunity Because the Facts, When Viewed in a Light Most Favorable to Plaintiff Establish that Defendants Clearly Recognized a Violation of Rights Under the Fourteenth Amendment and Title VII*

In determining whether an individual defendant is entitled to qualified immunity in a §1983 action, the court must apply a two-step test. *Couden v. Duffey*, 305 F. Supp. 2d 379, 387 (D. Del. 2004).

> First, the court must determine whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation. . . . If the plaintiff has raised a constitutional violation, the second step is to determine whether the constitutional right was clearly established. The question then becomes whether, in the factual scenario established by the plaintiff, a reasonable officer would have understood that his actions were prohibited. As a matter of law, if it would not have been clear to a reasonable officer *what the law required* under the facts alleged, he is entitled to qualified immunity.

*Id.* (internal citations, quotations and parentheticals omitted).

In addressing the first step, the record contains sufficient facts to establish a Constitutional violation of Plaintiff's right to equal protection under the law. As is indicated throughout this Answering Brief, Sgt. Hyden, Capt. Hitch and Capt. Watson ("Individual Defendants") violated

42

Plaintiff's rights when it wrongfully discriminated and retaliated against him under the color of state law.[29]

Moving on the second step, as supervising officers in an agency as large as the New Castle County Police, Individual Defendants certainly were aware that they must supervise and treat their employees free of any discriminatory animus. Furthermore, the investigations by Captains Hitch and Watson into Plaintiff's complaints indicate that by virtue of conducting such investigations, Captains Hitch and Watson were in fact aware of Plaintiff's Constitutional right to be employed free of discriminatory conduct by his superiors. Furthermore, even if the Court were to find that Sgt. Hyden were not aware of this fact, certainly once Captain Hitch began his investigation, Sgt. Hyden was put on notice that she may not discriminate against Plaintiff but, as the record reflects, the discrimination continued thereafter. Finally, again if the Court were to find that none of the Individual Defendants knew of the potential Constitutional violations, a reasonable supervising officer in their positions would have recognized that Plaintiff is entitled to equal protection under the law in terms of his employment.

First is the issue of Sgt. Hyden's false testimony. During the investigation, Sgt. Hyden flatly denied that that she made the Captain Setting's desk comment. (Hyden Dep. at 87). Later, following Officers Guyton and Brown's testimony that she had made the comment, Sgt. Hyden admitted that she made the comment, (Hyden Dep. at 84), necessarily implicating Sgt. Hyden for making a false statement during an investigation. However, this admission was not only disregarded, but New Castle County, Captains Hitch and Watson took no action whatsoever against a female, Sgt. Hyden.

---

[29] To restate the specific instances of discrimination and retaliation that have already been set forth in detail above would be superfluous and therefore will not be accounted with specificity in this portion of the Brief.

43

In fact, to this day, *no action* has ever been taken against Sgt. Hyden for her false statement. Obviously, this evidence establishes that Sgt. Hyden was receiving favorable treatment during the investigations of Plaintiff's complaint. But it also establishes that due to this favorable treatment, New Castle County, as well as Captains Hitch and Watson, held animosity toward Plaintiff and retaliated against him for his complaints.

MARTIN & WILSON, P.A.

/s/ TIMOTHY J. WILSON
**TIMOTHY J. WILSON**     **(Bar ID 4323)**
**JEFFREY K. MARTIN**     **(Bar ID 2407)**
1508 Pennsylvania Avenue
Wilmington, DE 19806
302-777-4681
twilson@martinandwilson.com
jmartin@martinandwilson.com
*Attorneys for Plaintiff*

DATED:  July 29, 2008

44

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JEFFREY D. HILL,                                :

             Plaintiff,                 :

        v.                                       :

NEW CASTLE COUNTY, a municipal          :
corporation, SGT. ANDREA HYDEN,         :
in her individual capacity, CAPT. MARK  :
HITCH in his individual capacity, and   :
CAPT. QUINTON WATSON, in his            :
individual capacity,                    :

             Defendants.              :

C. A. No. 07-228 (GMS)

JURY TRIAL DEMANDED

### CERTIFICATE OF SERVICE

I, Timothy J. Wilson, Esquire do hereby certify that a true and correct copy of the Plaintiff's Answering Brief In Opposition To Defendants' Motion For Summary Judgment was filed and serve via electronic filing on July 29, 2008 to the following:

Megan Sanfrancesco, Esquire
New Castle County Law Department
87 Reads Way
New Castle, DE 19707

        **MARTIN & WILSON, P.A.**

        **/s/ TIMOTHY J. WILSON**
        **TIMOTHY J. WILSON**     **(Bar ID 4323)**
        **JEFFREY K. MARTIN**     **(Bar ID 2407)**
        1508 Pennsylvania Avenue
        Wilmington, DE 19806
        302-777-4681
        twilson@martinandwilson.com
        jmartin@martinandwilson.com
        *Attorneys for Plaintiff*

DATED: July 29, 2008