*Jeffrey D. Hill v. New Castle County, et al.*
C. A. No. 07-228 (GMS)
Plaintiff's Answering Brief In Opposition Of Defendants' Motion For Summary Judgment

# APPENDIX A
# PART 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JEFFREY D. HILL,                    )
                                    )
            Plaintiff,              )
                                    )
                                    )
v.                                  ) Civil Action No.
                                    ) 07-228 (GMS)
NEW CASTLE COUNTY, a municipal      )
corporation, SGT. ANDREA HYDEN, in  )
her individual capacity, CAPT. MARK )
HITCH, in his individual capacity,  )
and CAPT. QUINTON WATSON, in his    )
individual capacity,                )
                                    )
            Defendants.             )

            Deposition of JEFFREY D. HILL, taken
pursuant to notice at the offices of New Castle County
Government Center, 87 Reads Way, New Castle, Delaware,
beginning at 9:30 a.m. on Tuesday, December 18, 2007,
before Ann M. Calligan, Registered Merit Reporter and
Notary Public.

APPEARANCES:

        JEFFREY K. MARTIN, Esquire
        MARTIN & WILSON, P.A.
          1508 Pennsylvania Avenue
          Wilmington, Delaware  19806
          on behalf of the Plaintiff,

        MEGAN SANFRANCESCO, Esquire
        NEW CASTLE COUNTY LAW DEPARTMENT
          87 Reads Way
          New Castle, Delaware  19720
          on behalf of the Defendants.


                WILCOX & FETZER
    1330 King Street – Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



1  ALSO PRESENT:

2              SGT. NICOLE HYDEN

3                   -----

4              JEFFREY D. HILL,

5       the witness herein, having first been

6       duly sworn on oath, was examined and

7       testified as follows:

8                   EXAMINATION

9  BY MS. SANFRANCESCO:

10   Q.    My name is Megan Sanfrancesco.  I'm an attorney

11  for the New Castle County Law Department.  I'm also

12  the attorney for Sergeant Hyden, Captains Hitch and

13  Watson.  I'm going to be asking you some questions

14  relating to the law suit that you filed against them.

15              Have you ever had your deposition taken

16  before?

17   A.   Yes.

18   Q.    What type of circumstance?

19   A.   Civil deposition, where somebody was injured.

20   Q.    Were you the officer involved?

21   A.   No.  No.

22   Q.    In what capacity were you deposed?  Were you a

23  plaintiff or defendant?

24   A.   A witness.

1    Q.    Have you ever had your deposition taken any

2    other time?

3    A.    Not that I recall.

4    Q.    Just a few ground rules for the deposition

5    process you probably are already familiar with.   We

6    need to have you verbalize your response for the court

7    reporter.   She won't be able to take down a shake of

8    the head, things like that, gestures.   So if I ask you

9    a question, try and verbalize your response.

10             If I ask you a question that you don't

11   understand, just tell me and I'll try and rephrase it

12   in a way that you can understand.

13             We will be able to take breaks.  If you

14   need to use the facilities or get a drink of water,

15   just let us know and we can stop, accommodate that

16   request.

17   A.    Okay.

18   Q.    Do you have any questions for me before we

19   start?

20   A.    No.

21   Q.    Before you got sworn in, your attorney just

22   told me you had just come off midnight shift last

23   night.

24   A.    No.   Couple days ago.

4

1    Q.   Oh.   Couple days ago.   What were your hours

2  yesterday?

3    A.   I was off yesterday.

4    Q.   You were off yesterday, and you started at what

5  time today?

6    A.   6:00 a.m.

7    Q.   You're not taking any medications or anything

8  that would impair your ability to testify credibly and

9  truthfully today?

10   A.   No.

11   Q.   Did you review any documents to prepare for the

12  deposition today?

13   A.   Yes.

14   Q.   Can you tell me what those documents were?

15   A.   The complaint itself that was filed and some of

16  the grievance papers that were involved in the

17  grievance process.

18   Q.   What types of papers were those?

19   A.   The grievance was all the stuff that was filed

20  from the FOP, from the union, and just paperwork that

21  was involved in that back and forth from the

22  government center to the union and the department.

23   Q.   Any other documents?

24   A.   Not that I can recall.

Jeffrey D. Hill - SanFrancesco

5

1    Q.    Did you in any other way prepare for the

2    deposition today, any other review, any other things,

3    documents?

4    A.    Yes.

5    Q.    What was that?

6    A.    I reviewed the case with the lawyer.

7    Q.    You said that you had reviewed the complaint

8    that was filed in this matter.  Did you also have a

9    chance to review the amended complaint?

10   A.    No.

11   Q.    I hand you a copy of the proposed amended

12   complaint in this matter.  It actually states

13   "Complaint" as the caption which is just a typo.  It's

14   an amended complaint that adds all of the information

15   that's been underlined.  If you could take a minute to

16   look through this, I just want to confirm that you

17   have an understanding of what's contained in that

18   document?

19            MR. MARTIN:  While we are off the record,

20   take whatever time you need, make sure you're familiar

21   with it.

22            (Discussion off the record.)

23            (Hill Deposition Exhibit 1 was marked for

24   identification.)

6

1    BY MS. SANFRANCESCO:

2       Q.   Have you had a chance to review the amended

3    complaint?

4       A.   Yes.

5       Q.   That was the same amended complaint that's been

6    marked as Hill 1?  Is that a yes?

7       A.   I didn't see you hand this to her.  I'm

8    assuming it is.

9       Q.   And does the amended complaint accurately state

10   the facts and the events leading up to your transfer

11   from the mounted patrol unit and the events

12   surrounding your claims against all the defendants?

13      A.   Yes.

14      Q.   In the amended complaint you named Sergeant

15   Hyden and Captains Hitch and Watson as individual

16   defendants.  Why were these defendants added to the

17   complaint?

18              MR. MARTIN:  I'm going to object insofar

19   as it may constitute attorney/client privilege and

20   also suggest that the complaint speaks for itself in

21   terms of the cause of action against those

22   individuals.

23      Q.   I'll clarify that I don't want you to answer

24   any conversations that you may have had with your

7

1    attorneys about that.  I want you to answer the

2    question based on your own personal knowledge.

