*Jeffrey D. Hill v. New Castle County, et al.*
C. A. No. 07-228 (GMS)
Plaintiff's Answering Brief In Opposition Of Defendants' Motion For Summary Judgment

# APPENDIX D

Andrea N. Hyden

8

1      Q.   How did you come to become the commander

2   of the mounted unit?

3      A.   I was actually approached by Captain

4   Setting when I was in patrol because he was the

5   lieutenant in there at the time, and I think it

6   was lieutenant, and he advised that there was

7   going to be a vacancy and would I be interested?

8   And I said, Of course.  I might have submitted a

9   memorandum, I'm not sure.

10      Q.   Why were you interested in working for

11   the mounted unit?

12      A.   Well, I had pretty much done everything

13   else that I had wanted to do and it's an interest

14   of mine.

15      Q.   What is an interest of yours?

16      A.   Horses and the mounted unit.

17      Q.   Had you worked with horses previously?

18      A.   Yes.

19      Q.   When did you start working with horses?

20      A.   I owned my first horse since I was

21   twelve.

22      Q.   And have you had horses continuously?

23      A.   Yes.

24      Q.   Prior to joining the mounted unit did you

Andrea N. Hyden

12

1      Q.   Did you ever win any awards prior to the

2   mounted unit competitions?

3      A.   Yes.

4      Q.   Do you have any idea how many awards you

5   have won?

6      A.   Over 100.

7      Q.   What about with the mounted unit?

8      A.   What time frame?

9      Q.   The entire time you have been with the

10   mounted unit, have you ever won any awards?

11      A.   Yes.

12      Q.   Do you recall what for?

13      A.   Last year I got sixth place in equitation

14   and then sixth place in obstacle combined with

15   equitation score and a year prior to that I think

16   it was eighth, 2006, in equitation.

17      Q.   Of the events that you entered from the

18   time you were a child up until you joined the

19   mounted unit is there both males and females at

20   those events?

21      A.   Correct.

22      Q.   What is the percentage of females to

23   males in those competitions?

24      A.   All depends on the level.

13

1       Q.   Is there typically more females than

2    males?

3       A.   Again, all depends on the level.

4       Q.   Well, what levels are there?

5       A.   The higher the level the percentage of

6    females kind of drops down a little bit, but it's

7    really hard to put a percentage on that.

8       Q.   When you first started is it safe to say

9    there were more females than males?

10      A.   Sure.

11      Q.   Just prior to joining the mounted unit

12   were there more females than males?

13      A.   I really -- I can't answer that

14   correctly.

15      Q.   What about with the mounted unit, the

16   competitions that you have --

17      A.   More male.

18      Q.   Is experience with horses crucial to

19   being the individual that is in command of the

20   mounted unit?

21      A.   Yes, you have to have knowledge and

22   experience.

23      Q.   It's a requirement?

24      A.   According to the SOP you have to have



1    to clarify that.

2        Q.  Okay?

3        A.  I think Corporal Williams had an accident

4    last year and I did have to discipline her.

5        Q.  Have you ever spent any time with

6    Corporal Hoff off-duty?

7        A.  Yes.

8        Q.  And what have you done with her?

9        A.  Mounted unit Christmas parties, four of

10   those.  I went to Canal Days on Corporal Hill's

11   boat with him and other members of the unit and

12   she was there.

13       Q.  Have you ever done anything just you two?

14       A.  Yes.

15       Q.  What types of things have you done?

16       A.  I went to a colt breaking clinic with her

17   last September.  We both brought unbroken horses

18   to break there.

19       Q.  Were these horses New Castle County

20   horses?

21       A.  Our own horses.

22       Q.  Anything else?

23       A.  Yes.  I one time went and got a pedicure

24   with Corporal Hoff and Corporal Williams.

27

```
 1        Q.   When was that?

 2        A.   Sometime in 2006, I'm not sure.  Probably

 3   open sandal season.

 4        Q.   Have you ever called her on the telephone

 5   for non-business reasons?

 6        A.   Corporal Hoff?

 7        Q.   Yes.

 8        A.   Non-business reasons?

 9        Q.   Yes.

10        A.   Maybe regarding the colt breaking clinic

11   or she had a question about one of her horses,

12   then, yes, possible.

13        Q.   It would have just been a couple

14   telephone calls?

15        A.   Horse-related stuff.

16        Q.   Has she ever called you for non-business

17   reasons?

18        A.   Yes.

19        Q.   Same stuff?

20        A.   Yes.

21        Q.   Did you ever contact Corporal Hill for

22   non-business related reasons?

23        A.   Off business?

24        Q.   Yes.
```



Andrea N. Hyden

28

1     A.   I had lunch with him once after work.

2     Q.   Where did you go?

3     A.   That restaurant right at Route 2 and 7.

4  I think he was going to an Eagles game or

5  something.  I'm not sure.

6     Q.   Was there anybody else there?

7     A.   Officer Hennessy.

8     Q.   Besides lunch have you ever called him?

9     A.   Called him?  I've called him off-duty,

10 but not for personal reasons, no.

11    Q.   Have you ever sent Corporal Hoff E-mails

12 for non-business reasons?

13    A.   Yes.

14    Q.   How often?

15    A.   Our whole unit will send E-mails to each

16 other so we'll forward them to each other.  So, I

17 wouldn't -- if I sent her one, I would send it to

18 everybody else, so I can't put a number on it.

19    Q.   And these are non-business E-mails?

20    A.   Just funny E-mails.

21    Q.   Jokes and things of that nature?

22    A.   Jokes.  I think Corporal Hill has been on

23 a couple of them that I've gotten.

24    Q.   Is it your testimony that you would have

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1   never sent her an E-mail just to her?

2       A.   If there was an E-mail that I felt was

3   funny because it was just something that she

4   could relate to, I might, but I can't say that

5   there is one particular incident that I can think

6   of right now.  Just like if there was something

7   funny I think Jim Hennessy would like, I might

8   just send it to him.

9       Q.   Do you ever get E-mail from her for

10  non-business reasons?

11      A.   No, not now.

12      Q.   What do you mean by "not now"?

13      A.   She doesn't have an E-mail address

14  anymore.

15      Q.   Does she have a work E-mail address?

16      A.   Yes, but I don't use that for personal

17  reasons.

