*Jeffrey D. Hill v. New Castle County, et al.*
C. A. No. 07-228 (GMS)
Plaintiff's Answering Brief In Opposition Of Defendants' Motion For Summary Judgment

# APPENDIX J

```
        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE
JEFFREY D. HILL,                    )
                                    )
         Plaintiff,                 )
                                    )   Civil Action
v.                                  )No. 07-228 (GMS)
                                    )
NEW CASTLE COUNTY POLICE            )
DEPARTMENT, a division of New       )
Castle County; and NEW CASTLE       )
COUNTY, a municipal corporation,)
                                    )
         Defendants.                )
```

        Deposition of QUINTON L. WATSON
taken pursuant to notice at the New Castle County
Law Department, 87 Reads Way, New Castle,
Delaware, beginning at 2:08 p.m. on Monday, June
30, 2008, before Christina M. Vitale, Certified
Court Reporter and Notary Public.
APPEARANCES:
      TIMOTHY J. WILSON, ESQUIRE
      MARTIN & WILSON
       1508 Pennsylvania Avenue
        Wilmington, Delaware  19806
        For the Plaintiff
     MEGAN SANFRANCESCO, FIRST ASSISTANT COUNTY
                                  ATTORNEY
        New Castle County Law Department
        87 Reads Way
        New Castle, Delaware  19720
        For the Defendants

ALSO PRESENT:  Jeffrey D. Hill and Mark Hitch


            WILCOX & FETZER
 1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477
               www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



Quinton L. Watson

2

1          QUINTON L. WATSON, the deponent

2    herein, having first been duly sworn on oath, was

3    examined and testified as follows:

4    BY MR. WILSON:

5        Q.  Good afternoon, Captain Watson.  Would

6    you like me to go through the instructions again?

7        A.  Not really.  I sat through them twice

8    already.

9        Q.  We are going to start off the same way.

10   What did you do to prepare for today's

11   deposition?

12       A.  I met with Megan Sanfrancesco.

13       Q.  Anything else?

14       A.  No.

15       Q.  Did you review any documents?

16       A.  I reviewed some Interrogatories that were

17   presented to me.

18       Q.  Were those Interrogatories that we sent

19   to you?

20       A.  I assume so, yes.

21       Q.  Did you review Corporal Hill's deposition

22   transcript?

23       A.  No.

24       Q.  But you were here at his deposition,

3

```
 1     correct?

 2         A.   No -- oh, yes, I was.

 3               MS. SANFRANCESCO:   To clarify for the

 4     record I don't think he was here for the whole

 5     deposition, were you?

 6               THE WITNESS:   Not for the whole

 7     deposition.

 8               MR. WILSON:   Yeah, I think he was

 9     here for part.

10               THE WITNESS:   For the first half, I

11     believe.

12     BY MR. WILSON:

13         Q.   Have you talked to anybody about this

14     lawsuit, not necessarily in preparation for the

15     deposition, but just in general?

16         A.   Yes.

17         Q.   Who have you talked to?

18         A.   Captain Hitch.  I think I talked to my

19     wife, Lieutenant McLaren.  That's about it.

20         Q.   And what did you and Captain Hitch talk

21     about?

22         A.   Basically just talked about being

23     surprised that we were being sued in reference to

24     a personnel move.
```

Quinton L. Watson

4

1    Q.  What about Lieutenant Colonel McLaren,

2    what did you guys talk about?

3    A.  Same thing, I guess venting to him in

4    regards to defending the lawsuit, in regards to

5    personnel transfer.

6    Q.  Did he ask you what the lawsuit was

7    about?

8    A.  I just said that Jeff Hill lawsuit, but

9    he pretty much knew the substance of that I guess

10   from the grievance hearings.

11   Q.  Did you talk to Sergeant Hyden about it?

12   A.  Not about it per se, but the fact of the

13   matter is that I was included in the lawsuit

14   because initially I wasn't and then I was.

