*Jeffrey D. Hill v. New Castle County, et al.*
C. A. No. 07-228 (GMS)
Plaintiff's Answering Brief In Opposition Of Defendants' Motion For Summary Judgment

# APPENDIX L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JEFFREY D. HILL,                    )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )   Civil Action
                                    )No. 07-228 (GMS)
                                    )
NEW CASTLE COUNTY POLICE            )
DEPARTMENT, a division of New       )
Castle County; and NEW CASTLE       )
COUNTY, a municipal corporation,)
                                    )
        Defendants.                 )

            Deposition of MARK HITCH taken
pursuant to notice at the New Castle County Law
Department, 87 Reads Way, New Castle, Delaware,
beginning at 1:22 p.m. on Monday, June 30, 2008,
before Christina M. Vitale, Certified Court
Reporter and Notary Public.

APPEARANCES:
        TIMOTHY J. WILSON, ESQUIRE
        MARTIN & WILSON
         1508 Pennsylvania Avenue
         Wilmington, Delaware  19806
         For the Plaintiff
        MEGAN SANFRANCESCO, FIRST ASSISTANT COUNTY
                                    ATTORNEY
         New Castle County Law Department
         87 Reads Way
         New Castle, Delaware  19720
         For the Defendants

ALSO PRESENT: Jeffrey D. Hill and Quinton L.
              Watson

            WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



Mark Hitch

2

1              MARK HITCH, the deponent herein,

2      having first been duly sworn on oath, was

3      examined and testified as follows:

4      BY MR. WILSON:

5         Q.  Good afternoon, Captain Hitch, I'm Tim

6      Wilson.

7         A.  Yes, sir.

8         Q.  Did you hear the instructions I gave

9      Sergeant Hyden?

10        A.  I did.

11        Q.  Would you like me to go over them

12     again --

13        A.  No, sir.

14        Q.  -- or do you recall?  That will save us a

15     little bit of time.  What did you do to prepare

16     for today's deposition?

17        A.  Met with Ms. Sanfrancesco.

18        Q.  Did you review any documents?

19        A.  No, sir.

20        Q.  Did you review Corporal Hill's deposition

21     transcript?

22        A.  I don't have his transcript.

23        Q.  At any time?

24        A.  No.

Mark Hitch

3

1    Q.   Did you talk to anybody other than Ms.

2    Sanfrancesco to prepare for this deposition?

3    A.   No, sir.

4    Q.   The next questions I will ask you don't

5    have to do with preparing for the deposition, but

6    have you talked to anybody about this lawsuit?

7    A.   Yes, sir.

8    Q.   Who have you talked to?

9    A.   Whew, my wife, I've talked to a couple

10   friends of mine, just general -- honest, just

11   general frustration, I can't believe I'm being

12   sued over this.

13   Q.   Have you talked to Captain Watson about

14   the lawsuit?

15   A.   Yes, sir.

16   Q.   What did you guys discuss?

17   A.   Generally the same thing.  Just kind of

18   in awe of being sued over a transfer.

19   Q.   Have you talked to Sergeant Hyden about

20   the lawsuit?

21   A.   Probably only consistent with what she

22   said in passing, Did you get your notice for

23   deposition?

24   Q.   Did you discuss the allegations in the



WILCOX & FETZER LTD.
Registered Professional Reporters

Mark Hitch

4

1    complaint with Sergeant Hyden?

2        A.  No, sir.

3            MR. WILSON:  And, again, I just want

4    to get some background information and the

5    previous stipulation of whatever it was we talked

6    about, personal information, is fine and won't be

7    shared with anybody.

8            MS. SANFRANCESCO:  Well, I mean, we

9    are going to keep their address as the county's

10   address and I'll be the person to contact in case

11   they're not here anymore and you can't contact

12   them.

13   BY MR. WILSON:

14       Q.  Sir, where were you born?

15       A.  Salisbury, Maryland.

16       Q.  What is your birth date?

17       A.  April 29, 1965.

18       Q.  Have you ever been arrested?

19       A.  No, sir.

20       Q.  Did you serve in the military?

21       A.  No, sir.

22       Q.  Have you ever been involved in any type

23   of civil legal proceeding?  Have you ever been

24   named as a party in a civil legal proceeding?

Mark Hitch

5

1    A.   No, sir.

2    Q.   Witness?

3    A.   Yes, sir, I'm sure.  I can't remember

4    specifically.