3       A.    Can you repeat the question, please?

4       Q.    The question is, in the amended complaint

5    Sergeant Andrea Hyden, Captain Mark Hitch and Captain

6    Quinton Watson were added as individual defendants.

7    What is your understanding of why they were added as

8    individual defendants?

9       A.    Due to the fact they were directly involved in

10   what transpired.

11      Q.    And what transpired meaning what?

12      A.    The actions taken against me that were listed

13   in the complaint here.

14      Q.    Do you know what it means to sue a defendant in

15   their individual capacity as opposed to their official

16   capacity?

17             MR. MARTIN:  I'm going to direct him not

18   to answer based upon anything he's discussed with

19   counsel, but if he has knowledge before or after that,

20   that's fine.

21      Q.    Again, clarify the question.  I don't want you

22   to answer anything that you have discussed with your

23   counsel.  I'm asking you based on your independent

24   knowledge.

8

```
 1              Do you know what it means to sue someone
 2   individually as opposed to in their official capacity?
 3   A.    Legally term?  Legally term, no, I do not.
 4   Q.    Do you have any understanding whatsoever?
 5   A.    I would say individually it would be the
 6   person.  What was the other term you used?
 7   Q.    Officially.
 8   A.    Officially would be their work capacity.
 9   Q.    You're aware that these defendants are sued in
10   their individual capacities?
11   A.    Yes.
12   Q.    What is your claim against each of these
13   defendants?  And let's start with Captain Hitch.
14   What's your claim against Captain Hitch?
15   A.    Claim against Captain Hitch is his retaliation
16   actions after everything that transpired between our
17   meetings and our discussions related to my complaint
18   against Sergeant Hyden.
19   Q.    What do you mean by retaliation actions?
20   A.    The fact that what he verbalized to me at the
21   conclusion of our meetings and what transpired
22   approximately a month and a half later were
23   retaliatory actions.
24   Q.    You're saying Captain Hitch retaliated against
```

Jeffrey D. Hill - SanFrancesco

9

1    you?

2    A.    Yes.    He's one of the individuals that did,

3    yes.

4    Q.    Exactly what did he do or verbalize to you that

5    you consider retaliation?

6    A.    I said he -- after our meetings -- we verbally

7    had meetings --

8    Q.    Right.

9    A.    -- related to this case.    His actions taken

10   after those meetings are the retaliation factors.

11   Q.    What were his actions that you consider to be

12   retaliatory?

13   A.    He transferred me out of the mounted unit.

14   Q.    And why do you consider that to be a

15   retaliatory action?

16   A.    Well, the conversation we had prior to that was

17   that, after a meeting with myself, him, and Sergeant

18   Hyden, we were on a clean slate, so he called it, and

19   that everybody should go back and try to get along.

20   After that date, I didn't have any confrontations with

21   Sergeant Hyden and, to my knowledge, had no problems

22   in my capacity in the mounted unit after that date.    I

23   was abruptly called into his -- him and Captain

24   Watson's office and explained to me I was being

1    transferred.

2      Q.   Is it your opinion that Captain Hitch and

3    Captain Watson requested your transfer out of the

4    mounted unit?

5      A.   I would say they were in the chain that did so,

6    yes.

7      Q.   What is your understanding of retaliation?

8            MR. MARTIN:  Again, caution him not to

9    express anything he may have discussed with counsel.

10     Q.   We'll state a standing -- I don't know what you

11   want to call it -- understanding on the record.  Any

12   question I ask you, I don't expect you to discuss with

13   me any conversations that you had with your counsel.

14   Of course, your counsel will remind you of that

15   whenever I ask a question, but that's not my intent.

16           So, again, the question was, what do you

17   consider retaliation?  What's your understanding of

18   what retaliation is?

19     A.   Actions taken against someone for something

20   they may have said or done.

21     Q.   In this particular context, what is it that you

22   may have said or done that you believe led Captain

23   Hitch to retaliate against you?

24     A.   The fact that I made a complaint against

Jeffrey D. Hill - Sanfrancesco

11

1   Sergeant Hyden.

2   Q.   What about Captain Watson, is it your opinion

3   that he retaliated against you?

4   A.   Yes.

5   Q.   How did he do that?

6   A.   Both captains called me into the office.

7   Obviously, they were -- they had just changed from one

8   captain was running the unit to another captain

9   running the unit.  So being that they both -- in my

10  opinion they both made that decision.

11  Q.   Is it your opinion that Captain Watson

12  retaliated against you for the same reasons you just

13  explained Captain Hitch retaliated against you, or is

14  it something different?

15  A.   Repeat that, please.

16  Q.   Do you believe that Captain Watson did

17  something different from Captain Hitch in terms of

18  retaliating against you, or is it the same claim that

19  you have against Captain Watson and Captain Hitch?

20  A.   Generally it's the -- it's the same incident,

21  so it would be the same claim.

22  Q.   Is there anything else, any other actions that

23  Captain Watson took that you are suing him for?

24  A.   Not to my knowledge.

12

1   Q.   So just so we are clear, my understanding from

2   what you said is that your claim against Captain

3   Watson is that he retaliated against you by

4   transferring you out of the mounted unit because you

5   filed a complaint against Sergeant Hyden, is that

6   correct?

7   A.   Yes.

8   Q.   What are your claims against Sergeant Hyden?

9   A.   Retaliation as well as gender discrimination.

10  Q.   Can you explain how Sergeant Hyden retaliated

11  against you?

12  A.   Yes.   I believe she was directly involved in

13  lobbying for my transfer because I made a complaint

14  against her.

15  Q.   And can you explain how she discriminated

16  against you because of your gender?

17  A.   Well, yes, I can.   There were different

18  occasions where she -- gender discrimination.   I'm not

19  sure if you're looking for examples or what you're

20  looking for exactly in that.   So you're going to --

21  Q.   I think we are going to go through and discuss

22  some of the allegations that are made in the

23  complaint.

24  A.   Okay.



Jeffrey D. Hill - Sanfrancesco

13

1    Q.   Are the allegations that are contained the

2    examples that you are referring to?

3    A.   Is that what you're asking me to comment about,

4    is the --

5    Q.   No.  Let me clarify the question.

6    A.   Okay.

7    Q.   In your complaint there are examples of let's

8    call them issue or incidents or things that occurred

9    between you and Sergeant Hyden over the years.  Are

10   those the examples that you're talking about that led

11   you to believe that Sergeant Hyden is discriminating

12   against you because of your gender?