18      Q.   Have you ever gone out for drinks with

19  Corporal Hoff?

20      A.   Christmas parties.

21      Q.   That's it?

22      A.   Yes.

23      Q.   Has she ever spent the night at your

24  house?



1     A.   Yes.

2     Q.   When was that?

3     A.   One summer my husband and I were away on

4 vacation and I have several horses and I needed

5 somebody to stay at my house and the two girls I

6 used were not available.  She stayed at my house

7 while I was gone.

8     Q.   Any time when you would have been there?

9     A.   No.

10     Q.   Have you ever spent the night at her

11 house?

12     A.   No.

13     Q.   Have you ever gone on a non-business

14 related trip with Corporal Hoff?

15     A.   Yes.

16     Q.   Where did you go?

17     A.   The colt breaking clinic that I told you

18 about.

19     Q.   Where was that?

20     A.   Allentown, Pennsylvania.  And I went on a

21 ski trip with the entire mounted unit that she

22 also attended.

23     Q.   When was the colt breaking clinic?

24     A.   Last fall.

Andrea N. Hyden

31

1    Q.   Did you guys stay in the same room?

2    A.   Yes.

3    Q.   Was it just you two?

4    A.   No.

5    Q.   Who else went?

6    A.   Another county employee by the name of

7    Carly White who also brought a horse.

8    Q.   Was Carly on the mounted unit?

9    A.   No.

10   Q.   She just likes horses?

11   A.   Yes.

12   Q.   Have you ever gone to the movies

13   together?

14   A.   With Corporal Hoff?

15   Q.   Yes.

16   A.   No.

17   Q.   Have you ever watched her dog while she

18   was away?

19   A.   Watched her dog?  No.

20   Q.   Has she ever watched your dog?

21   A.   Yes, the same week I told you about.

22   Q.   Have you ever gone shopping together?

23   A.   No.

24   Q.   Have you ever bought her a gift?



WILCOX & FETZER LTD.
Registered Professional Reporters

Andrea N. Hyden

32

1    A.   Yes.

2    Q.   And when was that?

3    A.   For the Christmas mounted unit party when

4   I bought everybody else gifts.

5    Q.   Any other time?

6    A.   No.

7    Q.   Has she ever bought you a gift?

8    A.   Yes.

9    Q.   When did she buy you a gift?

10   A.   Christmas mounted unit parties.

11   Q.   Did she buy everybody else a gift?

12   A.   The whole unit got together and bought me

13  something for Christmas.

14   Q.   And that's what we are talking about

15  here?

16   A.   Yes.

17   Q.   What about Rosemarie Williams, have you

18  ever done any of these things that we have just

19  talked about with her?

20   A.   Yes.

21   Q.   What have you done with her?

22   A.   Two Christmas parties, mounted unit

23  Christmas parties.  Same pedicure outing.

24   Q.   Was that just one time?



Andrea N. Hyden

33

1       A.   One time.   And she came to my house

2    sometime in the '90s when I had just had a foal

3    born and my husband worked with her because he

4    was in the parks unit and invited her and her

5    family to come see the newborn foal.

6       Q.   What about telephone calls, have you ever

7    called her for non-business reasons?

8       A.   No.

9       Q.   Has she ever called you for non-business

10   reasons?

11      A.   No.

12      Q.   Have you ever gone out for drinks with

13   Corporal Williams?

14      A.   No, other than Christmas parties.

15      Q.   Has she ever spent the night at your

16   house?

17      A.   No.

18      Q.   Have you ever spent the night at her

19   house?

20      A.   No.

21      Q.   Have you ever gone to the movies

22   together?

23      A.   No.

24      Q.   Have you ever gone shopping together?



Andrea N. Hyden

34

1       A.   No.

2       Q.   What about Corporal Hill, have you ever

3    done any of these things with him?

4       A.   Went to Canal Days with him, three or

5    four Christmas parties, ski trip, and that one

6    time I went out to eat with him and Officer

7    Hennessy, which I already mentioned.  So, about

8    five times or more.

9       Q.   When you discussed Corporal Williams

10   potentially joining the mounted unit with Captain

11   Watson what did you tell him about her?

12      A.   We just started going through all the

13   certified riders who would possibly come into the

14   unit and so I mentioned three other names and her

15   name came up and I said, Well, I would like to go

16   back and talk to the officers in the unit and see

17   what they think and that's what I did.

18      Q.   I may have already asked this, but did

19   you know her before that?

20      A.   I knew of her.

21      Q.   Just generally like everybody else?

22      A.   Correct.

23      Q.   When was the decision made that Corporal

24   Williams would join the mounted unit?

Andrea N. Hyden

35

1          A.   I can't remember the date.

2          Q.   Was it before Corporal Hill was informed

3     that he was being transferred out?

4          A.   I don't even know when he was informed so

5     I couldn't intelligently speak to that question.

6          Q.   Did you speak to Corporal Williams prior

7     to her being offered the position?

8          A.   Yes, once Captain Watson told me she was

9     going to be transferred I did speak with her.

10         Q.   What did you say to her?

11         A.   Asked her if she was interested in coming

12    in.

13         Q.   Was she?

14         A.   Yes.

15         Q.   Did you tell her why there was a position

16    available?

17         A.   I said, There is a vacancy, are you

18    interested?  She said, Yes.

19         Q.   Did you assist in providing answers to

20    the amended complaint in this case?

21              MS. SANFRANCESCO:  I'm going to

22    object to the extent that question calls for

23    anything protected by the attorney/client

24    privilege.

1    BY MR. WILSON:

2        Q.  Well, in response to paragraph 61 of the

3    amended complaint we state that you are friends

4    with Corporal Williams and Corporal Hoff and the

5    response is that you don't have information or

6    belief to answer that question, therefore, it's

7    denied.  Are you friends with Corporal Williams

8    and Corporal Hoff?

9        A.  I think you would have to define for me

10   what is a friend.  Maybe you can do that and then

11   I can maybe answer it correctly for you.

12       Q.  In your definition of what a friend is

13   are they friends?

14       A.  Let me describe to you what I consider a

15   friend.  A friend is somebody who you would call

16   when your dog just got hit or you are having an

17   argument with your spouse.  No, I would not call

18   them for something on that.

19       Q.  Since you have been with the mounted unit

20   have you ever attempted to transfer out of the

21   mounted unit?

22       A.  No.

23       Q.  Why not?

24       A.  I like my job.

Andrea N. Hyden

37

1          Q.   Is there any other place -- is the

2     mounted unit a place you would like to stay for

3     the foreseeable future?