15   Q.  And where were you born, sir?

16   A.  Wilmington, Delaware.

17   Q.  And what is your date of birth?

18   A.  12/5/63.

19   Q.  Ever been arrested?

20   A.  No.

21   Q.  Serve in the military?

22   A.  Yes.

23   Q.  When did you serve in the military?

24   A.  From 1982 until 1985.

Quinton L. Watson

5

```
 1        Q.   And what branch?

 2        A.   United States Marine Corps.

 3        Q.   And what was the final rank you achieved?

 4        A.   I actually got promoted to sergeant, but

 5   I left as a corporal.  I'll explain to you.  I

 6   took the test for sergeant.  When they learned

 7   that I wasn't going to reenlist they decided not

 8   to give me the rank because they wanted to give

 9   it to someone else.  So, I left there as a

10   corporal.

11        Q.   Did you go to college?

12        A.   Yes.

13        Q.   Where did you go?

14        A.   Del Tech.

15        Q.   And did you graduate?

16        A.   No.

17        Q.   What was your major?

18        A.   Criminal justice.

19        Q.   Are you still taking courses?

20        A.   Off and on, yes.

21        Q.   And your present job title is captain?

22        A.   Yeah, captain of the patrol division.

23        Q.   And how long have you held that title?

24        A.   Since September 2nd of 2007.
```



Quinton L. Watson

6

1    Q.  And just prior to that was that when you

2    were in charge of the mounted unit?

3    A.  Yeah, part of that time I was a commander

4    of the criminal investigation unit and for a

5    portion of that time I had the mounted unit under

6    me.

7    Q.  And once you assumed command of the

8    mounted unit or whatever it was called when you

9    were over the mounted unit did you learn about

10   this situation with Corporal Hill?

11   A.  Yes.

12   Q.  How did you learn about it?

13   A.  I think Captain Hitch informed me of an

14   ongoing issue with Corporal Hill.

15   Q.  Did he mention anything about Sergeant

16   Hyden?

17   A.  Yeah, the fact of the matter is there was

18   some personnel issues between Sergeant Hyden and

19   Corporal Hill.

20   Q.  By personnel issues do you mean

21   personality issues?

22   A.  No.  Just like performance-based issues,

23   Jeff not at times performing up to standards that

24   are set out for the mounted unit.



1      Q.   What standards?

2      A.   I guess teamwork, helping out,

3   statistical numbers, stuff like that.

4      Q.   Are there statistical numbers that they

5   have to achieve?

6      A.   No, but I guess what it is is she expects

7   a level of performance out of the officers.  They

8   are a unit that when they're assigned different

9   assignments especially in high profile

10  communities it is almost like a zero tolerance

11  thing.  They're put there for a specific reason.

12  They're not put there to warn people.  They're

13  putt there because there is a problem.  I guess

14  you would say your discretion is pretty much

15  limited as to just warning people, more so

16  enforcing traffic stuff, loitering, all kinds of

17  stuff, you know, whatever, zero tolerance.

18     Q.   Is it within Sergeant Hyden's authority

19  to impose statistical measures on police

20  officers?

21     A.   She is charged with the responsibility of

22  ensuring that the unit is producing and

23  performing up to standards.  So, pretty much she

24  has more of a leeway because she is a sergeant in

8

1      charge of that unit.  She doesn't pass any

2      statistical requirements on to us like this is

3      what my unit has to do.  So, it's pretty much

4      left up to her.

5          Q.  Did you participate in the decision to

6      transfer Corporal Hill?

7          A.  Yes.

8          Q.  And what was the reason for transferring

9      him?

10         A.  There was a multitude of reasons.  Some

11     of it was that his continued lack of performance

12     to a certain level.  There were some issues with

13     him having respect for Sergeant Hyden's

14     authority.  Just generally a lot of those issues

15     there.

16         Q.  Did you ever consider Sergeant Hyden's

17     respect for Corporal Hill?

18         A.  No.

19         Q.  Are commanding officers such as sergeants

20     that are over a unit are they required to respect

21     officers underneath them?

22         A.  Yes.

23         Q.  Did you ever speak to Sergeant Hyden

24     regarding Corporal Hill's transfer?

Quinton L. Watson

9

1     A.   Yes.

2     Q.   And what did she say to you?

3     A.   I had said to her that we were

4  contemplating moving Jeff out of the unit and I

5  just wanted to make her aware of that.

6     Q.   How did she respond?

7     A.   I don't recall exactly what she said, but

8  it was more so me doing the talking in reference

9  to us making a decision to move him out of the

10  unit.  I think we started talking about other

11  members she would like possibly to bring back

12  into the unit.

13    Q.   Did you get the indication she approved

14  of having Corporal Hill transferred out?