5    Q.   So, you don't specifically recall what

6    the case was?

7    A.   May have been and I'm not sure if it was

8    a deposition for a lawsuit or it was a labor --

9    OSHA board type thing is what is flashing in my

10   mind, investigation on that, but I don't think

11   so, sir.

12   Q.   Did you go to college?

13   A.   Yes, sir.

14   Q.   Where did you go?

15   A.   University of Delaware.

16   Q.   Did you graduate?

17   A.   I did, sir.

18   Q.   What year?

19   A.   1989.

20   Q.   And what is your degree in?

21   A.   BS in criminal justice.

22   Q.   Did you graduate with honors?

23   A.   No, sir.

24   Q.   Have you done any graduate work?

Mark Hitch

6

1    A.   No, sir.

2    Q.   And you are presently employed by New

3    Castle County, correct?

4    A.   Yes.

5    Q.   What is your job title?

6    A.   I'm a police captain.

7    Q.   How long have you been a police captain?

8    A.   A little over eight years.

9    Q.   And what department do you work in?

10   A.   Department?

11   Q.   There is no department?

12   A.   You don't mean the New Castle County

13   police, you mean my specific section?

14   Q.   Yes.

15   A.   I am the commander of the criminal

16   investigation section.

17   Q.   How long have you been in that position?

18   A.   Since early September of last year.

19   Q.   And where had you worked before that?

20   A.   Prior to that I was patrol commander.

21   Q.   And was that when you had the mounted

22   unit underneath you?

23   A.   You need more room to write this.

24   Q.   Okay.

Mark Hitch

7

1        A.    I was patrol commander and I don't

2   remember specific dates, but at the point I had

3   the mounted unit under me.  I was the criminal

4   investigation section commander at this time as

5   well.  I've been in -- since I've been a captain

6   to put it in retrospect I've been human resources

7   section commander, I've been the criminal

8   investigation section commander, I've been patrol

9   section commander twice and this is my second

10  tour as the criminal investigation section

11  commander.  So, when I had the mounted unit it

12  was my first tour in the criminal investigation

13  section.

14      Q.    When you had the mounted unit that was

15  during the relevant time period of Corporal

16  Hill's complaint, correct?

17      A.    Actually, no.  The time period of the

18  actual complaints, the incidents that were

19  occurring, Captain Setting was the commander of

20  the unit.  I came in shortly after that.

21      Q.    Were you made aware immediately that

22  there were these issues going on between Corporal

23  Hill and Sergeant Hyden?

24      A.    I was made aware by Captain Setting that



Mark Hitch

8

1 there was a complaint made by Corporal Hill

2 regarding Sergeant Hyden.  That was actually

3 prior to me taking the command.

4  Q.  And this topic that we were talking about

5 earlier, the clean slate meeting, was that your

6 idea?

7  A.  Having the meeting?

8  Q.  Yes.

9  A.  Yes.

10  Q.  Did that occur shortly after you took

11 over?

12  A.  No.  That occurred probably four months

13 after I took over, but after I had concluded

14 investigating and looking into the complaint that

15 Corporal Hill made.

16  Q.  Was Corporal Hill a good employee of the

17 mounted unit?

18    MS. SANFRANCESCO:  I'm just going to

19 object to the phrase "good employee."

20 BY MR. WILSON:

21  Q.  Did Corporal Hill receive good

22 evaluations during your time while he was on the

23 mounted unit?

24  A.  I don't remember prior to this incident

Mark Hitch

9

1    reviewing his evaluations so I'm afraid to tell

2    you yes or no as far as evaluations go.

3        Q.   Did you get complaints about Corporal

4    Hill?

5        A.   No, sir.

6        Q.   Did Sergeant Hyden complain about

7    Corporal Hill?

8        A.   Prior to the complaint?  Well, see, the

9    problem is, sir, I knew about this incident when

10   I walked into the unit.  So, it wasn't a

11   situation where I had an opportunity to discuss

12   any employee performances good or bad with

13   Sergeant Hyden because I walked into this

14   complaint.  So, when I walked into the unit I

15   already had this complaint to deal with.  So, I

16   mean, it's kind of hard to --

17       Q.   Okay, I understand.  Now, Corporal Hill

18   filed the complaint before Sergeant Hyden brought

19   up any type of issues with Corporal Hill,

20   correct?