13   A.   Yes.

14   Q.   Are there any other examples besides what's

15   contained in the complaint or the amended complaint?

16   A.   There could be.  There's a lot of things.

17   Q.   And did you --

18   A.   I may not recall everything from that many

19   years ago.  There are some things on paper, but there

20   are other things that I may recall at a later time.

21   Q.   Nothing that you recall now?

22   A.   If you have anything to show me that there may

23   be other things we are talking about, then, I may be

24   able to recall them.

Jeffrey D. Hill - Sanfrancesco

14

1   Q.   I'm asking you the question as to whether or

2   not you recall any other incidents besides what's

3   contained in the complaint right at this time?

4   A.   I'd have to take time to think about that.

5   Q.   How much time do you need to think about that?

6   A.   I don't know.

7           MS. SANFRANCESCO:   I think we need to take

8   a slight break so Corporal Hill can reflect as to

9   whether or not there are any other incidents besides

10  what's contained in the complaint that relate to his

11  gender discrimination claim against Sergeant Hyden.

12          MR. MARTIN:  You've not laid a foundation

13  suggesting that, you know, any other items may be

14  recalled during this recess.

15          MS. SANFRANCESCO:   I'm not saying I have

16  anything.   I'm asking -- let's go off the record.

17          (Discussion off the record.)

18  BY MS. SANFRANCESCO:

19  Q.   The question is, aside from what's contained in

20  the complaint, do you have any other incidence of

21  gender discrimination by Sergeant Hyden that you are

22  aware of at this time?

23  A.   At this particular time, no.  I could later,

24  but at this particular time, the answer is no.

Jeffrey D. Hill - Sanfrancesco

15

1  Q.   And have you had an opportunity to think about

2  all of what had transpired with Sergeant Hyden prior

3  to filing the complaint?

4  A.   Yes.

5  Q.   You have provided some documents to your

6  attorney relative to the matters that are contained in

7  the complaint.  I just got some of those documents on

8  Friday.  And those documents are some performance

9  evaluations, the EOC file, some time sheets.  Prior to

10  that time, your attorneys have provided a number of

11  other documents, time sheets, tax forms, things of

12  that nature.  Is it fair to say that you provided your

13  attorneys with documents relative to the matters

14  contained in the complaint?

15  A.   Yes.

16  Q.   Did you provide your attorneys with all the

17  documents that you have relative to the matters

18  contained in the complaint?

19  A.   I believe so.

20  Q.   Did you ever have any documents that existed at

21  one point but no longer exist?

22  A.   No.

23  Q.   Did you ever take any personal notes relative

24  to the matters contained in the complaint?

Jeffrey D. Hill - Sanfrancesco

16

1    A.    I believe I did.

2    Q.    Do you have those notes still?

3    A.    I believe -- I possibly do yes.

4    Q.    Did you provide those notes to your attorneys?

5    A.    Those, if I have them, no.

6    Q.    Did your attorneys make a request for all

7    documents that you have in connection with this

8    matter?

9    A.    I recall when I turned them over.  I don't know

10   if they were asked for or I volunteered them.  I did

11   turn over my paperwork.

12   Q.    Is there a reason why you did not turn over

13   your personal notes regarding these matters?

14   A.    My personal notes, they may be in there.  It

15   was -- I'm not sure what's in there, everything in the

16   file.  I'd have to look at it again.

17   Q.    I'll represent to you that I did not see any of

18   your personal notes contained in either discovery.  So

19   what I'm going to ask from you is, we are going to

20   continue this deposition on another date.  Between

21   this time and that time, I'd like you to review all of

22   your records that you have at home, including your

23   personal notes and provide those to your attorney so

24   that we can review them and then discuss them at the

Jeffrey D. Hill - Sanfrancesco

17

1    next deposition.  Do you understand that request?

2       A.    Yes.

3       Q.    What was the subject matter of your personal

4    notes, if you remember?

5       A.    Well, a lot of my notes were mental notes, so

6    just reflecting on the issues at hand, issues of the

7    problems I was having.

8       Q.    When you say "mental notes," I'm not sure what

9    you mean.

10      A.    These were things I heard, things I saw, things

11   of that nature.

12      Q.    Were these notes that you took, you mean, while

13   you were at work or at home or what types of --

14      A.    Well, obviously, when I take a mental note,

15   it's after something that just happened or occurred.

16      Q.    Were these relative to the events with Sergeant

17   Hyden or Captains Hitch or Watson?

18      A.    Yes.

19      Q.    When did you start taking these notes?

20      A.    I don't recall exactly when.

21      Q.    Like I said, try and get those for the next

22   deposition, and we'll review them at that time.

23      A.    Okay.

24      Q.    Corporal Hill, I want to go over a few

Jeffrey D. Hill - Sanfrancesco

18

1   background questions.  Where do you live right now?

2   A.    My exact address?

3   Q.    Mm-hmm.

4   A.    670 Port Penn Road, Middletown, Delaware,

5   19709.

6   Q.    How long have you lived there?

7   A.    A little over a year.

8   Q.    Who do you live there with?

9   A.    Myself.

10  Q.    And where did you live before that?

11  A.    51 Mailly Drive, Townsend, Delaware, 19734.

12  Q.    How long did you live there?

13  A.    Approximately six to seven years I think.

14  Q.    And who did you live there with?

15  A.    Myself.

16  Q.    Either of these addresses, no roommates?

17  A.    I had -- I've had a roommate that lived with me

18  years ago.  It was a friend of mine.  My one

19  girlfriend resided there back and forth between her

20  house and my house, but nobody claimed it as their

21  primary residence.

22  Q.    Let me ask you this.  What year would you say

23  your issues or problems with Sergeant Hyden began?

24  A.    Maybe 2000 -- I'd have to look over the notes.

19

1    Are you asking me exactly when?

2    Q.    Yes.

3    A.    Okay.

4              MR. MARTIN:  When you refer to notes,

5    you're now actually pointing to the amended complaint

6    before you, is that correct?

7              THE WITNESS:  Yes.

8              MR. MARTIN:  For the record.

9    A.    Yes.  Yes.

10             Approximately December 2004.

11   Q.    Can you tell me, who were your roommates from,

12   let's say, January 2004 to the present, if any?