4          A.   Would I like to stay?

5          Q.   Yes.

6          A.   Sure.

7          Q.   What types of things do you like about

8     working on the mounted unit?

9          A.   Well, first and foremost is that I'm

10    working with horses.  Second, I like the people

11    who work for me.  I like the unit that I'm in as

12    far as special operations goes.  I work well with

13    the other supervisors within special ops.  I like

14    my horse.

15         Q.   Are you proud of being a member of the

16    mounted unit?

17         A.   Yes.

18         Q.   Why?

19         A.   All the reasons that I just told you and

20    I take pride in my job and how I do it.

21         Q.   Based upon your knowledge of different

22    mounted units is the New Castle County mounted

23    unit a respected mounted unit?

24         A.   I believe so.



Andrea N. Hyden

48

1          A.   Yes, he was assigned to our unit when I

2     first came over and I very shortly after that

3     retired him.

4          Q.   Where did he go when he was retired?

5          A.   Back to his owner.

6          Q.   Who was his owner?

7          A.   I think it's Patricia something.  I can't

8     remember a last name.  Trish, Patricia.

9          Q.   Oliver didn't go to Corporal Williams?

10         A.   No.  He went to its owner.

11         Q.   Are you familiar with the horse Misty?

12         A.   Yes.

13         Q.   Has Misty ever been assigned to any

14    police officer?

15         A.   No.

16         Q.   How did the mounted unit get Misty?

17         A.   I broke Misty when she was three when I

18    was in college.

19         Q.   When who was in college?

20         A.   When I was in college.  The owner of that

21    horse then telephoned me several years later when

22    I was in the mounted unit asking if we would be

23    interested in taking her as a donation for the

24    unit.  I then discussed what she had been doing

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Andrea N. Hyden

49

1    with the horse, told her we do have a 90-day

2    trial period and that we would be interested in

3    trying her.  She was trailered up to us.  She

4    started the 90-day trial period and she ended up

5    not working out and being sent back to the owner.

6         Q.  Did any of the members of the mounted

7    unit ride Misty?

8         A.  Yes.

9         Q.  Who rode her?

10        A.  Everybody had a chance to ride her.  I

11   think Corporal Hill might have ridden her when

12   she first came.

13        Q.  Who rode this horse the most out of all

14   the officers?

15        A.  Corporal Hoff.

16        Q.  Is there a reason for this?

17        A.  She asked to.

18        Q.  Was Misty a good jumping horse?

19        A.  She could jump, yes.  She was a bad

20   police horse.

21        Q.  Would Misty have been a good horse for

22   use in competitions?

23        A.  Obstacles, she didn't even go into the

24   course, she wouldn't even go into the ring.  So,

Andrea N. Hyden

51

1    been able to ride him.  He would be -- would we

2    be interested in looking at him.  I told him we

3    would.  I sent out Corporal Hill and Corporal

4    Hoff to go try out the horse and depending what

5    they thought about the horse then we would agree

6    to bring it back.  I went back and looked at him

7    as well and we agreed to take him on a trial

8    basis.

9        Q.   How long did the unit have Tonka?

10       A.   We still have him.

11       Q.   Still have him?

12       A.   Yes.

13       Q.   Is he assigned to anybody?

14       A.   No.

15       Q.   Why not?

16       A.   Quite honestly nobody wants to ride him.

17   Everybody has their own assigned horse.

18       Q.   I'm sorry, just jumping back to Misty for

19   a second.  In order to get ready for this

20   competition that Corporal Hoff rode Misty in did

21   she have to work with Misty a lot?

22       A.   Yes.

23       Q.   Did she have to request permission to

24   ride Misty in the competition?

Andrea N. Hyden

52

1     A.  Yes.

2     Q.  Did she get that permission from you?

3     A.  Yes.

4     Q.  Did Corporal Hoff also have the horse

5   that she was assigned to at that time?

6     A.  Yes.

7     Q.  What is the name of that horse?

8     A.  Laura.

9     Q.  So, Corporal Hoff was working with both

10  Laura and Misty at that time?

11     A.  Yes.

12     Q.  And that's permissible to work with two

13  horses at the same time?

14     A.  Sure.

15     Q.  Back to Tonka.  Was Tonka just a horse

16  that was there in case something happened with

17  one of the other horses?

18     A.  He is one of the extra horses, yes.

19     Q.  And at some point Corporal Hill started

20  working with Tonka, correct?

21     A.  A week before the competition, yes.

22     Q.  And this is because Corporal Hill's horse

23  had a code discoloration?

24     A.  Yes.

1     Q.   The code discoloration would be a

2   negative in the competition?

3     A.   In the uniform competition, that's

4   correct.

5     Q.   He only worked with Tonka for a week?

6     A.   It was whenever he decided that he could

7   not use his assigned horse for the competition,

8   whatever that period of time that was is when he

9   started working with her.  Phil Davis had

10  actually been coming in on his days off and his

11  time off and working with Tonka and Phil was

12  supposed to ride Tonka.

13    Q.   Why didn't Phil ride Tonka?

14    A.   He agreed to take Darby because Jeff

15  needed Tonka for the competition.

16    Q.   What was wrong with Phil's horse?

17    A.   Nothing was wrong with Phil's horse.

18    Q.   Why didn't Phil ride his horse?

19    A.   Because he gave his horse to Jeff because

20  Jeff's horse had a code discoloration.

21    Q.   So, Tonka was Phil's horse?

22    A.   He was assigned that horse for the

23  competition, yes.  Phil is an auxiliary rider and

24  he goes with us to these competitions to help

Andrea N. Hyden

55

1    horse?  Like as in patrol to ride on patrol?

2      Q.  Yes.

3      A.  No.

4      Q.  And why was the horse not assigned to

5    anybody?

6      A.  Because everybody else had a horse at the

7    time that they were riding.  Now, Officer Andy

8    Guiton did ride Tonka quite a bit on the street

9    because his horse had an injury.

10     Q.  Were there any behavioral issues with

11   Tonka?

12     A.  Yes.

13     Q.  What were those?

14     A.  Was and still is, bucks at the canter.

15     Q.  Bucks at what?

16     A.  The canter.  He will buck you off.

17     Q.  Was this an issue that Corporal Hill

18   worked with Tonka on?