15    A.   I don't know if you would say approved.

16  She gave no indication one way or the other if I

17  can say that.  She didn't say, Well, why are you

18  doing that?  Or, You shouldn't do that.

19    Q.   Now, Captain Hitch testified that he was

20  unaware of the under the desk comment.  Were you

21  aware of this comment?

22    A.   Yes.

23    Q.   Did you investigate this comment?

24    A.   Yes.

Quinton L. Watson

10

1    Q.  And what did you find?

2    A.  I found from speaking to Sergeant Hyden

3    that she advised me after I mentioned to her

4    about the comment that she didn't recall making

5    that comment.

6    Q.  Did she ever deny making it?

7    A.  No.  She used those words I don't recall

8    making that comment.

9    Q.  Did you ever make a finding one way or

10   the other whether she made the comment?

11   A.  No, because I was given specific

12   instructions in regards to looking into that.

13   Q.  I'm not sure I understand.

14   A.  If I can start by telling you how I got

15   involved with that.

16   Q.  Okay.

17   A.  Lieutenant Colonel McLaren who was the

18   acting chief at the time came into my office one

19   afternoon and I guess it was after a grievance

20   step hearing in the Hill case and he informed me

21   that apparently there was an issue that came up

22   during the grievance in regards to Jeff saying

23   that Nicole had made a comment about him going

24   under Captain Setting's desk.  Lieutenant Colonel

11

1    then said that I need you to ask Nicole if she

2    remembers making that statement.  I then said to

3    him, Okay, but what do you want me to do after

4    that?  You want me to give you a memo form of

5    what her reply is?  No, just let me know what she

6    said.  I said okay.

7              She needed to sit down, I called her

8    over to the stables and I told her the reason why

9    I was calling and I asked her do you recall

10   making that statement to Jeff Hill?  She at that

11   time told me, no, she didn't recall making that

12   statement.  I said, Are you sure?  Yes, I don't

13   recall making a statement like that.  I then went

14   over and knocked on Lieutenant Colonel's door.  I

15   said to him, I just got done talking to Nicole

16   and she doesn't recall making that statement.  Do

17   you need me to do anything else?  He said, No.

18   That was the end of my involvement at that point

19   in that whole issue.

20   Q.   Did you have some subsequent involvement?

21   A.   Yes.

22   Q.   Can you tell me what that was?

23   A.   About three weeks later I had just got

24   home from work and I got a phone call and it was

12

1    Sergeant Hyden.  She told me she had a discussion

2    with Officers Brown and Guiton in regards to the

3    statement, the issue that I talked to her about a

4    few weeks ago.  She says that she learned during

5    that conversation that Brown and Guiton did, in

6    fact, recall her making that statement to

7    Corporal Hill.  She says, I still don't remember

8    making that statement, but I trust Brown and

9    Guiton and if they said I made it, I must have

10   made it, but I still don't recall it.

11                I said to her, Okay, Nicole, I'll

12   pass it on to Lieutenant Colonel tomorrow.  Next

13   day I saw Lieutenant Colonel and let him know

14   about the conversation that I had with Sergeant

15   Hyden evening before and he said, Okay, and that

16   was the end of my involvement with that.

17       Q.   Was Sergeant Hyden disciplined for making

18   the comment?

19       A.   I don't believe so.

20       Q.   Do you believe that a sergeant who makes

21   a comment like that should be disciplined?

22       A.   I believe, yes, if it offends the

23   recipient, yes.

24       Q.   Did you ever talk to Corporal Hill about

Quinton L. Watson

13

1    the comment?

2        A.   No.

3        Q.   So, you never found out if he was

4    offended by it?

5        A.   No.

6        Q.   Were you the person that decided to

7    replace Corporal Hill with Corporal Williams?

8        A.   Yes.

9        Q.   What did you base that decision on?

10       A.   I based it on the fact that Rosemarie was

11   actually the last officer that came out of

12   mounted.  So, I looked at that that she is

13   probably not that rusty.  I know that Corporal

14   Berg had came out of there, but Corporal Berg

15   actually his position was a parks officer and

16   when he was a parks officer he had gotten cross

17   training in riding horses.  So, technically he

18   wasn't a mounted officer in a sense full-time.

19   So, I was looking at someone that had been in

20   mounted full-time.