21       A.   Again, sir, because -- I'm not trying to

22   be difficult with this question, but she filed --

23   he filed the original or he made the original

24   verbal complaint to Captain Setting so I didn't

W&F

Mark Hitch

10

1    discuss Corporal Hill prior to that with Sergeant

2    Hyden.  So, she didn't have an opportunity to say

3    good or bad about Jeff at that point because I

4    walked into this complaint that he had already

5    made through Captain Setting.

6        Q.  Based upon your observations would you

7    say that Sergeant Hyden and Corporal Hoff are

8    friends?

9        A.  I don't know, sir.  I don't know.

10       Q.  If you don't know, that's fine.

11       A.  I just don't know.

12       Q.  Have you ever heard from any police

13   officers that Corporal Hoff receives more

14   favorable treatment from Sergeant Hyden than did

15   the other officers in the mounted unit?

16       A.  Corporal Hill.

17       Q.  Anybody else?

18       A.  I think Officer Guiton when I prodded him

19   with the question gave some indication that he

20   felt she was treated differently.

21       Q.  Do you remember what he said?

22       A.  I don't, sir.

23       Q.  Anybody else?

24       A.  No, sir.

Mark Hitch

11

1    Q.   The contest that is referred to in the

2    complaint did that occur while you were in

3    charge?

4    A.   I'm not sure exactly when that occurred,

5    sir.  I want to say no, I want to say it happened

6    prior to me being in charge, but I'm not sure

7    when that occurred other than hearing her say

8    April to whatever, March.

9    Q.   Are these type of contests held in any

10   other divisions?

11   A.   I mean, I don't know if formal contest is

12   how I would describe them, but I have heard of

13   units trying to motivate their officers by

14   putting some type of for lack of a better word

15   challenge out there to the officers to produce.

16   Q.   What is your understanding of the policy

17   of the acting sergeant when the regular sergeant

18   is away?  Let me rephrase that.  Is it your

19   understanding that the most senior officer should

20   be made acting sergeant?

21   A.   It's my understanding that the policy is

22   the most senior officer now.  Prior to that, as

23   Sergeant Hyden indicated, it was senior most

24   qualified.



Mark Hitch

12

Q.   The whole thing with the radar units you weren't in command at that time?

A.   No, sir.

Q.   Are you aware of Corporal Hill's allegation regarding Sergeant Hyden's comment about him being under Captain Setting's desk?

A.   I'm aware of the complaint, yes, sir.

Q.   Were you made aware of that comment when you were in charge of the mounted unit?

A.   No, sir.

Q.   When did you find out about that?

A.   When I read Corporal Hill's grievance.

Q.   Were you not in charge of the mounted unit when you read his grievance?

A.   No, sir, I believe the grievance was filed after Captain Watson had taken command of the mounted unit.

Q.   Why would you read the grievance if you were not in command?

A.   Because I was listed as part of that grievance, if I recall, sir.

Q.   Do you approve of statements like the one that was alleged?

A.   Do I approve of them?

Mark Hitch

13

1    Q.   Yes.

2    A.   Obviously as manager of the department my

3  answer is no.  As a manager on the department do

4  I believe they occur in certain situations and

5  there are complaints made about them, yes, I'm

6  aware of that too.  I think it's probably -- you

7  know, I met with Jeff several times prior to that

8  grievance and that statement was never brought to

9  my attention at any point until I read it in the

10  grievance.

11   Q.   Were you in charge of investigating this

12  grievance?

13   A.   The grievance?

14   Q.   Yes.

15   A.   I wasn't in charge of the grievance.  The

16  original complaint if you are talking about that?

17  I investigated that, yes.

18   Q.   What did you do to investigate that?

19   A.   I interviewed Jeff, Corporal Hill.  I

20  interviewed the other members of the mounted

21  unit.  I interviewed Sergeant Hyden.

22   Q.   Did you collect written statements from

23  anybody?

24   A.   No, not at that point.

Mark Hitch

14

1       Q.   You said not at that point, did you at

2   some point?

3       A.   Not related to that investigation, that

4   original investigation, no, sir.