13   A.    When you say roommate, you're going to have to

14   elaborate on that.

15   Q.    Anyone who you shared your living residence

16   with.

17   A.    I had a girlfriend who stayed there from time

18   to time.

19   Q.    What was her name?

20   A.    Katie -- Katherine Bowers.

21   Q.    Where does she live now?

22   A.    I believe her address is 5 Wisteria Drive in

23   Newark.

24   Q.    When did she live there?

Jeffrey D. Hill - Sanfrancesco

20

1    A.    She didn't live there.

2    Q.    She stayed there with you from time to time?

3    A.    Yes.

4    Q.    During the time period that we discussed,

5    January of '04 through the present?

6    A.    Not that whole time, no.

7    Q.    But in between that time?

8    A.    There was a time frame in there, yes, where she

9    did stay at my house.

10   Q.    Who else?

11   A.    That was at 51 Mailly Drive.

12   Q.    Okay.

13   A.    This past spring, a fellow co-worker stayed at

14   my new residence for a month or so because he was

15   going through a separation with his wife.

16   Q.    Who was that?

17   A.    His name is Jason Mollohan.

18   Q.    He works for the county police department?

19   A.    Yes.

20   Q.    And you said this was at your new residence?

21   A.    Yes.

22   Q.    At --

23   A.    670 Port Penn Road.

24              MR. MARTIN:   Let's stop for a moment.   Off

21

1  the record.

2                 (Discussion off the record.)

3  BY MS. SANFRANCESCO:

4     Q.    Other than those two individuals, have you

5  resided with anyone else from January of 2004 to the

6  present?

7     A.    Not that I can recall.

8     Q.    Did you ever reside with any other members of

9  the New Castle County Police Department?

10    A.    During this time period?

11    Q.    During any time period.

12    A.    Yes.   It was an Officer Scott Twigg stayed at

13  my residence at 51 Mailly Drive for another short time

14  period because he also was going through a separation.

15    Q.    Do you recall when that was?

16    A.    I wasn't living at the house at 51 Mailly Drive

17  that long at the time, so late nineties, early 2000

18  maybe.

19    Q.    How about any other members of the New Castle

20  County Police Department?

21    A.    Not that I can recall.

22    Q.    How long have you worked for the county, either

23  in a police officer capacity or otherwise?

24    A.    Between 15 and 16 years.

22

1    Q.    Was it always as a police officer, or no?

2    A.    No.

3    Q.    What did you do for the county before you were

4    a police officer?

5    A.    I worked for the county for a little under a

6    year as a motor equipment operator.

7    Q.    Who was your supervisor at that time?

8    A.    I believe his last name was Cheyney.  I forget

9    his first name.

10   Q.    Do you know the time period that this was?

11   A.    I believe -- actually, let me back up.  I

12   worked as motor equipment operator.  I also worked as

13   a seasonal summer employee the summer before I was

14   hired by the county police.

15   Q.    So that was the summer of --

16   A.    That was the seasonal -- the seasonal time was

17   the summer of -- that would have been the summer of

18   '92.

19   Q.    Was it the same supervisor at that time,

20   Cheyney or somebody?

21   A.    No.  It was for a month, and I don't recall his

22   name.

23   Q.    Prior to becoming a New Castle County police

24   officer which I presume was sometime after 1992 and

Jeffrey D. Hill - SanFrancesco

23

1    aside from your seasonal experience at the county and

2    aside from your motor equipment operator experience at

3    the county, what did you do?

4    A.    Prior to that I was a college student.

5    Q.    Where did you go to college?

6    A.    Delaware Tech.

7    Q.    What years did you go there?

8    A.    '90 -- maybe part of the -- '90, '91, and '92.

9    Q.    Did you graduate from Delaware Tech?

10    A.    Yes.

11    Q.    What was your degree in?

12    A.    Criminal justice.

13    Q.    Did you hold any other jobs or other

14    employment, any military experience?

15    A.    Yes.

16    Q.    Can you tell me about that?

17    A.    I was in the U.S. Army from 1986, 1987, and

18    '88.

19    Q.    What did you do in the U.S. Army?

20    A.    I worked in the aviation unit as a fuel

21    specialist, I believe is what the terminology was.

22    Q.    What did you do as a fuel specialist?

23    A.    Tested aviation fuels and also assisted with

24    tactical type situations that related to that and with

Jeffrey D. Hill - Sanfrancesco

24

1  aircraft.

2     Q.   What were your circumstances on leaving the

3  Army?

4     A.   I joined for three years.  When my time was up,

5  I left.

6     Q.   How about after that, what did you do?

7     A.   After that, was when I became a motor -- well,

8  for a short time, like I said, I was a motor equipment

9  operator with the county and at that time going to

10  school part time.

11    Q.   Aside from what we've already discussed, have

12  you held any other jobs prior to becoming a New Castle

13  County police officer?  And I don't mean like when you

14  were in high school working for Dairy Queen or

15  something.  I mean any other jobs when you were like

16  21 or older.

17    A.   I held some part-time jobs while I was in

18  college, yes.

19    Q.   Can you tell me about those?

20    A.   I worked at Foot Locker in the mall, Christiana

21  Mall, for a time period.  I worked at Doris Market in

22  the deli section.  When I got out of the military I

23  worked at Down Under Restaurant and Bar in Newark.

24    Q.   How long did you work there for?

**W&F**

25

1    A.   I'm not sure.  A few months.

2    Q.   Okay.  What did you do there?

3    A.   Bar backed and bar tended.

4    Q.   Have you ever been married?

5    A.   No.

6    Q.   Do you have a significant other at this time?

7    A.   No.

8    Q.   Have any children?

9    A.   No.

10   Q.   From January 2004 until, let's say, the present

11   time, have you dated people?

12   A.   Yes.

13   Q.   How often would you say that you dated?

14   A.   Well, like I said, I was dating Katie Bowers

15   for a portion of that time.

16   Q.   Would you call that a significant relationship

17   as opposed to sort of dating someone casually?

18   A.   I considered her my girlfriend.

19   Q.   Did you have any other girlfriends from January

20   2004 to the present besides her?

21        MR. MARTIN:  I'm going to object.  Let's

22   go off the record here.