19     A.  I don't know, I don't know what he worked

20   on with him.

21     Q.  Was Corporal Hill required to do this

22   canter at the competition?

23     A.  Yes.

24     Q.  Did Tonka buck him off?



Andrea N. Hyden

56

1      A.  No.

2      Q.  How did Tonka perform at that

3  competition?

4      A.  Which part?

5      Q.  Overall.  To be honest with you I don't

6  know what the parts are.

7      A.  Performed very well in the uniform

8  competition, he got first place.

9      Q.  What other parts are there?

10     A.  The obstacle course didn't place.  And

11  second place in equitation.

12     Q.  Second place in equitation, that's pretty

13  good, right?

14     A.  Yes.

15     Q.  Even though he did not place in the

16  obstacle course did he perform well?

17     A.  I can't remember.  I mean, it wasn't well

18  enough to even be up there so you wouldn't say,

19  wow, he did great.  I don't know, I can't

20  remember.

21     Q.  Did he perform poorly?

22     A.  These are terms that I just wish you

23  could maybe clarify for me.  Poorly as in what?

24     Q.  Well, I'm not entirely familiar with

1    horse competitions so it's kind of hard.  Just

2    based upon your experience and observations would

3    you say that the horse performed well, poorly,

4    average?  Was he below average?

5        A.  I will say he did fairly well.  How about

6    that?

7        Q.  Okay.  After the competition Corporal

8    Hill approached you and asked if he could

9    continue working with Tonka, correct?

10       A.  I remember this coming up in the document

11   that you provided to my attorney and I am trying

12   to remember if I actually had that discussion

13   with him.  I can honestly tell you I don't

14   specifically remember, but is it possible?  Yes.

15       Q.  Did Corporal Hill continue to work with

16   Tonka after this competition?

17       A.  I believe he still continued to ride him.

18       Q.  Did Corporal Hoff begin riding Tonka?

19       A.  She rode him as well, yes.

20       Q.  Would you say Corporal Hoff rode Tonka

21   more than Corporal Hill?

22       A.  Without looking at a daily roster I

23   couldn't do the numbers.  I'm sure Guiton rode

24   him quite a bit too.

Andrea N. Hyden

63

```
 1    tree and start telling people if you want to come

 2    in it's yours, come in and take it.

 3       Q.   If everybody comes in everybody can work?

 4       A.   That's correct.

 5       Q.   I kind of want to switch gears here and

 6    talk about this contest that we mentioned in the

 7    amended complaint.  Are you familiar with what

 8    I'm talking about?

 9       A.   Yes.

10       Q.   The contest was to measure the officer's

11    statistics, correct?

12       A.   Their contacts, yes.

13       Q.   Can you tell me what a contact is.

14       A.   An officer's daily contact average is

15    based on criminal arrests, traffic citations,

16    traffic warnings and something that is called

17    CPC, crime prevention checks.

18       Q.   What the contest was for was to see who

19    could get the most contacts?

20       A.   It was based on contacts, yes.

21       Q.   And the person who would get the most

22    contacts would be the winner?

23       A.   Yes.

24       Q.   Are contacts important in the mounted
```



Andrea N. Hyden

64

1    unit?

2        A.   It's very important along with many other

3    things that we do, yes.

4        Q.   Why is it important?

5        A.   Because we are considered a high profile,

6    high visibility unit.  Traditionally we are

7    placed in high crime neighborhoods that need

8    special attention and usually the direction that

9    we're given is zero tolerance for any crime.  So,

10   when you are in a high crime neighborhood with a

11   zero tolerance approach you are going to get high

12   contacts.

13       Q.   Why did you decide to have this contest?

14       A.   At the time other patrol supervisors were

15   also doing similar things.  I thought it would be

16   a good incentive to motivate the officers to be

17   productive.

18       Q.   How long did the contest run?

19       A.   It was supposed to last quarterly with

20   the first quarter being January, February, March,

21   second quarter being April, May June and so

22   forth.  It only lasted one quarter.

23       Q.   What quarter was that?

24       A.   January, February, March.



Andrea N. Hyden

65

1    Q.    Why didn't it continue?

2    A.    Because both quarters it would have been

3    Corporal Hoff and I discussed it with her and I

4    said that I thought that I didn't think it would

5    improve morale of the unit for me to continue to

6    reward her for her job well done even though she

7    was the highest contact officer.  So, she agreed

8    not to hold me to the second quarter.

9    Q.    When did you announce the contest?

10    A.    In April.

11    Q.    So, you announced a contest in April for

12    January, February and March?

13    A.    That's correct, and then advising that

14    the next quarter would be April, May, June.

15    Q.    Why did you do it retroactive?

16    A.    First quarter starting with January 1st

17    of the year and just, again, as incentive to say,

18    you know, this is what I'm going to do and this

19    is the reward that you get and let's start our

20    second quarter now.

21    Q.    Did anybody complain that they thought it

22    was unfair that the first quarter was already

23    over with before the contest was announced?

24    A.    No.



Andrea N. Hyden

66

1    Q.   Did anybody say they thought it wasn't

2    fair?

3    A.   No, not to me.

4    Q.   During the January, February and March

5    time frame was Corporal Hoff patrolling in a

6    patrol car?

7    A.   Exclusively?

8    Q.   At all.

9    A.   All officers patrol in a patrol car as a

10   chase car.

11   Q.   Did she patrol in a patrol car more than

12   the other officers in the mounted unit during

13   this time period?

14   A.   I can't intelligently answer that

15   because, again, I don't have daily rosters in

16   front of me.

17   Q.   And you don't have a recollection?

18   A.   No.

19   Q.   Is it easier to accumulate statistics if

20   you are working out of a patrol car instead of on

21   horseback?

22   A.   In what capacity?

23   Q.   I don't know what you mean by what

24   capacity.

Andrea N. Hyden

67

1      A.   If you are going out in your patrol car

2    and not assisting the officers on horses, yes.

3    If you are going out as a chase car, no.

4      Q.   What is a chase car?

5      A.   Your job as a chase car is to assist the

6    officers on horses because the officers on horses

7    don't have computers and they can't run data,

8    they can't transport prisoners and they can't go

9    after cars that have fled them.  Therefore, the

10   chase car is to take a position in the back

11   basically.  They call or go over to them and ask

12   them to run data.  They will use our rap sheet to

13   verify that the driver is who they say they are.