21            So, I know the discussion came up

22   when I was talking to Sergeant Hyden that she had

23   wanted Corporal Berg back in the unit and I kind

24   of didn't want to do that because I was more

Quinton L. Watson

14

1    concerned about how that would look to the rank

2    and file.  What I mean by that is you have a guy

3    that just got transferred out of the parks unit,

4    he is already back on the street and now all of a

5    sudden you guys are going to slide him back into

6    the mounted unit.  And that's just me, that was

7    my concern, I didn't want to leave that

8    appearance.

9        Q.  I don't understand what the appearance

10   is.

11       A.  The appearance is the fact that usually

12   when we bring somebody out of a unit we usually

13   post for that position.  We usually post

14   department Y open for this position.  In this

15   case we weren't posting for that position.  We

16   were just putting someone in there temporarily.

17   I didn't want anybody thinking we were just going

18   to slide Berg in there without opening it to

19   everybody else.  So, I just didn't want to go for

20   that.

21              I know Phil Davis' name came up.  I

22   didn't want to go with his name.  There was an

23   issue a while back way back with Phil Davis and a

24   horse.  I just wanted to stay away from that.  He

15

1    is a good officer, but I just wanted to stay away

2    from that.  Ed Sommers' name came up.  When I was

3    a risk manager with the department when I was

4    over top of HR I knew that Ed had a severe back

5    injury and it was almost to the point where it

6    was career ending-type of injury.  He came back,

7    but I just didn't want to touch that because he

8    could probably get thrown off a horse, jumping up

9    -- hopping up and down on a horse, no, I said

10   let's not look at that issue.

11           So, I looked at Rosemarie.  I

12   remember Rosemarie from when I was a lieutenant

13   on patrol squad C, she was an officer on that

14   squad.  She always performed real good, never had

15   an issue with her, she always had that can-do

16   attitude.  She just left the unit and I said,

17   Hey, why don't we put her back in there

18   temporarily?

19           I then went to the Lieutenant Colonel

20   with my recommendation.  He had no issue with it,

21   but he said to me make sure she understands this

22   is a temporary position, just fill it for the

23   summer so we can get through the summer.  In the

24   fall we are going to post it department-wide and

1    bring somebody else in.

2              I called Corporal Williams and spoke

3    to her about an addition.  I didn't say it was a

4    vacancy, I said addition because I didn't want

5    her to know that.  I said it's an addition.  We

6    are thinking about beefing up mounted for the

7    summer.  Would you be interested in coming back

8    on a temporary basis?  She said, I would love to

9    come back.  I said, You understand now that the

10   end of the summer you are going to go back to

11   your patrol squad.  We are just going to fill it

12   for right now.  She said, I don't have any

13   problem with that.

14             I went back and told the Lieutenant

15   Colonel and said I did go over and made sure she

16   understood it was only temporary and that we were

17   posting it in September and he said okay and so

18   we did.

19   Q.   Was the job eventually posted?

20   A.   No.

21   Q.   Why not?

22   A.   In the interim before the end of the

23   summer we formed what is called a special

24   operations division and that was taking different

17

1   entities from the building and putting them under

2   one command. The commander at that time was

3   Captain Setting so mounted was taken from me and

4   put under his command. I explained to Captain

5   Setting that we had Rosemarie in there for the

6   summer and told her she would be coming out in

7   the fall. He said, Okay, okay, no problem. I

8   left it at that. The fall came around and she

9   didn't come out at all.

10      Q.   That wasn't your decision?

11      A.   That wasn't my decision.

12      Q.   Corporal Williams had just come out of

13  mounted I think you said?

14      A.   Yeah, and what I meant by that just come

15  out being the one that I remember recently coming

16  out the shortest period of time and I think I

17  want to say probably in about two years she had

18  been out.

19      Q.   Why did she leave the mounted unit?

20      A.   I believe at the time it was just they

21  were rotating people. Sometimes they do that

22  when they want to bring in new people and rotate

23  some older people out of the unit so they will do

24  that from time to time, but I wasn't there when

Quinton L. Watson

18

1    they rotated her out so I don't know exactly the

2    reason why.

3        Q.   And she was rotated into patrol?

4        A.   Yes.

5        Q.   The same division Corporal Hill was put

6    into?