5       Q.   Did you collect written statements from

6   people in regard to any issues surrounding the

7   problems between Sergeant Hyden and Corporal

8   Hill?

9       A.   Again, not in that original complaint,

10  which is what as far as what I'm thinking of as

11  the incident between Sergeant Hyden and Corporal

12  Hill was that original complaint that he made to

13  Captain Setting that I ended up having to pick up

14  and look into.  I didn't collect any written

15  documents today.

16      Q.   Did you ever collect any written

17  documents from anybody?

18      A.   Yes.

19      Q.   Who did you get them from?

20      A.   Sergeant Hyden, Officer Hennessy, Officer

21  Hoff, Officer Brown.

22      Q.   Did you request that these individuals

23  give you written statements?

24      A.   Yes.

Mark Hitch

15

1    Q.   Did you tell them what you wanted to be

2    in the statements?

3    A.   No, sir.

4    Q.   What were your instructions to these

5    people?

6    A.   They had indicated to me verbally

7    concerns over Corporal Hill's demeanor and

8    performance around the stables and essentially my

9    instructions were put it in writing.

10   Q.   And did this occur after the clean slate

11   meeting?

12   A.   Yes, sir, it did.

13   Q.   How long after the clean slate meeting?

14   A.   I would estimate approximately a month.

15   Q.   What prompted you to request these

16   statements?  Was it just their comments to you?

17   A.   Sergeant Hyden came to me and indicated

18   that some of the officers had expressed concerns

19   to her that after the meeting the end of January,

20   which you are referring to as the clean slate

21   meeting, Corporal Hill had initially done better

22   around the stables and on the street, but that

23   that had faded off and she expressed that these

24   other officers -- my recollection of that is she

Mark Hitch

16

1    essentially told me these other officers want to

2    talk to you.  So, I set up times for them to come

3    in and talk to me.

4        Q.  Would you say that when Sergeant Hyden

5    came to you with these complaints that Corporal

6    Hill was no longer on the clean slate?

7            MS. SANFRANCESCO:  I'm just going to

8    object to the term.  That was Sergeant Hyden's

9    term.

10   BY MR. WILSON:

11       Q.  Was the term "clean slate" used at the

12   meeting?

13       A.  Yes.

14       Q.  What did you interpret clean slate to

15   mean?

16       A.  That from that point on -- sir, this was

17   a three and a half hour meeting, which, to be

18   honest with you, I thought would last about an

19   hour, but they were both given ample opportunity

20   in my opinion to express their feelings and after

21   that my idea of clean slate was everybody was

22   going to go back out.  He was going to do what

23   was expected of him.  She was going to treat him

24   just like any other member of the unit and

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

Mark Hitch

17

1    starting fresh.

2        Q.   Is it your understanding that what had

3    happened in the past was to be left in the past

4    and not be drudged up any further?

5        A.   Yes, sir.

6        Q.   During this meeting were the parties

7    encouraged to speak freely?

8        A.   I feel that they were, yes, sir, and I

9    feel that they both did speak freely.

10       Q.   Was there any point in the meeting where

11   Sergeant Hyden pulled rank in essence saying, You

12   can't talk to me this way, I'm a sergeant?

13       A.   Not that I recall, sir, not that I

14   recall.

15       Q.   Was Sergeant Hyden angry during the

16   meeting?

17       A.   I don't remember anyone being angry

18   during the meeting.

19       Q.   After the meeting were you satisfied that

20   Sergeant Hyden's attitude towards Corporal Hill

21   would be that she was going to forget about

22   everything that had happened in the past?

23            MS. SANFRANCESCO:   Objection to the

24   extent it calls for speculation.



Mark Hitch

18

1    A.   It was my understanding -- yes, sir, it
2  was, but, again, I'm not sure that -- I'm not
3  convinced that she acted otherwise prior to that
4  meeting I guess is my point, is my concern, with
5  the question.
6    Q.   Who made the decision to transfer
7  Corporal Hill out of the mounted unit?
8    A.   All decisions for transfer, sir, are at
9  the authority of the chief of police.
10   Q.   Did anybody make any recommendations to
11 the chief of police?
12   A.   Yes, sir.
13   Q.   Who made the recommendations?
14   A.   Myself and Captain Watson.
15   Q.   And why did you make the recommendation?
16   A.   Because after speaking briefly with the
17 officers and reading their memos my personal
18 opinion was that Corporal Hill's general demeanor
19 around the stables, his alleged or reported lack
20 of motivation and production was -- had been
21 noticed and noted by the other members of the
22 unit and in my opinion at that point he hadn't
23 conformed or held up his end of the bargain from
24 the clean slate meeting that he was going to

Mark Hitch

19

1   improve his attitude, improve his work product,

2   and because of that it was affecting the morale

3   and general cohesiveness of that entire unit.