23        (Discussion off the record.)

24

Jeffrey D. Hill - Sanfrancesco

26

1    BY MS. SANFRANCESCO:

2       Q.    Did you ever date anybody named Elaine?

3       A.    Named who?

4       Q.    Elaine?

5       A.    Elaine?

6       Q.    Mm-hmm.

7       A.    I don't know if I ever dated anybody in my life

8    named Elaine.  I don't know.

9       Q.    Did you ever date any other female police

10   officers?

11      A.    Yes.

12      Q.    What are their names?

13      A.    You're referring to Eileen?

14      Q.    Eileen?

15      A.    Yes.  I did date her.

16      Q.    When did you date her?

17      A.    I met her at the mounted competition in 2000 --

18   I believe it was the mounted competition in 2004.

19      Q.    Do you remember where that was?

20      A.    It was in Canada.

21      Q.    What's Eileen's last name?

22      A.    Skurkis.

23      Q.    Can you spell that for record please?

24      A.    S-k-u-r-k-i-s I believe.

27

1    Q.    How long did you date her?  How long were you

2    together?

3    A.    Approximately three, four months.

4    Q.    Aside from Eileen and Ms. Bowers, have you

5    dated anyone else for, let's say, three months or more

6    from 2004 to 2006?

7    A.    Not that I recall.

8    Q.    I'm sorry.  You said you've been a New Castle

9    County police officer for how long?

10   A.    I was hired in September of 1992.

11   Q.    Where did you start out in the police

12   department?

13   A.    I was hired approximately three to four months

14   prior to the academy starting, so I was an employee

15   working in the police station.

16   Q.    Then what was your assignment?

17   A.    General work around the building, helping out

18   with evidence and supply, records unit.

19   Q.    Did you have a supervisor at that time?

20   A.    I guess it would have been the drill

21   instructors that were going to have the academy coming

22   up in January.

23   Q.    I'm talking about after you graduated from the

24   academy.  What was your first assignment?

Jeffrey D. Hill - Sanfrancesco

28

1    A.    My first assignment was patrol.

2    Q.    Where were you assigned?  Did you have a

3    specific sector or --

4    A.    My first assignment was in 2 zone, which is

5    the -- I guess you call it the west side of New Castle

6    County.

7    Q.    How long were you there for?

8    A.    I don't recall exactly.

9    Q.    Do you recall who your supervisor was?

10   A.    I believe my first service supervisor was

11   Sergeant Hernandez.

12   Q.    What was your next assignment after that?

13   A.    After patrol or after that particular area

14   where I worked?

15   Q.    After that particular area where you worked.

16   A.    I worked on the west side for a while.  I don't

17   know exactly how long.  I worked in different sectors

18   on patrol within the county, different time periods.

19   Q.    How did you move from sector to sector?

20   A.    Sometimes they reassign people.

21   Q.    And what about other times?

22   A.    I don't recall.  I -- just different areas.

23   Sometimes you go from area to area.  Sometimes they

24   need people in certain areas.  Sometimes they don't.

Jeffrey D. Hill - SanFrancesco

29

1   Sometimes there's a need for manpower in a certain

2   area more than other areas and they move people

3   around.

4       Q.   Why don't I make this easier.  What I'm trying

5   to do is find what you've done since the time you

6   started in the police department until you got to the

7   mounted unit.

8       A.   Okay.

9       Q.   So if you could tell me where you've been, how

10  long you've been there, and who your supervisor was,

11  I'd like to have that information.

12      A.   Every supervisor each step of the way to the

13  mounted unit, is that what you're asking?

14      Q.   If you can remember.

15      A.   I worked in patrol from the time I got out of

16  the academy until the time I got transferred into the

17  mounted unit.  During that time period, I worked in,

18  to my knowledge, every sector or every district in New

19  Castle County.  I had different supervisors.  Usually

20  there's a different supervisor assigned to different

21  districts.  So I worked for Sergeant Hernandez.  I

22  believe -- I don't know if the order of supervisors is

23  exactly correct, but I remember working for Sergeant

24  Schofield, Sergeant Marbury.  Well, at the time

1    Sergeant Schreiber, how Lieutenant Schreiber.

2    Q.    How long did you work for Sergeant Schrieber

3    before he was a lieutenant?

4    A.    I worked for him down in the Middletown

5    district on two different occasions on two different

6    squads.   The exact time -- probably a year, a year or

7    more.

8    Q.    Okay?

9    A.    Sergeant Riddell.

10            Now, these are all prior to going into the

11   mounted unit?

12   Q.    Yes.

13   A.    I believe I worked for Sergeant Avena for a

14   while when I first -- when I come out of the academy

15   for a little while.   There could be other sergeants I

16   worked for for short periods of time that I'm not

17   recalling at this time.

18   Q.    What was your assignment immediately prior to

19   going into the mounted unit?

20   A.    Patrol.

21   Q.    How did you get into the mounted unit?

22   A.    I requested it through a memorandum.

23   Q.    Do you recall who that memo was sent to?

24   A.    I believe it was -- when you request a unit, it

Jeffrey D. Hill - SanFrancesco

31

1    goes directly to the chief of police, I think, through

2    the chain of command.

3        Q.   Prior to being transferred from the mounted

4    unit, had you ever been transferred before?

5        A.   Within patrol?

6        Q.   Had you ever been transferred before?

7        A.   You're going to have to elaborate on transfer.

8        Q.   What's your understanding of what a transfer

9    is?

10       A.   When you're transferred from -- well, when

11   you're moved from place to place.

12       Q.   So had you been moved from place to place,

13   then, prior to being on mounted patrol?

14       A.   Yes.

15       Q.   Are those the different areas that you just

16   described earlier or others that you haven't mentioned

17   to me yet?

18       A.   I was transferred from different areas of

19   patrol.  I also did a temporary assignment in human

20   resources after I injured my shoulder.

21       Q.   So approximately how many times would you say

22   that you've been transferred prior to being

23   transferred out of the mounted patrol unit?

24       A.   Out of the mounted unit?

Jeffrey D. Hill - Sanfrancesco

32

1    Q.    Yes.

2    A.    I got transferred out of the mounted unit to

3    patrol.

4    Q.    Prior to that transfer, approximately how many

5    times had you been transferred?