14   Again, if there are any prisoners they will

15   transport them back and forth.

16              So, there is not a whole lot of time

17   to be out there doing your own individual work

18   not to mention if you are out doing that then who

19   is going to help the other officers on horseback.

20     Q.   Do the officers in the mounted unit do

21   they ever work out of a patrol car in a situation

22   that has not been the chase car?

23     A.   Yes.

24     Q.   And what circumstances would somebody get



Andrea N. Hyden

69

1      Q.   What did she take?

2      A.   Two days off.

3      Q.   For the second quarter Corporal Hoff took

4   no prizes?

5      A.   No.

6      Q.   Does New Castle County have a policy

7   regarding officers who are injured in terms of

8   having to get medical clearance before they come

9   back to work?

10     A.   Yes.

11     Q.   What is that policy?

12     A.   If you are injured on duty you go to

13   Omega, you are examined and they determine if you

14   are fit for full duty or modified duty and

15   ultimately Omega, County Medical, determines when

16   you can return back to work for duty.

17     Q.   What about when you are injured off-duty?

18     A.   If you are injured off-duty and you feel

19   like you cannot do your job as a patrol officer,

20   you have to report to your supervisor that you

21   feel like you can't and then you are required to

22   go get examined by Omega, same process.

23     Q.   For the on-duty injuries do you have to

24   go to Omega before you can come back to work?

Andrea N. Hyden

70

1        A.    Yes, you have to be cleared by Omega,

2    yes.

3        Q.    Was there an incident where Corporal Hoff

4    fell down some steps and was injured?

5        A.    Yes, she told me she had fallen down her

6    steps.

7        Q.    Did this happen at home?

8        A.    Yes.

9        Q.    Did it affect her ability to do her job?

10       A.    She did not tell me that she couldn't do

11   her job, no.

12       Q.    But did it affect her job even though she

13   didn't report it?

14       A.    She did her job so I guess that was not

15   affecting it.

16       Q.    So, she wasn't required to go to Omega?

17       A.    No.   It's her responsibility.   Only an

18   officer knows whether or not they can or cannot

19   do their job and then they have to advise their

20   supervisor that they can or cannot do their job.

21   If they say they cannot do their job, then they

22   have to go to Omega to be cleared.

23       Q.    As a supervisor what if you observe an

24   officer who clearly can't do their job?

**W&F**

73

```
 1        Q.  Who determines if he has the best

 2    qualifications?

 3        A.  Supervisor who is assigning the acting

 4    sergeant status.

 5        Q.  If the most senior officer in the unit

 6    does not have the best qualifications, the

 7    supervisor can select somebody else?

 8        A.  At that period of time, yes.

 9        Q.  And at some point this policy changed?

10        A.  Correct.

11        Q.  What was the new policy?

12        A.  Most senior and if the most senior

13    officer did not want that position, then they

14    would pass on to the next most senior.

15        Q.  Did you always follow these policies?

16        A.  Yes.

17        Q.  After the new policy went into effect

18    there was never a time where Corporal Hill was

19    not the acting sergeant?

20        A.  There were times when Corporal Hill was

21    not the acting sergeant during those times.

22        Q.  And why was he not the acting sergeant?

23        A.  Because he was not working that day.

24        Q.  Who was the acting sergeant then?
```



74

1        A.    The next senior officer would be Corporal

2    Hoff.

3        Q.    Was there ever a time when Corporal Hill

4    was working when he wasn't the acting sergeant

5    during this time frame?

6        A.    Not to my knowledge.

7        Q.    When Corporal Hill had the radar units

8    calibrated he was the acting sergeant, correct?

9        A.    Yes.

10        Q.    And you were upset that he had the radar

11    units calibrated, correct?

12        A.    Yes.

13        Q.    Why were you upset?

14        A.    During that time there was rumor that the

15    mounted unit may -- its stability existing may

16    have been in jeopardy.  Coinciding with that we

17    also had a direct order from our then Colonel

18    David McAllister to patrol the door area, which

19    is Dunleith, Oakmont, Overview Gardens and

20    Rosegate.  The reason why we were in there was

21    because we were having a lot of crime issues with

22    shootings, drugs, robberies, quality of life

23    complaints.  Therefore, our unit was dedicated to

24    that area only.

1    answer his phone.  I called Corporal Hoff and

2    talked to her, I said, Where is everybody?  At

3    the time I can't remember who she was riding

4    with, but she was with somebody on the horse.  I

5    said, Where is everybody else?  She said that

6    Corporal Hill and Officer Brown are calibrating

7    the radar units.  So, they weren't where I asked

8    them to be.

9        Q.  Did you know that the radar units were

10   supposed to be calibrated before you left?

11       A.  No, no, I did not.

12       Q.  So, there was Corporal Hill and Corporal

13   Brown doing radar units, where was everybody

14   else?

15       A.  I think Officer Hennessy might have been

16   off that day, I'm not sure.  And either Corporal

17   Berg or Officer Guiton were with Corporal Hoff

18   and then the other one would have been the chase

19   car.

20       Q.  And where was Corporal Hoff?

21       A.  In the area.

22       Q.  So, there were some officers in the area?

23       A.  Correct.

24       Q.  How long does it take to calibrate radar



Andrea N. Hyden

78

1     A.   If you use your radar, important.

2     Q.   If you don't have it calibrated is it

3   possible that it could give an inaccurate

4   reading?

5     A.   Sure.

6     Q.   If a radar unit gives an inaccurate

7   reading is it possible that a defendant who is

8   being prosecuted based upon information gained

9   from the radar unit could use that as a defense?

10    A.   If the officer introduces the radar

11  calibration book.  There are other solutions to

12  that.  They can make a plea going into it, they

13  can just not introduce the radar calibration

14  book.

15    Q.   Couldn't the defendant's attorney ask for

16  the radar calibration book?

17    A.   Yes.

18    Q.   Somebody else had scheduled these units

19  to be calibrated, correct?

20    A.   I don't know.

21    Q.   It wasn't Corporal Hill?

22    A.   I don't know.

23    Q.   How is it normally done?

24    A.   We don't have a process for it.  If you

1    have a radar unit, you need to make sure you keep

2    up on the calibration.

3        Q.   It's each individual officer's

4    responsibility --

5        A.   Yes.

6        Q.   -- to calibrate?  Do they have to request

7    permission from you before they calibrate their

8    radar units?