7        A.   Yes, yes.  Actually, the same squad.

8        Q.   When you made the decision to transfer

9    Corporal Hill, did you ever consider that

10   Sergeant Hyden might be part of the problem?

11       A.   No.

12       Q.   Why not?

13       A.   I had gotten no indication at all that

14   she was part of the problem.  From my standpoint

15   as being her supervisor she had been running the

16   unit effectively.  I had no issues with her

17   knowledge of horses, the needs, and also her

18   ability to supervise the officers there.  So,

19   like I said, my door is open one way or the other

20   and if anybody had any issues they could come to

21   me.  There was never an issue with that.  No one

22   came to me and told me any complaints about

23   Sergeant Hyden.

24       Q.   You knew Corporal Hill had made

19

1    complaints about Sergeant Hyden, right?

2        A.    In the past with other commanders or

3    whatever, but not with me.

4        Q.    That did not raise any red flags to you

5    that they had problems before and now all of a

6    sudden she is coming to you with problems between

7    Corporal Hill again?

8        A.    No, because my issue with that is that

9    if, in fact, the sergeant did what she was

10   supposed to do and if the officer had any issues

11   they could come to me also.  It's not one of

12   those things where you don't come to me and

13   especially in our chain of command if you are

14   having problems with your immediate supervisor

15   you are allowed to go around that supervisor to

16   the next supervisor above them.  Corporal Hill

17   never came to me with any issues about Sergeant

18   Hyden at all.

19       Q.    Were you aware of the clean slate

20   meeting?

21       A.    I was aware of a meeting held between

22   Sergeant Hyden and Captain Hitch and Jeff Hill,

23   but I don't know if they characterized it to me

24   as a clean slate.

Quinton L. Watson

20

1       Q.   Did you have an understanding that the

2   parties were going to start new from that point

3   forward?

4       A.   Yes.

5       Q.   And it didn't raise any red flags with

6   you that about a month later Sergeant Hyden is

7   complaining again?

8               MS. SANFRANCESCO:   Objection.

9       A.   No, it didn't raise any red flags for me.

10  Just the fact that obviously it's not starting

11  off again the right way.

12      Q.   Did you ever consider that maybe Corporal

13  Hill didn't complain because he thought it wasn't

14  a clean slate?

15      A.   No, never thought that.

16      Q.   How long were you in charge -- I keep

17  saying the mounted unit, I know you were in

18  charge of other things, but when the mounted unit

19  was under you?

20      A.   I came back into -- I took over the

21  criminal investigation unit I think it was in

22  February of '06.  At that time I think I took the

23  mounted then from Captain Hitch because he had it

24  and, I don't know, somewhere probably before the

21

1  end of that summer it was moved into special

2  operations I believe.  Maybe it went around to

3  the following year and then it was taken from me

4  -- I mean, removed from my command.  I don't want

5  to use a negative word, taken from me.

6     Q.  In our complaint we state that when you

7  and Captain Hitch called Corporal Hill in to

8  inform him of the transfer that he was not given

9  a reason for the transfer and that statement was

10  denied.  Did you give him a reason that he was

11  being transferred?

12     A.  Absolutely.

13     Q.  What did you tell him?

14     A.  We told him it was based on performance

15  issues and we also talked about him not -- and I

16  know I specifically talked to him about not

17  respecting the authority of Sergeant Hyden and I

18  just couldn't, me personally, I couldn't tolerate

19  that.

20     Q.  Did you identify what the performance

21  issues were?

22     A.  They had been outlined before.  Like I

23  said, myself and Captain Hitch were talking to

24  him and it was good both of us were in there

22

1    because it kept a kind of continuity to some of

2    the issues.  So, some of his performance around

3    the stables, his reports and stuff like that, all

4    that kind of activities.

5              My focus pretty much was on the fact

6    that he still in my opinion was not submitting to

7    the rank above him and what that is is Sergeant

8    Hyden's rank and pretty much for me is when the

9    supervisor tells you to do something or tasks you

10   with something, if is not illegal, unethical or

11   immoral, you are supposed to do.  If you don't do

12   it, you not only have an issue with her, but you

13   have an issue with me because she was in charge

14   of that unit and she works under me so,

15   therefore, it's an issue.  So, I can't stand for

16   that in any of the units that I have ever run.

17   Q.  Do you have specific examples of things

18   she asked him to do?

19   A.  I'll give you two examples.  One of them

20   was the anniversary -- I think it was the mounted

21   unit's 25th anniversary.  I think Jeff was tasked

22   with the assignment of a challenge coin, they

23   wanted to get a challenge coin made for this

24   event, and I guess they wanted to hand it out to

1    some different people or whatever and he was

2    given some instructions on a vendor to use for

3    this.