4           It's a small unit, they're together

5   all the time and the sense that I was getting is

6   some of those officers were just -- they were

7   uncomfortable being around Jeff at that point.

8       Q.  Did you ever consider that Sergeant

9   Hyden's actions may have been what prompted his

10  reverting back to -- because you stated at first

11  he had a good attitude and everything was going

12  fine and all of a sudden he kind of reverted back

13  to the way he was before.  Did you ever consider

14  that Sergeant Hyden might have had something to

15  do with that?

16      A.  No, sir.

17      Q.  Why not?

18      A.  Because I was never given any indication

19  that Sergeant Hyden's actions were in-

20  appropriate, that she had done anything in-

21  appropriate after that meeting.

22      Q.  Did you speak with Corporal Hill about

23  that?

24      A.  I did not.

Mark Hitch

20

1    Q.   Why not?

2    A.   As far as that question?

3    Q.   Yes.

4    A.   Because honestly Corporal Hill had felt

5    comfortable enough to come forward and make the

6    complaint about Sergeant Hyden's actions in his

7    opinion before.  If there were those actions or

8    some actions that were inappropriate, I felt

9    fairly certain he would come forward with them

10   again.  Additionally, in speaking with the other

11   three officers I spoke to there was no indication

12   that Sergeant Hyden's actions were in-

13   appropriate.

14   Q.   Were you ever concerned that transferring

15   Corporal Hill out of the unit after he had made

16   complaints about Sergeant Hyden would have legal

17   ramifications?

18   A.   No, sir.

19   Q.   Corporal Williams, were you the one that

20   made the decision to replace Corporal Hill with

21   Corporal Williams?

22   A.   No, sir, I wasn't.

23   Q.   Who made that decision?

24   A.   I have no idea.  That decision was made

Mark Hitch

21

1    after I was transferred from command of that

2    unit.

3        Q.   Had Sergeant Hyden ever mentioned

4    Corporal Williams to you as a potential

5    replacement?

6        A.   No, sir.  In fact, the only people I even

7    remember having replacement conversations -- I

8    don't know if it was replacement as much as it

9    was people she would like to see in the unit was

10   Corporal Berg and Corporal Davis and I think she

11   mentioned Corporal Sommers.  I don't remember her

12   mentioning Ed, I remember Phil and Joe because

13   they were classmates of mine; but, other than

14   that I do remember those two specifically.

15       Q.   Did Sergeant Hyden expressly request that

16   Corporal Hill be transferred out of the unit?

17       A.   No, sir.

18       Q.   Did she make any request that any type of

19   discipline be --

20       A.   No, sir.  She brought the concerns to my

21   attention.  She never said to me I want Jeff gone

22   or I recommend that Jeff be transferred.  She

23   never said the words.

24       Q.   Did she ever make an inference that she

Mark Hitch

22

1    wanted Jeff gone?

2        A.   Not that I could go back and point to.  I

3    think probably a lot of that was my opinion was

4    me jumping to the conclusion that she wanted

5    that, but I can't point to anything she said or

6    did that would say I wanted Jeff gone or that she

7    wanted Jeff to be transferred.  I probably

8    assumed a lot based on if I had been in that

9    position, if I had been in her position.

10       Q.   How is it decided where Corporal Hill

11   would be transferred to?

12       A.   Do you mean what section of the

13   department, sir?

14       Q.   Yes.

15       A.   Generally when officers are transferred

16   from an inside unit, although not always,

17   generally are transferred back to the street,

18   back to the patrol division.  As far as the

19   specific squad that Jeff was transferred to that

20   would have been the decision of Captain Watson I

21   think at that time.

22       Q.   Why do you say back to the patrol

23   division?

24       A.   Because we all started in the patrol

Mark Hitch

23

1    division, sir.

2        Q.   Everybody?

3        A.   When we graduate from police academy,

4    yes, sir.  When we are transferred into an inside

5    unit for the most part that's where all of us

6    come from.

7        Q.   Do police officers generally try to move

8    to an inside unit?

9             MS. SANFRANCESCO:  I object to the

10   extent it calls for speculation.