6    A.    You asked me how many times have I been

7    transferred since patrol a minute ago.  I'm not sure

8    if you're asking me now before or after.

9    Q.    Let me just make sure that I'm clear.

10   A.    Okay.

11   Q.    The subject of your amended complaint is that

12   you were transferred out of the mounted unit to

13   patrol.  Prior to the transfer that forms the basis of

14   your lawsuit, prior to that transfer, how many times

15   had you been transferred?

16            MR. MARTIN:  For the record, you're

17   talking about transfers within patrol because he was

18   only in patrol from the academy up to the time of the

19   mounted unit.

20            MS. SANFRANCESCO:  Yes.  I'm talking about

21   any transfers whatsoever.

22   A.    For purposes of within the department, when

23   you're moved from sector to sector, district to

24   district, people's common knowledge is that's not a

Jeffrey D. Hill - Sanfrancesco

33

1    transfer.

2      Q.   What is that?

3      A.   You're being moved.

4      Q.   What is a transfer?

5      A.   Transfer to a different unit is usually

6    something that the officer requests.  Most cases to go

7    to a specialized unit, from unit to unit.

8      Q.   Transfers aren't just made at an officer's

9    request, is that correct?

10     A.   I would say yes.

11     Q.   Are you familiar with New Castle County and New

12   Castle County Police Department policy and procedure?

13     A.   Some of it.

14     Q.   Are you familiar with the procedures for

15   transfer?

16     A.   I'd have to read over that.

17     Q.   At this time, what is your understanding as to

18   why someone can get transferred?

19     A.   Any reason they choose.

20     Q.   Who chooses?

21     A.   The department.

22     Q.   So you're saying that your understanding is the

23   department can choose to transfer someone at any time?

24     A.   That's my understanding.

34

1    Q.    Can the department make transfers for any other

2    reasons?

3    A.    Backing up to my other answer, I believe they

4    can transfer for any reason that they choose to.

5    Other than that, that pretty much says it all.

6    Q.    Where are you working right now, what's your

7    assignment now?

8    A.    I am working on C Squad in the Southern Patrol

9    District.

10    Q.    And how long have you held that assignment?

11    A.    Approximately since May of 2007.  Yes.  No.

12    May of 2006, I believe.

13    Q.    Were you transferred to C Squad SPU from the

14    mounted unit or were you transferred to another place?

15    A.    Another place.

16    Q.    Where was that?

17    A.    I was transferred from mounted to C Squad,

18    Central District.

19    Q.    So were you in Central District from the time

20    of your transfer which would have been in March 2006

21    and then you transferred to C Squad, SPU, in May 2006?

22    A.    That's fairly accurate, yes.

23    Q.    How did you get from Central District to SPU?

24    A.    I had told the lieutenant when I first came

Jeffrey D. Hill - Sanfrancesco

35

1  out.   They asked me where I wanted to work.

2      Q.   Who asked you?

3      A.   Lieutenant Merrill.

4          MR. MARTIN:   Can we go off the record for

5  a second?

6          MS. SANFRANCESCO:   Sure.

7          (Pause.)

8  BY MS. SANFRANCESCO:

9      Q.   I think the question was, how did you get from

10 Central District to SPU, and you said Lieutenant

11 Merrill asked you where you wanted to work.

12     A.   When I first came out of the mounted unit to

13 patrol, I was -- I recall speaking with Lieutenant

14 Merrill, and I believe he asked if I had a preference

15 in where I worked.

16     Q.   How did you get to having this conversation

17 with him?

18     A.   I don't recall if it was in person or on the

19 phone.   I know I had a conversation with him.   As I

20 was -- after I was transferred, I had a conversation

21 with him prior to me actually -- the date of actually

22 starting on C Squad.

23     Q.   Was he in your chain of command?

24     A.   He was the lieutenant in charge of C Squad.

1    Q.   So he asked you where you wanted to work, and

2  what did you tell him?

3    A.   I believe he asked me if I had a preference,

4  and I explained, if I had a preference, I'd like to

5  work in the Southern District.

6    Q.   And why did you have a preference to work in

7  the Southern District?

8    A.   I believe all the years I worked there the most

9  in patrol and I was familiar with the area.

10   Q.   Do you also live in the Southern District?

11   A.   Yes.

12   Q.   Did he tell you, you know, you have to wait for

13  a few months before you get down there?  How did you

14  eventually get, then, from Central District to SPU?

15   A.   He had originally told me that it was -- there

16  was no openings there.  I said okay.

17   Q.   And then --

18   A.   I believe he said, "I need you to work in the

19  Central District."  That was the -- that was that.

20   Q.   At some point did an opening become available

21  in SPU, Southern Patrol?

22   A.   Yes.

23   Q.   And was that in May of 2006?

24   A.   Yes.



Jeffrey D. Hill - Sanfrancesco

37

1    Q.   And then you were transferred to Southern

2    Patrol?

3    A.   Yes.

4    Q.   And your supervisor there is who?

5    A.   It was Sergeant McKenna.

6    Q.   How long were you under Sergeant McKenna?

7    A.   From that date, until approximately last

8    spring.

9    Q.   When you say that date, are you referring to

10   May 2006?

11   A.   Yes.

12   Q.   And last spring, let's say, May or April or May

13   of 2007?

14   A.   Yes.

15   Q.   And who was your supervisor after that?

16   A.   Sergeant McKenna was reassigned on a temporary

17   assignment at headquarters.  Since that date we

18   haven't -- our squad has not had a direct sergeant as

19   a supervisor.

20   Q.   Who would you say is the next available, then,

21   in your chain of command?

22   A.   In Southern Patrol Unit it would be Lieutenant

23   Merrill.

24   Q.   What are your duties down at Southern Patrol?

Jeffrey D. Hill - Sanfrancesco

38

1    A.   Patrol the areas below the canal from the --

2    basically from the canal, C&D Canal to Smyrna within

3    our jurisdiction.

4    Q.   What are your hours?

5    A.   Well, they change.  Shift work.  Day work I

6    work six in the morning till four in the afternoon.

7    Evening shift I work 3:00 p.m. to 1:00 a.m., and the

8    midnight shift, I'm currently working 9:00 p.m. to

9    5:00 a.m.