9        A.   No.  They just let me know that they are

10   going to do it.  We have handheld units that

11   Conrad DeMatteus will contact us and let us know

12   they need to be calibrated and make sure that

13   gets done.

14       Q.   Who does the calibration?

15       A.   As far as officers go?

16       Q.   No.  I assume there is an individual that

17   does the calibration?

18       A.   I think it's a company that does it.

19       Q.   Do you know who it is?

20       A.   No.

21       Q.   If Conrad DeMatteus contacts you and

22   says, Hey, this calibration company is coming in,

23   do you get the radar units over there?

24       A.   Yes.

1      Q.  If you had been on vacation -- if you had

2   not been on vacation and Conrad DeMatteus called

3   you up on that day when you were supposed to be

4   in that area --

5                MS. SANFRANCESCO:  Objection, calls

6   for speculation.

7   BY MR. WILSON:

8      Q.  -- would you have taken the radar units

9   to have them calibrated?

10     A.  You know, again, not being there that's

11  hard to say.  McAllister was the kind of chief

12  that the chain of command wasn't as severe as it

13  has been before and has been now.  He would pop

14  in in the office.  He would stop you in the

15  hallway.  He would drive by the areas that you

16  are assigned to and because it was such a fresh

17  order I would have had to weigh that very

18  seriously and then maybe have further discussions

19  with Conrad and say, When are they coming next?

20  Wait a minute, I have two other radar units, I

21  have two handheld units, can I get away without

22  getting these calibrated now and doing them

23  later?

24                I think for me to answer that

1    blanketly I don't know that I can do that with

2    one blanket answer.  I think with any good, sound

3    decision-making you have to consider all the

4    circumstances.

5        Q.   If an officer lets his radar unit fall

6    out of calibration --

7        A.   Then they can't use that unit until it

8    has been re-calibrated if you are going to go to

9    trial and use that calibration book.

10       Q.   Is he subject to discipline if it's not

11   calibrated on a timely basis?

12       A.   Not if I'm aware of it and approve it.

13       Q.   How many days was it before you came back

14   from vacation before this incident with the radar

15   unit occurred?

16       A.   I came in on my day off from vacation.

17       Q.   Is it the next day?

18       A.   The very same day I came in.

19       Q.   And you had a meeting with the entire

20   mounted unit, correct?

21       A.   Correct.

22       Q.   And what was the meeting about?

23       A.   About the unit not being fully-staffed in

24   the DOOR area.



Andrea N. Hyden

82

1        Q.   Why didn't you address this in private

2    with Corporal Hill?

3        A.   I wanted to assure that all members of

4    the mounted unit understood my order for future

5    reference.

6        Q.   Do you think addressing this issue in

7    front of the whole unit hurt Corporal Hill's

8    credibility for future times when he was serving

9    as acting sergeant?

10        A.   I don't know.

11        Q.   Was that your intent?

12        A.   No.

13        Q.   Has your supervisor ever taken issue with

14    a decision you have made?

15        A.   Taken issue?  What do you mean by that?

16        Q.   Has he ever been upset with a decision

17    you made?

18        A.   Nothing comes to mind right now.

19        Q.   Has your supervisor ever reprimanded you

20    for anything?

21        A.   No.

22        Q.   When you were on vacation this particular

23    time, did you receive any telephone calls from

24    Corporal Hoff?

1      A.   No.

2      Q.   So, any telephone conversations you had

3   were coming from your phone?

4      A.   That's correct.

5      Q.   Now I want to talk about the alleged

6   statement about Corporal Hill being under Captain

7   Setting's desk.  You have an understanding as to

8   what I'm talking about, correct?

9      A.   That's correct.

10     Q.   Paragraph 28 of the amended complaint

11  states that Corporal Hill unaware of where

12  Captain Setting's office was located asked you

13  for the location and you responded you should

14  know, you spend enough time under his desk.  The

15  response that you have given is that you can't

16  answer because you lack information and belief,

17  therefore, it's denied.  I don't understand how

18  you can't have information or belief as to

19  whether you made that statement or not.

20              MS.  SANFRANCESCO:   Objection.

21  BY MR.  WILSON:

22     Q.   Did you make the statement?

23     A.   I cannot recall making that statement,

24  no.



Andrea N. Hyden

84

    1         Q.   So, do you deny making the statement?

    2         A.   I'm not going to deny making the

    3    statement because there has been testimony in the

    4    Step III grievance by Officer Brown and Officer

    5    Guiton that they heard me make that statement and

    6    I trust Officer Brown and Guiton's testimony.

    7    So, clearly I made the statement, but I can tell

    8    you I don't remember making the statement.

    9         Q.   When you say clearly you made it, then

   10    you would be admitting that you made it?

   11         A.   Of course, but I can't remember making

   12    it.

   13              MS. SANFRANCESCO:  I'm going to make

   14    a standing objection to the characterization of

   15    the contents of the amended complaint that were

   16    drafted by an attorney.

   17              MR. WILSON:  Well, it was drafted by

   18    an attorney, but these people are your clients

   19    and they should have information or belief

   20    whether they made a statement or not.

   21              MS. SANFRANCESCO:  That's my standing

   22    objection.  You can ask her the questions about

   23    facts that form the basis for what is in the

   24    complaint, but she -- or the answer, but clearly

Andrea N. Hyden

85

1    Sergeant Hyden didn't draft it just like you

2    drafted the complaint and not Corporal Hill.  I'm

3    assuming Corporal Hill didn't draft it.

4              MR. WILSON:  Corporal Hill read the

5    complaint and verified everything was accurate.

6    That's what I always do with my clients.  If you

7    are representing these people and you have this

8    type of answer I can't understand how these

9    individuals can answer in that way, but your

10   objection is noted.

11   BY MR. WILSON:

12      Q.  Initially you did deny making the

13   statement, though, correct?

14      A.  To who?

15      Q.  To anybody.

16      A.  I would like for you to specify what you

17   are talking about.

18      Q.  Did you ever deny that you made the

19   statement?

20      A.  To who?

21      Q.  I'm asking you the questions, have you

22   ever denied making the statement?

23      A.  You know, again, if you asked me did you

24   make the statement, I would say, no, I did not

86

1       make that statement because I had no recollection

2       of making that statement.  After I heard that

3       Officer Brown and Officer Guiton both said I made

4       the statement I'm not going to say I didn't make

5       it.  Everybody says a million words a day.  I can

6       tell you I don't remember every single word I've

7       said.  If there has been testimony that two

8       officers said they heard me say it, then I

9       clearly said it.  Do I recall making it?  Did I

10      recall making it when I was first asked?  No.