4                  I heard from her a few times where it

5    seemed like Jeff was dragging his feet a little

6    bit with the process and then he actually went on

7    and got in contact with another vendor, which is

8    not what Sergeant Hyden had instructed him to do.

9    Again, just seemed like he was off trying to do

10   his own thing and not listening to what the

11   supervisor told him to do.

12                 Another issue, again, showing his

13   lack of respect for authority was an issue I

14   remember when she called me and was asking had I

15   seen Jeff?  I said to her, I said, I just saw

16   Jeff about ten minutes ago in the copy room with

17   Lieutenant Schreiber, they were talking when I

18   walked past there.  She then said, Oh, really?

19   He is supposed to be at the stables here helping

20   tack up the horses for the day's assignment.

21                 Again, that's another issue and the

22   stables are probably around ten, eleven miles

23   away from our main headquarters.  For you to

24   actually leave the stables and come across town

1    I'm thinking if it's during the daytime I think

2    you might want to let the sergeant know if they

3    think you are outside and not gone all the way

4    across town.  Why is that?  I don't know.  You

5    ask your client.  I'm thinking that you must have

6    no disregard for your supervisor and just going

7    to do what you want to do.  I can't have that.

8        Q.  Did you ask him why he wasn't at the

9    stables?

10       A.  I didn't need to.  I left it to Nicole.

11   I told Nicole that I just saw him ten minutes

12   ago.  He is not there now obviously because I

13   just came back down the hall and I didn't see

14   him.  So, I'm assuming she addressed the issue

15   with him once I told her I saw him at the

16   building.

17       Q.  At this meeting when you were informing

18   him of the transfer did he ask you if this had

19   anything to do with the complaint that he made

20   against Sergeant Hyden?

21       A.  Yes.

22       Q.  And what was your response?

23       A.  I told him no on two occasions on that

24   meeting because he brought it up twice in that

25

1    meeting and both times I told him it was not and

2    I know that Captain Hitch also said the same

3    thing because we were in the meeting together.  I

4    think his whole reply is this is so wrong on so

5    many levels.

6    Q.  With that statement did you believe that

7    he thought that it was because he made the

8    complaint?

9    A.  I'm assuming because I had to say it to

10    him twice in there that it wasn't.  So, I'm

11    assuming he may have thought it was.

12    MR. WILSON:  Again, let me talk to

13    Jeff and we should be able to wind it up well

14    before five o'clock.

15    (Brief recess.)

16    BY MR. WILSON:

17    Q.  The issue with the coin, Corporal Hill

18    completed that task, correct?

19    A.  Yes.

20    Q.  Are you aware that Corporal Hill spoke to

21    Sergeant Hyden about using a local vendor and she

22    approved it?

23    A.  No.

24    Q.  If a police officer ignores an order from



1    a superior, is that something that warrants

2    discipline?

3        A.   Are you talking about a direct order or

4    instructions?  What are you talking about?

5        Q.   Tell me what the difference is.

6        A.   Well, usually if you are given an order

7    it's me telling you directly that I want you to

8    do something, but, if I ask you to do something,

9    that's a little different, it's not as strong;

10   but, if I ask you to do something and you don't

11   do it and then I come back to you and say I'm

12   ordering you now to do it, see what I'm saying,

13   now it has gotten a little more serious and more

14   official.  That's the difference.  It would all

15   depend on what it was.

16       Q.   The vendor thing did you view that as an

17   order or an instruction?

18       A.   I viewed it as an instruction.  Everybody

19   was given tasks so I viewed it as her giving him

20   instructions on how she wanted the whole coin

21   thing to go.

22       Q.   The issue with Jeff not being where he

23   was supposed to do don't all police officers

24   carry cell phones?