11       A.   My answer would be that a number do and a

12   number don't.  Some officers are completely happy

13   working the street.  Some look to go to other

14   areas of the department.

15       Q.   Do you know of any officer that has spent

16   his entire career in patrol?

17       A.   Off the top of my head I know of one.

18       Q.   Who is that?

19       A.   Corporal Mike Hopkins.  And I'm sure

20   there is a number of others, but that's -- again,

21   because Mike was in my academy class is why his

22   name pops to my mind.

23       Q.   When you were in patrol where did you

24   transfer to?



Mark Hitch

24

1    A.    Detectives.

2    Q.    Is that something you wanted?

3    A.    Yes, sir, it was.

4    Q.    Did you enjoy working in patrol?

5    A.    There were aspects, yes, sir, there were

6    aspects of patrol I enjoyed.

7    Q.    Were there aspects of patrol you didn't

8    enjoy?

9    A.    Just like any other job, just like when

10   you are with the detectives there are certain

11   things you did that you didn't enjoy doing, sure,

12   just like in any other position we held, but we

13   all became cops knowing we were very possibly

14   going to be in patrol for your entire career and

15   you accept that when you come into the police

16   department.

17   Q.    With regard to a complaint made by a

18   civilian employee to a civilian supervisor about

19   a police officer should that be reported to that

20   police officer's supervisor?

21   A.    Please ask me that again.

22   Q.    Okay.  We spoke earlier about the issue

23   with --

24   A.    And I'm not familiar with that.

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

Mark Hitch

25

1      Q.  -- the smiley face.  That's why I'm

2   trying to get the policy on it.  If a civilian

3   employee has a complaint about a police officer

4   and that civilian employee complains to his

5   supervisor should the police officer's supervisor

6   be notified of that complaint?

7      A.  I don't know what the civilian's

8   supervisor policies are on what they're supposed

9   to and not supposed to report so I couldn't

10  answer that.

11     Q.  This under the desk comment you said that

12  you didn't know about it while you were in charge

13  of the mounted unit?

14     A.  No, sir.

15     Q.  Was Captain Watson supposed to

16  investigate that allegation?

17     A.  I don't know who was supposed to

18  investigate it.

19         MR. WILSON:  If we can take a couple

20  minutes and I'll talk to Jeff, I'm almost done.

21         (Brief recess.)

22  BY MR. WILSON:

23     Q.  Going back to the memos that you got from

24  the other officers why did you just get memos

Mark Hitch

26

1  from Brown, Hoff, Hennessy and Hyden?

2  A. Because those were the specific officers

3  that it was indicated to me that they wanted to

4  talk to me.

5  Q. Don't you think that a complete

6  investigation you would speak to everybody and

7  get memos from everybody about it?

8  MS. SANFRANCESCO: Objection.

9  A. In retrospect, sir, I probably should

10  have gotten a memo from Officer Guiton as well.

11  Q. And you didn't even talk to Officer

12  Guiton about this?

13  A. No, no, sir.

14  Q. You have besides the mounted unit you

15  have been over Corporal Hill before, correct?

16  A. Honestly, sir, probably. Probably when I

17  was in patrol first time Jeff probably worked

18  under my command with several layers in between

19  us.

20  Q. Do you ever recall there being any issues

21  with Corporal Hill in terms of performance or

22  behavior?

23  A. I don't recall any.

24  Q. Have you heard of any problems with

Mark Hitch

27

1    Corporal Hill since he has been out of the

2    mounted unit?

3        A.   He has not worked for me, sir, but not to

4    my knowledge, not that I've heard.

5        Q.   How long was it after the clean slate

6    meeting did Sergeant Hyden come to you with her

7    complaints?

8        A.   I think it was a month, sir.

9        Q.   And she said that for a period of time

10   his behavior was better, his attitude was better?

11       A.   I think she indicated it was roughly a

12   week, sir.

13               MR. WILSON:   Okay, Captain, that's

14   all I have.   I appreciate your time.

15               (The deposition was concluded at 2:07

16   p.m.)

17                   I N D E X

18   DEPONENT:  Mark Hitch                    PAGE

19       Examination by Mr. Wilson                2

20

21               E X H I B I T S

     (No exhibits marked for identification.)

22

23   ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 28

24   CERTIFICATE OF REPORTER                PAGE 29