10   Q.   Do you get shift differential?

11   A.   Yes.

12   Q.   When you were transferred to Central District,

13   generally were your duties to patrol the areas that

14   make up the Central District?

15   A.   Yes.

16   Q.   And what were your hours at that time?

17   A.   I believe they were the same as below the --

18   where I'm working now, all three shifts.

19   Q.   Shift differential again?

20   A.   Yes.

21   Q.   When you worked at the mounted patrol unit,

22   what were your hours?

23   A.   Primarily the hours were 8:00 a.m. to 4:00 p.m.

24   Q.   What days of the week?

Jeffrey D. Hill - Sanfrancesco

39

1    A.    Primarily, but not always, Monday through

2    Friday.

3    Q.    Any shift differential there?

4    A.    Yes.  At times.

5    Q.    Can you explain?

6    A.    There were times when we worked evening shift,

7    and there were times when we worked some very few

8    weekends, some weekends.

9    Q.    Would you say there's shift differential more

10   so in your current assignment and your assignment at

11   Central District than at mounted?

12   A.    Yes.

13   Q.    Aside from your family, who would have

14   knowledge of the matters contained in the complaint?

15   I guess maybe before you answer that, a better way to

16   ask this question is going to be taking a look at some

17   of the people that are listed in your Rule 26

18   disclosures.

19          MR. MARTIN:   Off the record a moment.

20          (Recess taken.)

21   BY MS. SANFRANCESCO:

22   Q.    Corporal Hill, I placed in front of you your

23   Rule 26 disclosures, and what these are, under

24   number 1, we asked for the "name and, if known, the

1  address and telephone number of each individual likely

2  to have discoverable information relevant to disputed

3  fact alleged with particularity in the pleadings."

4          So what I'm going to do is go through the

5  people that are listed in your initial disclosures and

6  in your amended disclosures and you can tell me who

7  they are and what they might know about the amended

8  complaint and the matters contained therein.  Do you

9  have any questions about that before we start?

10  A.    Not at this time.

11  Q.    So the second person listed on the list is

12  Corporal Joseph Blythe?

13          We are in the first one, that page.

14  A.    Okay.

15  Q.    Why is he listed there?

16  A.    He was the union representative who was present

17  during my first step grievance process.

18  Q.    How about Phil Davis?

19  A.    He is an officer that sometimes -- he used to

20  be a mounted officer.  He sometimes -- he's an

21  auxiliary rider who sometimes rides as well as

22  participates in different functions with the mounted

23  unit.

24  Q.    What can he tell us about the matters contained

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

41

1    in the complaint or amended complaint?

2      A.   He was present at different times within the

3    mounted unit as well as at the 2005 mounted

4    competition.

5      Q.   When he was present, did he witness certain

6    events or what relevance does he have to this

7    litigation aside from what you've just said?

8      A.   It's my belief that he witnessed some of the

9    events at the competition, yes.

10     Q.   What events were these?

11     A.   He witnessed some of the comments made about me

12   to Sergeant Hyden.  He also witnessed some of the

13   treatment I received after I completed the

14   competition.

15     Q.   When you say he witnessed some of the comments

16   to Sergeant Hyden, who made the comments?

17     A.   Comments that I'm referring to were made by

18   Corporal Hoff.

19     Q.   Do you know what those comments were?

20     A.   The comment that I -- about we were just --

21   there was a discussion about a portion of the horse

22   that was dirty and Corporal Davis had relayed to me,

23   that I took care of it.  It was not a problem.  But he

24   wanted to let me know that Corporal Hoff was -- exact

1    words I don't recall -- bad mouthing to me to Sergeant

2    Hyden to try to get me in trouble.

3         Q.    For what?

4         A.    For that portion of the horse that was -- that

5    had been overlooked by myself.

6         Q.    Is this the horse Chief?

7         A.    Yes.

8         Q.    You said he witnessed something else.  I'm

9    sorry.  I missed --

10        A.    He was at the competition.  He participated in

11   the competition.  He was present after I received my

12   awards and witnessed the reaction from the individuals

13   within my department.

14        Q.    And what were those reactions and what

15   individuals made those reactions?

16        A.    Everybody in the mounted unit, including the

17   individuals that travelled with us, were present when

18   I left the competition ring after receiving my awards.

19        Q.    When you said receive your awards, did you

20   receive one award for each portion of the competition

21   or was this a specific award for a certain portion of

22   the competition?

23        A.    Different awards for different portions of the

24   competition.



43

```
 1    Q.   So when you're talking about Phil Davis, was he

 2   present for each?

 3    A.   Yes.

 4    Q.   And what happened?

 5    A.   Different reactions were from different people.

 6   Most congratulated.  Most were very excited about my

 7   accomplishments.  Some were not.

 8    Q.   What did he witness with respect to Sergeant

 9   Hyden?

10    A.   It is my belief that he witnessed that she was

11   displeased by my performance and said nothing to me.

12    Q.   Did you ever discuss this with him?

13    A.   I don't recall if I did or not.

14    Q.   Did he witness any reaction, to your knowledge,

15   by Corporal Hoff?

16    A.   It's my belief that he witnessed her actions as

17   well.

18    Q.   Did you ever speak to him about that?

19    A.   I don't recall if I spoke with him about it

20   after the fact.

21    Q.   And would Corporal Davis be able to tell us

22   anything else regarding the matters contained in the

23   complaint?

24    A.   Possibly.
```



44

1   Q.   To your knowledge, at this time, anything other

2   than that the -- what competition was this?  What

3   year?

4   A.   I believe it was 2005.  Yes.

5   Q.   So aside from the events that you just

6   discussed at the 2005 mounted competition?

7   A.   Corporal Davis has been in different functions

8   within the mounted unit, not just that competition.

9   So could he witness other things?  Yes.  To my

10  knowledge, has he?  I don't know.

11  Q.   Did you ever discuss anything else with him?

12  I'm not saying that you discussed this with him, but

13  have you ever discussed any of the events with him or

14  any of the matters that are contained in the

15  complaint.

16  A.   I do recall discussing some issues leading up

17  to this.  I believe it was a past -- I think it was

18  this past mounted competition or -- I don't know if it

19  was the one before that.