11          Q.  At one point you denied making it,

12      correct?

13          A.  If you say I did, then I guess I did.

14          Q.  Well, I'm not testifying, you are.

15          A.  Okay.

16          Q.  Either you did deny or didn't.

17                  MS. SANFRANCESCO:  I'm going to

18      object for the record.  I think Sergeant Hyden is

19      trying to answer your question.  I think it is an

20      appropriate response to the question.

21                  MR. WILSON:  I don't.  It's a very

22      simple question.  Either you did deny it or you

23      didn't deny it.

24                  MS. SANFRANCESCO:  Well, apparently

87

1    she doesn't think it's a simple question because

2    she has asked you for clarification.

3    BY MR. WILSON:

4        Q.  Did you deny making the statement ever?

5              MS. SANFRANCESCO:  And it has been

6    asked and it has been answered.

7              MR. WILSON:  It has not been

8    answered.

9              MS. SANFRANCESCO:  It has been.

10       A.  Yes, I did, I denied making that

11   statement because I had no recollection of making

12   it, yes.

13       Q.  When you denied making the statement, you

14   said that making such a statement would be

15   harassing, correct?

16       A.  Yes, I did.

17       Q.  Paragraph 30 of the amended complaint

18   states Sergeant Hyden made no similar statements

19   to Corporal Hoff the only other female offer in

20   the mounted unit.  Again, the response is you

21   lack information or belief.  Have you ever made

22   that type of statement to Corporal Hoff?

23       A.  No.

24       Q.  I want to talk about the trip to Virginia



Andrea N. Hyden

88

1    Beach now for the competition.  In the amended

2    complaint you deny you did not congratulate

3    Corporal Hill after winning at the competition,

4    correct?

5        A.    I'm sorry, can you restate that again.

6        Q.    In the amended complaint we state that

7    you didn't congratulate him after winning the

8    competition?

9        A.    Okay.

10       Q.    And that statement is denied.

11       A.    Okay.

12       Q.    Did you congratulate him?

13       A.    I don't know that I congratulated

14    anybody.

15       Q.    Why wouldn't you congratulate him?

16       A.    I didn't congratulate anybody.  I think

17    when we got back I told everybody we all did

18    well, our unit came back with several ribbons,

19    it's something to be proud of; but, I didn't walk

20    up to any one particular person and say,

21    Outstanding job.

22       Q.    Is it fair to say in your view it was a

23    team victory?

24       A.    Yes.



1      Q.   So, it wasn't appropriate to single one

2    person out for their individual accomplishments

3    because it's a good reflection on the mounted

4    unit as a whole?

5      A.   Is it appropriate?  Is it good manners?

6    Is it bad manners?

7      Q.   Is that how you viewed it?

8      A.   I really didn't view anything.  I didn't.

9    I didn't make a conscious effort to say I'm not

10   going to congratulate anybody.  I just didn't do

11   it.

12     Q.   During this competition you were upset

13   about an issue with Corporal Hill's horses

14   sheath, correct?

15          MS. SANFRANCESCO:  I'm going to

16   object to the characterization of some of the

17   questions.  They're more leading and assuming

18   facts in evidence than asking a question.  I just

19   want to make that a standing objection for the

20   record.

21     Q.   Were you upset with an issue with

22   Corporal Hill at the competition?

23     A.   An issue came up with a dirty sheath and

24   I think that upset is the word that you have been

Andrea N. Hyden

90

1    using regularly during this. Was I disappointed?

2    Yes.

3        Q.   Was the sheath cleaned before he went

4    into competition?

5        A.   Yes.

6        Q.   Did you clean the sheath?

7        A.   Myself and Corporal Davis did.

8        Q.   How long does it take to clean a sheath?

9        A.   The right way?

10       Q.   Yes.

11       A.   Thirty minutes. Depending on how long it

12   has been since you have done it last, depending

13   on whether the horse cooperates or not, could

14   take a long time.

15       Q.   Because you and Corporal Davis stepped up

16   and cleaned the sheath there were no negative

17   consequences --

18       A.   No.

19       Q.   -- at the competition? Were you

20   disappointed with Corporal Hill on any other

21   issues on this trip?

22       A.   There were a couple other issues with his

23   uniform that ultimately did not become issues,

24   but they could have been.

Andrea N. Hyden

92

1     A.   It was a piece of leather on the breast

2   strap that needed to be shortened, but, again,

3   ultimately he won the uniform competition.

4     Q.   How did you remedy that?  Did you just

5   cut if off?

6     A.   We didn't, we left it.

7     Q.   Did anybody else in the mounted unit

8   forget anything that you were disappointed in on

9   the trip?

10     A.   Forget anything?

11     Q.   Or overlook anything, anything that would

12   cause an issue for the competition?

13     A.   In what part of the competition?

14     Q.   Any part of the competition.  We know why

15   you were disappointed with Corporal Hill.  Were

16   you disappointed with anybody else on the mounted

17   unit in their performance at the competition?

18     A.   No.

19     Q.   Following the competition you had a

20   meeting with Corporal Hill regarding these

21   issues?

22     A.   It wasn't a meeting.

23     Q.   What was it?

24     A.   It was an impromptu discussion.

93

```
 1        Q.   Where did it occur?

 2        A.   In the mounted unit office located at

 3    carousel park.

 4        Q.   Is that your office?

 5        A.   Yes.

 6        Q.   Why was Corporal Hill there?

 7        A.   It was the day we got back from the

 8    competition and it was the unloading and getting

 9    gear back where it belongs day.

10        Q.   Why was he in your office?

11        A.   Just walked into the office and I was in

12    there.

13        Q.   And you just decided at that point to

14    bring up these issues?

15        A.   I didn't bring it up.

16        Q.   He brought it up?

17        A.   Yes.

18        Q.   What did he say?

19        A.   He was just kind of basically recapping

20    the success of the competition and Phil Davis,

21    how amazing he is and his high energy, his

22    dedication level, teamwork.

23        Q.   After he did that that's when you brought

24    up these other issues?
```

94

1      A.   That's when we started talking about

2    dedication, teamwork, things like that.