Quinton L. Watson

27

```
 1        A.   No.   Some do, some don't.

 2        Q.  Do you know if Corporal Hill carried a

 3   cell phone?

 4        A.  I don't have that personal knowledge.   It

 5   wasn't anything the department assigned to him.

 6   So, if it is, it's a personal.

 7        Q.  Did Sergeant Hyden state why she was

 8   calling you to look for Corporal Hill?

 9        A.  She was asking me if I seen him.  I don't

10   know if she thought possibly he may have been at

11   the building, but she was calling me to ask have

12   I seen him around.

13        Q.  Did she ever call you looking for any of

14   the other people that worked for her?

15        A.  Not that I recall.

16        Q.  So, it was just this one time?

17        A.  Right.

18        Q.  By virtue of him not being at the stables

19   how did you view that as his disobeying an order

20   or an instruction?

21        A.  I view it this way.  During the workday

22   the supervisor of a specific unit or squad is

23   charged with the accountability of an employee.

24   If I come to you and I ask you where Jeff is you
```

Quinton L. Watson

28

1    should be able to tell me where he is at.  If he

2    is in court that day, he is on vacation that day,

3    if he is down in a development working, you

4    should know.  You shouldn't throw your hands up

5    and say I don't know because then I'm having an

6    issue with you.  He works for you and you don't

7    know where he is at.

8              So, accountability is important not

9    only in the mounted unit, but everywhere.  If

10   anybody came to me and asked me where is so and

11   so I should be able to tell them where so and so

12   is.  Off-duty that's different, but on-duty,

13   yeah.

14   Q.  Did it strike you as odd that she was

15   calling you looking for Corporal Hill?

16   A.  No.  I just took it as maybe seeing if he

17   was over the building and if I had seen him.

18   That's what I took it as.

19   Q.  Why wasn't Corporal Hill disciplined

20   somehow instead of transferring?

21   A.  Why wasn't he disciplined instead of

22   transferring him?

23   Q.  Yes.

24   A.  That's just not the method I would have

1    suggested or even brought up.  My thing is in

2    essence is that he is in a specialized unit.

3    There is a lot required with anybody in a

4    specialized unit.  Our thing is to make sure we

5    have a cohesive group that works as a team.  If

6    that's not working out, maybe look at maybe

7    making some changes.  We don't look at right away

8    going in and disciplining him.  We look at making

9    some changes.

10          Maybe he is not the right fit in

11   there, maybe some things have changed, maybe we

12   need to get some fresh people in here and send

13   this officer back to the street.  So, never

14   crossed my mind to discipline him.  It just means

15   obviously we may need to make a change here.

16       Q.   Did you know how long Corporal Hill had

17   worked in the mounted unit?

18       A.   No.

19       Q.   Did you look in to see if there had been

20   any other past issues with regard to his

21   performance?

22       A.   No, other than what I've heard from

23   Captain Hitch and the investigation and memos and

24   all that kind of stuff, yeah, that's about it.

30

1    Q.  With regard to the under the desk comment

2    were you instructed to investigate that?

3    A.  I was instructed by Lieutenant Colonel

4    McLaren to ask Sergeant Hyden whether she made

5    the comment or not.

6    Q.  So, you weren't instructed to investigate

7    it, just ask her about it?

8    A.  Yes.

9         MS. SANFRANCESCO:  I object.

10   A.  I did exactly what I was instructed to do

11   and that was to ask her if she made the comment

12   or not.

13   Q.  Did you think that an issue like that

14   warranted any further investigation?

15   A.  Honestly I don't know.  I mean, it's one

16   of those things if it had just happened then

17   obviously a whole different realm of things would

18   have happened.  You would do your proper

19   investigation and all that.  If it came up in a

20   grievance possibly a year, year and a half after

21   it was allegedly happened and my boss just told

22   me to ask her, I did exactly what my boss told

23   me, asked her.

24   Q.  Because of the passage of time it was not

1    as serious as it would have been if it had been

2    reported to you right away?

3        A.   Just my opinion, you are asking me my

4    opinion?

5        Q.   Yes, sir.

6        A.   Yes, because if that statement offended

7    you right then and there when it happened it

8    would have brought it up.  A year and a half

9    later, two years later, I don't know if it

10   offended you that much at that point to bring it

11   up and especially in a grievance hearing.  So,

12   when you ask me to ask Sergeant Hyden I did

13   exactly what he asked of me and I asked her.

14                MR. WILSON:  That's it.

15                MS. SANFRANCESCO:  No questions.

16                (The deposition was concluded at 2:51

17   p.m.)

18                   I N D E X

19   DEPONENT:  Quinton L. Watson          PAGE

20       Examination by Mr. Wilson            2

21                E X H I B I T S

22     (No exhibits marked for identification.)

23   ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 31

24   CERTIFICATE OF REPORTER                PAGE 32