20  Q.   When you say this past mounted, which year?

21  A.   This would be '07.

22  Q.   '07.  Okay.

23       What were those issues?

24  A.   He was working as a detective down at Southern

45

1   Patrol, so there's been times when our shifts might

2   cross.  And I believe we were talking about the fact

3   he still had my saddle rack that I purchased for the

4   competition that was mine personally.  And he had

5   asked to borrow it the year before to help shine the

6   saddle.  And I could -- I just told him he could hold

7   on to it as long as he needed it.  I just started

8   talking about the competition and just did -- he had

9   told me that -- that he was -- something of the nature

10  of Darla at the stables --

11      Q.    Corporal Hoff?

12      A.    Corporal Hoff.  I'm sorry.  Yes.

13            Was irritating him at some level.  He

14  didn't go into explicit detail.

15      Q.    Irritating him at the stables at the 2007

16  competition?

17      A.    No.  No.  No.

18      Q.    Oh.

19      A.    Prior to going to the competition.  Exactly

20  what his words were I don't remember.  It wasn't a

21  very long conversation.

22      Q.    Do you know why he would discuss Corporal Hoff

23  with you?

24      A.    He had said at times before that she was -- let

Jeffrey D. Hill    Sanfrancesco

46

1   me back up.  Phil -- I'm sorry -- Corporal Davis is

2   one that's always been very helpful when it comes to

3   preparing for the uniform mounted judging portion of

4   the national competition.  He's helped a lot of

5   officers prepare because he's done it many years

6   before.  He helped myself as well.  And he was -- if I

7   recall correctly, he was just -- he would try to do

8   something to assist the officers who were preparing,

9   and I believe he was saying that Darla kept

10  interrupting him and trying to change things he was

11  doing to try to help, something of that nature.

12     Q.   When Corporal Davis participated or even helped

13  with the mounted unit at the national competition, was

14  he in the unit at the time?

15          Let me go back.  Let's say for the

16  competition in 2005, was he in the mounted unit when

17  you attended that competition?

18     A.   No.

19     Q.   So he was just assisting the mounted unit in

20  preparing for the competition?

21     A.   Well, past members of the mounted unit are

22  considered auxiliary riders, I guess you could call

23  them.  So he did participate in that competition as

24  well as assisted.

47

1    Q.    Was this something that Corporal Davis was

2    really interested in?  I mean, he wanted to stay

3    involved with the mounted unit?  Would you say that's

4    fair to say?

5    A.    Yes.  That's fair.

6    Q.    And was he very energetic about his

7    participation?

8    A.    Yes.

9    Q.    What about Dominick Gregory, what can he tell

10   us?

11   A.    He is a sergeant that works in the internal

12   affairs division.  And he investigated a portion of my

13   complaint against Sergeant Hyden.

14   Q.    And Colonel Rick Gregory?

15   A.    He is the chief of police who runs the

16   department, who I submitted my memorandum to

17   regards -- regarding my complaint.

18   Q.    Did you ever have a conversation with Colonel

19   Gregory about your complaint against Sergeant Hyden?

20   A.    Yes, I did.

21   Q.    When that was?

22   A.    After my submittal of the memorandum, and I

23   believe it was -- I don't recall exactly when it was.

24   Q.    But you believe it was after you submitted the

Jeffrey D. Hill - Sanfrancesco

48

```
 1   memorandum?
 2      A.   I believe.   I don't recall exactly when the
 3   meeting was.
 4      Q.   And memorandum that you are referring to, this
 5   was from you to Colonel Gregory?
 6      A.   Yes.
 7      Q.   And what was the nature of that memorandum?
 8      A.   It was a memorandum, a complaint that I was
 9   lodging against Sergeant Hyden in reference to -- I
10   believe the topics were truthfulness and conduct
11   towards a subordinate.
12      Q.   When you had your discussion with Colonel
13   Gregory what did you discuss with him?
14      A.   He was not directly -- he did not have, in my
15   opinion, knowledge of the whole complaint.  And being
16   that he was a new chief, I requested a meeting with
17   him to explain myself and to let him know that I was
18   dedicated to this police department and did not want
19   him to get a misconception of what I was about.
20      Q.   How long did that meeting last?
21      A.   Maybe a half hour.
22      Q.   What about Major Hedrick?
23      A.   He was -- his name appeared on different
24   documents in regards to evaluations, and at one time,
```

49

1    during the investigation by Captain Hitch, he had told

2    me that he was going to be off.  And if I had any

3    complaints or anything to add to the case, to contact

4    Major Hedrick, but -- I'm sorry.  That's -- his name

5    appeared on many documents.  That's what I'm saying.

6        Q.    And you referenced evaluations?

7        A.    Right.

8        Q.    Did he sign off as, you know, acting chief or

9    was he a direct supervisor or -- in what capacity

10   would he have signed off on the evaluation?

11       A.    As being a staff member within the chain of

12   command.

13       Q.   And you said at one time during the

14   investigation with Hitch, he told you to contact him

15   for what reason?

16       A.    I believe that Captain Hitch told me he was

17   going to be off.  For what reason I don't recall.  If

18   I had anything -- if I had any questions or anything

19   about it to contact the major.

20       Q.    Oh, Captain Hitch told you to contact Major

21   Hedrick?

22       A.    Right.

23       Q.    Did you ever contact Major Hedrick about

24   anything with reference regarding Sergeant Hyden or

50

1   your complaints?

2      A.   No.

3      Q.   Major Hedrick still work for the county?

4      A.   No.   Well, not as a police officer.   I don't

5   know if he does other than that or not.

6      Q.   Captain Mark Hitch is listed next, and I

7   understand from the documents and from the allegations

8   in the complaint that he was responsible for

9   investigating the complaint that you had made against

10  Sergeant Hyden, is that correct?

11     A.   Yes.

12     Q.   Aside from that investigation, is there any

13  other reason that he would be listed here?

14     A.   Possibly.   Not off the top of my head -- I

15  can't think of anything.

16     Q.   Number 9, Robert Larrimore, internal affairs,

17  why is he listed.

18     A.   He was in the Internal Affairs Division.   At

19  one point in time there was some -- at one point in

20  time during this investigation.

21     Q.   Did he, to your knowledge, investigate any

22  portion of your complaint against Sergeant Hyden?

23     A.   Not to my knowledge.

24     Q.   Is he simply listed because he was in the unit