3      Q.   These issues that we talked about, the

4    pants, the sheath and the piece of leather you

5    spoke to Corporal Hill about that during this

6    discussion?

7      A.   I know we talked about the sheath.   The

8    others I can't remember.

9      Q.   Did you talk about Corporal Hill's

10   statistics during this discussion?

11     A.   Yes.

12     Q.   What did you say to him about that?

13     A.   Well, the conversation evolved and we

14   then started talking about productivity,

15   motivation, teamwork and I mentioned that his

16   productivity was still not where it should be and

17   that I hadn't seen a big improvement on teamwork.

18     Q.   Was this the first time you ever

19   mentioned his productivity to him?

20     A.   No.

21     Q.   How many times had you addressed his

22   productivity with him prior to this?

23     A.   Once prior in the spring of the same

24   year.

Andrea N. Hyden

95

1    Q.   What did you say to him at that point?

2    A.   Same issues, productivity, teamwork,

3    motivation level.

4    Q.   Again, in the amended complaint we allege

5    that you stated to Corporal Hill that's strike

6    two during this conversation and then you said,

7    You saw what happened to Doc.  Did you make these

8    statements?

9    A.   No.

10   Q.   And you have a clear recollection of

11   that?

12   A.   Yes.

13   Q.   And Doc is Corporal Devine, correct?

14   A.   That's correct.

15   Q.   And Corporal Devine was not with the

16   mounted unit at this time, correct?

17   A.   Yes.

18   Q.   And was he transferred out of the mounted

19   unit?

20   A.   Yes.

21   Q.   Why was he transferred out of the mounted

22   unit?

23   A.   Productivity, lack of motivation, lack of

24   teamwork, unwillingness to modify his work ethic

1    and work assignments.

2       Q.   What does "work assignments" mean?

3       A.   Unwilling to modify his work assignments.

4       Q.   Do you have any specific examples?

5       A.   He was assigned in the parks unit, but

6    there were many times when I needed the parks

7    officers to assist with the mounted unit and

8    there was an unwillingness to switch gears.

9       Q.   Was there an issue with Corporal Devine

10   about a vacation that he wanted to take?

11      A.   I don't remember that, no.

12      Q.   All right, that leads us to Corporal

13   Hill's transfer.  Initially you made statements

14   that you played no part in Corporal Hill's

15   transfer, correct?

16      A.   I believe in the grievance II hearing I

17   stated that it came from outside sources, yes.

18      Q.   But then later you admitted that you did

19   play a part in it?

20      A.   I guess I need you to clarify what "play

21   a part" means.

22      Q.   Did you request the transfer?

23      A.   No.

24      Q.   Did you talk to anybody about having him

Andrea N. Hyden

97

1    transferred?

2        A.    No.

3        Q.    Did you express your desire to anybody to

4    have him transferred?

5        A.    No.

6        Q.    Did you write to anybody?

7        A.    Yes.

8        Q.    Who did you write to?

9        A.    I created a memorandum to Captain Hitch.

10        Q.    What did the memo say?

11        A.    It was reporting the progress of Corporal

12    Hill's productivity and overall demeanor within

13    the mounted unit, cohesiveness with the other

14    officers after our January meeting.

15        Q.    And did you write this memo after

16    Corporal Hill made a complaint about the way you

17    were treating him?

18        A.    Which complaint would that be?

19        Q.    Any complaint.

20        A.    You mean the original complaint?

21        Q.    Any complaint at all to your knowledge.

22        A.    Yes.  Yes.

23        Q.    Did his complaint about you play any part

24    in your deciding to write a memo?



WILCOX & FETZER LTD.
Registered Professional Reporters

Andrea N. Hyden

98

1      A.   No.

2      Q.   After you wrote the memo to Captain Hitch

3   did you have any conversations with Captain Hitch

4   about Corporal Hill?

5      A.   I actually had a conversation with

6   Captain Hitch prior and I told him -- I was

7   reporting back to him the progress that was being

8   made within the unit in regards to Corporal Hill.

9   I told him there were some concerns.  He said,

10  Draft a memo and send it to me.  That's what I

11  did.

12     Q.   At some point you, Corporal Hill and

13  Captain Hitch had a meeting, correct?

14     A.   That's correct.

15     Q.   And what happened at that meeting?

16     A.   We all sat in the same room for three and

17  a half hours, given an open venue to discuss any

18  and all issues that were concerning either one of

19  us.  We left stating that we had cleared the air

20  and I actually -- I'm the one that came up with

21  the clean slate statement.  I said, you know, as

22  far as I'm concerned starting tomorrow you will

23  have a clean slate with me.  Tomorrow is a new

24  day.  I would like to see progress.  I would like

Andrea N. Hyden

99

1      for this to work.  This is how it ended.  In my

2      opinion it ended on a good note.

3          Q.  But there continued to be problems,

4      correct?

5          A.  Yes, after that, a week after.

6          Q.  What happened then?

7          A.  Initially he went back and made a real

8      conscious effort to talk to all the officers

9      within the unit that he hadn't been talking to

10     regularly.  He might have apologized to a couple

11     of them.  Everybody agreed that they would work

12     together.  His productivity did come up, his

13     overall demeanor did improve and then shortly

14     after that things started reverting back to the

15     way they had been prior.

16         Q.  What happened that made them revert back

17     to the way they were?

18         A.  Him, not them.

19         Q.  Do you know why he started reverting

20     back?

21         A.  No.

22         Q.  Did it have anything to do with his

23     interaction with you?

24         A.  I don't know why.

1       Q.   So, the meeting, I'll call it the clean

2    slate meeting, did that happen between your first

3    conversation with Captain Hitch and your memo to

4    Captain Hitch?

5       A.   No.

6       Q.   When did the clean slate meeting occur?

7       A.   Prior.

8       Q.   To either?

9       A.   Yes.

10      Q.   How did Captain Hitch know there was an

11   issue?

12      A.   Because Corporal Hill filed a complaint.

13      Q.   So, that's what precipitated the meeting?

14      A.   Yes.

15      Q.   In the memo to Captain Hitch did you

16   request that Corporal Hill be transferred?

17      A.   No.

18      Q.   Did you request any type of relief?

19      A.   Any kind of relief?

20      Q.   Did you request that Captain Hitch do

21   anything?

22      A.   My memo basically stated what was

23   occurring within the unit and advising him of the

24   condition of the unit.